# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

TRIBUNE COMPANY, et al.,[1]

Debtors.

Chapter 11
Case No. 08-13141 (KJC)
Jointly Administered

### POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF
### SECOND AMENDED JOINT PLAN OF REORGANIZATION FOR TRIBUNE COMPANY AND
### ITS SUBSIDIARIES PROPOSED BY THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED
### CREDITORS, OAKTREE CAPITAL MANAGEMENT, L.P., ANGELO, GORDON & CO., L.P.,
### AND JPMORGAN CHASE BANK, N.A. (AS MODIFIED APRIL 26, 2011)

SIDLEY AUSTIN LLP
James F. Conlan
Bryan Krakauer
Kevin T. Lantry
Jessica C.K. Boelter
One South Dearborn Street
Chicago, Illinois 60603
Telecopier: (312) 853-7036

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telecopier: (302) 652-3117

*Counsel for Debtors and Debtors in Possession and Certain Non-Debtor Affiliates*

CHADBOURNE & PARKE LLP
Howard Seife
David M. LeMay
30 Rockefeller Plaza
New York, New York 10112
Telecopier: (212) 541-5369

LANDIS RATH & COBB LLP
Adam G. Landis (No. 3407)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telecopier: (302) 467-4450

ZUCKERMAN SPAEDER LLP
Graeme W. Bush
James Sottile
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Telecopier: (202) 822-8106

*Counsel for the Official Committee of Unsecured Creditors*

DEWEY & LEBOEUF LLP
Bruce Bennett
James O. Johnston
Joshua M. Mester
333 South Grand Avenue, Suite 2600
Los Angeles, California 90071
Telecopier: (213) 621-6100

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Robert S. Brady (No. 2847)
M. Blake Cleary (No. 3614)
The Brandywine Building – 17th Floor
1000 West Street, Post Office Box 391
Wilmington, Delaware 19899 0391
Telecopier: (302) 571-1253

*Counsel for Oaktree Capital Management, L.P. and Angelo, Gordon & Co., L.P.*

WILMER CUTLER PICKERING HALE & DORR LLP
Andrew Goldman
399 Park Avenue
New York, New York 10022
Telecopier: (212) 230-8888

*Co-Counsel for Angelo, Gordon & Co, L.P.*

DAVIS POLK & WARDWELL LLP
Donald S. Bernstein
Damian S. Schaible
Elliot Moskowitz
450 Lexington Avenue
New York, New York 10017
Telecopier: (212) 701-5800

RICHARDS LAYTON & FINGER
Mark Collins (No. 2981)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telecopier: (302) 651-7701

*Counsel for JPMorgan Chase Bank, N.A.*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are listed on the next page.

Tribune Company (0355); 435 Production Company (8865); 5800 Sunset Productions Inc. (5510); Baltimore Newspaper Networks, Inc. (8258); California Community News Corporation (5306); Candle Holdings Corporation (5626); Channel 20, Inc. (7399); Channel 39, Inc. (5256); Channel 40, Inc. (3844); Chicago Avenue Construction Company (8634); Chicago River Production Company (5434); Chicago Tribune Company (3437); Chicago Tribune Newspapers, Inc. (0439); Chicago Tribune Press Service, Inc. (3167); ChicagoLand Microwave Licensee, Inc. (1579); Chicagoland Publishing Company (3237); Chicagoland Television News, Inc. (1352); Courant Specialty Products, Inc. (9221); Direct Mail Associates, Inc. (6121); Distribution Systems of America, Inc. (3811); Eagle New Media Investments, LLC (6661); Eagle Publishing Investments, LLC (6327); forsalebyowner.com corp. (0219); ForSaleByOwner.com Referral Services LLC (9205); Fortify Holdings Corporation (5628); Forum Publishing Group, Inc. (2940); Gold Coast Publications, Inc. (5505); GreenCo, Inc. (7416); Heart & Crown Advertising, Inc. (9808); Homeowners Realty, Inc. (1507); Homestead Publishing Co. (4903); Hoy, LLC (8033); Hoy Publications, LLC (2352); InsertCo, Inc. (2663); Internet Foreclosure Service, Inc. (6550); JuliusAir Company LLC (9479); JuliusAir Company II, LLC; KIAH Inc. (4014); KPLR, Inc. (7943); KSWB Inc. (7035); KTLA Inc. (3404); KWGN Inc. (5347); Los Angeles Times Communications LLC (1324); Los Angeles Times International, Ltd. (6079); Los Angeles Times Newspapers, Inc. (0416); Magic T Music Publishing Company (6522); NBBF, LLC (0893); Neocomm, Inc. (7208); New Mass. Media, Inc. (9553); Newscom Services, Inc. (4817); Newspaper Readers Agency, Inc. (7335); North Michigan Production Company (5466); North Orange Avenue Properties, Inc. (4056); Oak Brook Productions, Inc. (2598); Orlando Sentinel Communications Company (3775); Patuxent Publishing Company (4223); Publishers Forest Products Co. of Washington (4750); Sentinel Communications News Ventures, Inc. (2027); Shepard's Inc. (7931); Signs of Distinction, Inc. (3603); Southern Connecticut Newspapers, Inc. (1455); Star Community Publishing Group, LLC (5612); Stemweb, Inc. (4276); Sun-Sentinel Company (2684); The Baltimore Sun Company (6880); The Daily Press, Inc. (9368); The Hartford Courant Company (3490); The Morning Call, Inc. (7560); The Other Company LLC (5337); Times Mirror Land and Timber Company (7088); Times Mirror Payroll Processing Company, Inc. (4227); Times Mirror Services Company, Inc. (1326); TMLH 2, Inc. (0720); TMLS I, Inc. (0719); TMS Entertainment Guides, Inc. (6325); Tower Distribution Company (9066); Towering T Music Publishing Company (2470); Tribune Broadcast Holdings, Inc. (4438); Tribune Broadcasting Company (2569); Tribune Broadcasting Holdco, LLC (2534); Tribune Broadcasting News Network, Inc., n/k/a Tribune Washington Bureau Inc. (1088); Tribune California Properties, Inc. (1629); Tribune CNLBC, LLC f/k/a Chicago National League Ball Club, LLC (0347); Tribune Direct Marketing, Inc. (1479); Tribune Entertainment Company (6232); Tribune Entertainment Production Company (5393); Tribune Finance, LLC (2537); Tribune Finance Service Center, Inc. (7844); Tribune License, Inc. (1035); Tribune Los Angeles, Inc. (4522); Tribune Manhattan Newspaper Holdings, Inc. (7279); Tribune Media Net, Inc. (7847); Tribune Media Services, Inc. (1080); Tribune Network Holdings Company (9936); Tribune New York Newspaper Holdings, LLC (7278); Tribune NM, Inc. (9939); Tribune Publishing Company (9720); Tribune Television Company (1634); Tribune Television Holdings, Inc. (1630); Tribune Television New Orleans, Inc. (4055); Tribune Television Northwest, Inc. (2975); ValuMail, Inc. (9512); Virginia Community Shoppers, LLC (4025); Virginia Gazette Companies, LLC (9587); WATL, LLC (7384); WCCT, Inc., f/k/a WTXX Inc. (1268); WCWN LLC (5982); WDCW Broadcasting, Inc. (8300); WGN Continental Broadcasting Company (9530); and WLVI Inc. (8074); WPIX, Inc. (0191). The Debtors' corporate headquarters and the mailing address for each Debtor is 435 North Michigan Avenue, Chicago, Illinois 60611

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ..................................................................1

II. THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE
BEST INTEREST OF CREDITORS........................................................5

    A. Creditors Overwhelmingly Support The DCL Plan And
Settlement. ........................................................................................8

    B. The DCL Plan Settlement Is The Product Of Good Faith
Negotiation And Extensive Mediation. ........................................10

        1. Initial Investigations, Negotiations, And The April Plan...........11

        2. The Examiner Report And Its Aftermath ...................................13

        3. The Mediation And Proposed Settlement...................................14

    C. The DCL Plan Settlement Results In Recoveries Well Within
The Range Of Reasonableness.......................................................16

        1. The Examiner Report Supports The Reasonableness Of The
DCL Plan Settlement.................................................................16

        2. Professor Black's Analysis Demonstrates That The DCL
Plan Settlement Is Reasonable. .................................................20

III. THE NOTEHOLDERS' OBJECTIONS TO THE DCL PLAN
SETTLEMENT HAVE NO MERIT.......................................................26

    A. The Noteholders Mischaracterize The DCL Plan Settlement
And Understate The Settlement Consideration Provided To
The Non-LBO Creditors..................................................................26

        1. The Noteholders' "Settlement Percentages" Are False And
Misleading..................................................................................26

        2. The Noteholders Ignore The Value Of Litigation And
Creditors' Trust Recoveries. .....................................................27

        3. The Noteholders Improperly Apportion The Settlement
Consideration. ............................................................................29

    B. The Examiner Report Was Not A "Game Changer" In Favor
Of Non-LBO Creditors....................................................................32

C.     There Are Substantial Hurdles To Prevailing On A Claim For
Full Avoidance....................................................................................35

    1.  Challenges To Collapse ...................................................................35

    2.  Challenges To Proving Insolvency At Step One Even
       Assuming Collapse ........................................................................39

    3.  Challenges To Proving Intentional Fraudulent Transfer And
       Equitable Subordination ...............................................................41

    4.  Potential Defenses Exist To The "Full Avoidance" Claims...........42

D.     Each of the Noteholders' Other Putative "Paths to Success"
Faces Substantial Hurdles...................................................................43

    1.  Challenges To Proving Tribune Insolvency At Step One
       While Eliminating All Step One "Protected Debt" .......................44

    2.  The "WEAR" Theory Has No Basis in Law..................................46

    3.  Challenges To The Claim Of Increased DEV Coupled With
       A Prohibition On Postpetition Interest In Respect Of
       Allowed Step One Senior Loan Guaranty Claims .........................52

E.     Dr. Beron's "Expected Recovery" Analysis Is Fatally Flawed.........57

F.     Tuliano's Opinion Regarding "Step One" Solvency Is
Unsupportable......................................................................................64

    1.  Tuliano's Opinion Regarding Tribune Insolvency At Step
       One (Including Step Two Debt) Conflicts With The
       Examiner Report And Is Unsupportable.......................................65

         a.     Contemporaneous Market Evidence Contradicts
              Tuliano's Opinion. ............................................................66

         b.     Tuliano's Opinion Is Based On Methodological
              Errors. ..............................................................................69

    2.  Tuliano's Opinion Regarding Guarantor Debtor Insolvency
       At Step One (Including Step Two Debt) Conflicts With The
       Examiner Report And Is Unsupportable.......................................75

G.     Singh's Opinion Regarding Tribune's Current Valuation Is
Not Credible. .......................................................................................76

    1.  Erroneous Valuation Of The Core Businesses .............................77

-ii-

        2.  Erroneous Valuation Of The Non-Controlled Investments ........................ 81

        3.  Other Errors ............................................................................................ 84

IV.    THE NOTEHOLDERS' OTHER OBJECTIONS TO THE DCL
      PLAN ARE UNFOUNDED .......................................................................... 85

      A.    FCC Approvals And Waivers Do Not Call Into Question The
           Feasibility Of The DCL Plan. ......................................................... 85

      B.    The DCL Plan Does Not Discriminate Unfairly Against
           Creditors Who Fail To Assign Claims To The Creditors' Trust.
           ......................................................................................................... 88

      C.    The DCL Plan Does Not Discriminate Unfairly Against
           Creditors Who Benefit From PHONES Subordination. ................... 90

           1.  The Overwhelming Majority Of Other Parent Claims Are
               Entitled To The Benefit Of The PHONES Subordination. ........... 90

           2.  Any Discrimination Relating To PHONES Subordination Is
               Immaterial And Not Unfair. ..................................................... 92

      D.    The DCL Plan Properly Classifies The Swap Claim. .................... 95

      E.    The DCL Plan's Releases And Bar Order Are Appropriate. ........... 96

           1.  Releases In Favor Of The Senior Lenders Are Appropriate ........ 97

           2.  The Bar Order Is Appropriate. .................................................. 98

           3.  Limited Releases Of Certain Shareholders Are Appropriate. ...... 99

               a.    Releases Of The Retiree Claimants Are
                    Appropriate. ............................................................ 100

               b.    Limited Releases Of Other Shareholders Are
                    Appropriate. ............................................................ 101

V.     THE NOTEHOLDER PLAN CANNOT BE CONFIRMED ...................... 102

      A.    The Noteholder Plan Violates Section 1129(a)(10). ...................... 103

           1.  The Noteholders' Interpretation Of Section 1129(a)(10) Is
                Unsupportable. ....................................................................... 103

           2.  The DCL Plan Does Not Face A Similar 1129(a)(10)
               Shortcoming. ......................................................................... 106

**B.**   **The Noteholder Plan Has Other Fundamental Defects.**.................................107

    **1.**   **The Noteholder Plan Cannot Terminate Claims Against Non-Debtors.**...............................................................................107

    **2.**   **The Noteholder Plan Fails To Implement The Intercompany Claims Settlement.**..........................................................................108

    **3.**   **The Noteholder Plan Destroys Value Through Unnecessary Taxation.**.......................................................................................110

    **4.**   **The Noteholder Plan Unfairly Discriminates Against Senior Lenders.**.......................................................................................112

    **5.**   **The Noteholder Plan Has No Collective Action Mechanism To Bind Holdouts To Settlements And Would Require Full Litigation.**.......................................................................................113

**VI.**   **THE DCL PLAN IS SUPERIOR TO THE NOTEHOLDER PLAN.** ......................114

  **A.**   **Creditors Overwhelmingly Prefer The DCL Plan.**...............................115

  **B.**   **The DCL Plan Provides Better Treatment To Creditors.**.....................116

  **C.**   **The DCL Plan Is More Feasible Than The Noteholder Plan.**................118

  **D.**   **The DCL Plan Accomplishes A True Reorganization.**...........................121

**VII.**   **CONCLUSION** .........................................................................................123

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adams v. Comm'r,
  T.C. Memo 2002-80.................................................................................................71

Board of Comm'rs v. Hurley,
  169 F. 92 (8th Cir. 1909)........................................................................................55

Boyer v. Crown Stock Distrib., Inc.,
  587 F.3d 787 (7th Cir. 2009)..................................................................................36

Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.),
  388 B.R. 46 (D. Del. 2008).....................................................................................43

Dallas v. Comm'r,
  T.C. Memo 2006-212 (September 28, 2006)...........................................................71

Del. Open MRI Radiology Assocs., P.A. v. Kessler,
  898 A.2d 290 (Del. Ch. 2006).................................................................................70

Dobler v. Montgomery Cellular Holding Co.,
  2004 Del. Ch. LEXIS 139 (Del. Ch. Oct. 4, 2004), (Del. Supr. 2005)...................70

Eichenholtz v. Brennan,
  52 F.3d 478 (3d Cir. 1995)......................................................................................98

First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga
  Litholite Co.),
  218 F.2d 671 (2d Cir. 1955)....................................................................................48

Gross v. Comm'r,
  272 F.3d 333 (6th Cir. 2001)...................................................................................71

Heck v. Comm'r,
  T.C. Memo 2002-34.................................................................................................71

Heins v. Ruti-Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.),
  836 F.2d 1263 (10th Cir. 1988)...............................................................................107

In re AbitibiBowater Inc.,
  2010 Bankr. LEXIS 3987 (Bankr. D. Del. Nov. 22, 2010).....................................11

In re AbitibiBowater, Inc.,
  No. 09-11296 (Bankr. D. Del. Sept 13, 2010)........................................................106

In re Adelphia Commc'ns Corp.,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................107

In re Armstrong World Indus., Inc.,
    348 B.R. 111 (D. Del. 2006) ...............................................................................92

In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ..............................................................74

In re Bridge Info. Sys.,
    311 B.R. 781 (Bankr. E.D. Mo. 2004) .................................................................73

In re Capmark Fin. Group, Inc.,
    438 B.R. 471 (Bankr. D. Del. 2010) ..................................................................114

In re Cooper,
    147 B.R. 678 (Bankr. D.N.J. 1992) ....................................................................104

In re Coram Healthcare Corp.,
    315 B.R. 321 (Bankr. D. Del. 2004) ......................................................8, 115, 118

In re Dow Corning Corp.,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ..............................................................92

In re Enron Corp.,
    2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ..............................105

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ...............................................................16, 100

In re First Magnus Fin. Corp.,
    No. 07-01578 (JMM) (Bankr. D. Ariz. Oct. 30, 2007).......................................114

In re Genesis Health Ventures, Inc.,
    266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................104

In re Greate Bay Hotel & Casino, Inc.,
    251 B.R. 213 (Bankr. D. N.J. 2000) ..............................................94, 113, 116, 118

In re Hellig-Meyers,
    319 B.R. 447 (Bankr. E.D. Va. 2004).................................................................74

In re Holley Garden,
    238 B.R. 488 (Bankr. M.D. Fla. 1999) .........................................115, 116, 118, 121

In re Master Mortgage Inv. Fund,
    168 B.R. 930, 935 (Bankr. W.D. Mo. 1994) ................................................97, 100

_In re Matter of Sound Radio, Inc.,_
   93 B.R. 849 (Bankr. D.N.J. 1988) ..................................................................................118

_In re MEDIQ, Inc.,_
   No. 01-252 (MFW) (Bankr. D. Del. May 16, 2001).....................................................105, 106

_In re Oaks Partners. Ltd.,_
   141 B.R. 453 (Bankr. N.D. Ga. 1992) ..........................................................................121

_In re Oakwood Homes Corp.,_
   449 F.3d 588 (3d Cir. 2006)........................................................................................74

_In re Orchards Village Invs., LLC,_
   2010 WL 143706 (Bankr. D. Or. Jan. 8, 2010) ..................................................................115

_In re Owens Corning,_
   419 F.3d 195 (3d Cir. 2005)........................................................................42, 49, 50, 105

_In re Pegasus Satellite Television Inc.,_
   No. 04-20878 (Bankr. D. Me. Jan. 31, 2005) ......................................................................114

_In re Penn Central Transp. Co.,_
   484 F.2d 1300 (3d Cir. 1973)......................................................................................101

_In re Reading Broad., Inc.,_
   386 B.R. 562 (Bankr. E.D. Pa. 2008) ..........................................................................87

_In re River Village Assocs.,_
   181 B.R. 795 (E.D. Pa. 1995) .....................................................................................116

_In re Sacred Heart Hosp. of Norristown,_
   182 B.R. 413 (Bankr. E.D. Pa. 1995) ............................................................................55

_In re SGPA, Inc.,_
   No. 01-02609 (RJW), 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. Sept. 28, 2001).............105

_In re Smurfit-Stone Container Corp.,_
   Case No. 09-10235 (Bankr. D. Del. 2010) .....................................................................55

_In re Solutia, Inc.,_
   379 B.R. 473 (Bankr. S.D.N.Y. 2007).......................................................................73, 74

_In re TCI 2 Holdings, LLC,_
   428 B.R. 117 (Bankr. D.N.J. 2010) .........................................................................87, 115

_In re Temple Zion,_
   125 B.R. 910 (Bankr. E.D. Pa. 1991) ...........................................................................88

In re Trans World Airlines, Inc.,
    134 F.3d 188 (3d Cir. 1988)....................................................................74

In re Unbreakable Nation Co.,
    437 B.R. 189 (Bankr. E.D. Pa. 2010) .....................................................94

In re Valley View Shopping Center L.P.,
    260 B.R. 10 (Bankr. D. Kan. 2001) ......................................................121

In re Washington Mut., Inc.,
    442 B.R. 314 (Bankr. D. Del. 2011) ..........................................29, 89, 97

In re Winstar Commc'ns,
    348 B.R. 234 (Bankr. D. Del. 2005) .......................................................74

In re Zenith Elecs. Corp.,
    241 B.R. 92, 110-11 (Bankr. D. Del. 1999)............................................99

Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC),
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ..............................................69, 70

Ivanhoe Bldg. & Loan Ass'n of Newark, N.J.,
    295 U.S. 243 (1935)................................................................................55

Kipperman v. Onex,
    411 B.R. 805 (N.D. Ga. 2009) ...............................................................70

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.
    P'ship),
    115 F.3d 650 (9th Cir. 1997) ...............................................................112

Mervyn's Holdings, LLC v. Lubert Adler Group IV, LLC (In re Mervyn's Holdings,
    LLC),
    426 B.R. 488 (Bankr. D. Del. 2010) .......................................................38

Metlyn Realty Corp. v. Esmark Inc.,
    763 F.2d 826 (7th Cir. 1993) .................................................................69

Myers v. Martin (In re Martin),
    91 F.3d 389 (3d. Cir. 1996).................................................................8, 16

Paloian v. LaSalle Bank, N.A.,
    619 B.R. 688 (7th Cir. 2010) .................................................................71

Pengo Indus., Inc. v. Licht,
    962 F.2d 543 (5th Cir. 1992) .................................................................74

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),
    403 F.3d 43 (2d Cir. 2005).................................................................................43

Siegel v. Warner Bros. Entm't, Inc.,
    2009 U.S. Dist. LEXIS 66115 (C.D. Cal. July 8, 2009) .........................................74

Thrifty Oil Co. v. Bank of America Nat'l Trust and Savings Assoc.,
    322 F.3d 1039 (9th Cir. 2003) ...........................................................................95

U.S. v. Ron Pair Enters., Inc.,
    489 U.S. 235 (1989).........................................................................................104

VFB LLC v. Campbell Soup Co.,
    482 F.3d 624 (3d Cir. 2007).............................................................................69

Whyte v. Kivisto (In re SemCrude, L.P.),
    Adv. No. 09-50189, 2010 Bankr. LEXIS 4160 (Bankr. D. Del. Nov. 19, 2010) ...................98

**STATUTES**

11 U.S.C. § 502(b)(2) ..........................................................................................74

11 U.S.C. § 546(g) ...............................................................................................96

11 U.S.C. § 548(d)(2)(D) .....................................................................................95

11 U.S.C. § 560....................................................................................................96

11 U.S.C. § 1129(a)(10).......................................................................................103

11 U.S.C. § 1129(c) .............................................................................................115

47 U.S.C. § 308(b) ..............................................................................................87

47 U.S.C. § 310(d) ..............................................................................................86

**OTHER AUTHORITIES**

47 C.F.R. § 73.3555 .............................................................................................86

Rev. Proc. 94-45, 1994-2 C.B. 684......................................................................111

Richard A. Brealey, Stewart C. Meyers, & Franklin Allen, PRINCIPLES OF CORPORATE
    FINANCE (8th ed. 2006)......................................................................................72

Shannon P. Pratt, VALUING A BUSINESS (5th ed. 2007)......................................72, 73

Steven Kaplan & Richard Ruback, THE VALUATION OF CASH FLOW FORECAST: AN
    EMPIRICAL ANALYSIS, 50 J. Fin. 1059,1064-66 (1995)........................................72

A549

Timothy A. Luehrman, USING APV: A BETTER TOOL FOR VALUING OPERATIONS, 75
   Harv. Bus. Rev. 145, 146-51 (1997) ....................................................................................72

Treas. Reg. § 1.468B-9(b).....................................................................................................100

Treas. Reg. § 1.468B-9(c)(2)(ii) ...........................................................................................112

## I.   PRELIMINARY STATEMENT[2]

Over the past two and a half years, the major constituencies in these chapter 11 proceedings have worked diligently to develop a plan of reorganization that fairly addressed claims arising from Tribune's 2007 Leveraged ESOP Transactions.  The parties' investigations were thorough, negotiations were contentious, and progress was, at times, frustratingly slow.  However, with the benefit of the Examiner Report and the assistance of Judge Gross, a settlement was forged late last year that is incorporated into the DCL Plan and has been agreed to by the Committee, the fiduciary with standing to bring the LBO-Related Causes of Action.[3]  In addition, the settlement has been endorsed by Judge Gross, and the DCL Plan has the overwhelming support of all creditor constituencies not controlled by the Noteholders, including the very "Non-LBO Creditors" who stand to gain or lose from the litigation being settled.

---

[2] Capitalized terms not otherwise defined have the meanings given in the *Second Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries (As Modified April 26, 2011)* [Docket No. 8769] (the "DCL Plan") proposed by the Debtors, the Committee, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. (the "DCL Proponents"), in the related Specific Disclosure Statement for the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the DCL Proponents. [Docket No. 7135] (the "Debtor/Committee/Lender Specific Disclosure Statement"), or the Joint Disclosure Statement [Docket No. 7198] (the "Joint Disclosure Statement").

Trial exhibits are cited as "DCL Ex." and "NPP Ex."; designated deposition testimony is cited as "[name] Dep. at [page:line]; and the transcript of the confirmation hearing is cited as "Tr. [date] at [page:line]." The term "DCL Obj." refers to the DCL Proponents' pretrial objection to the Noteholder Plan [Docket No. 8011] and the term "DCL Reply" refers to the DCL Proponents' pretrial memorandum in support of confirmation of the DCL Plan [Docket No. 8173].

The term "Noteholders" refers to the proponents of the *Third Amended Joint Plan Of Reorganization For Tribune Company And Its Subsidiaries Proposed By Aurelius Capital Management, L.P., Deutsche Bank Trust Company Americas, Law Debenture Trust Company Of New York, And Wilmington Trust Company* [Docket No. 8755] (the "Noteholder Plan").  The term "Noteholder Obj." refers to the Noteholders' pretrial objection to the DCL Plan [Docket No. 8026] and the term "Noteholder Reply" refers to the Noteholders' pretrial memorandum in support of the Noteholder Plan [Docket No. 8171].

[3] The facts that the DCL Proponents include both plaintiff (the Committee) and defendant (JPMorgan, Oaktree, Angelo Gordon) in respect of the LBO-Related Causes of Action subject to the DCL Plan settlement, and that each negotiated and fully supports the settlement as a fair and reasonable middle ground among widely varied and risky potential litigation results, is a strong endorsement of the reasonableness of the settlement.  Naturally, each of the DCL Proponents has differing views on the strengths and weaknesses of the claims to be settled, as well as the significance of some of the evidence and testimony regarding those claims.  In the course of demonstrating the reasonableness of the settlement, this brief summarizes a number of those potential strengths and weaknesses and refers to the substantial evidentiary record.  Each of the DCL Proponents reserves all of its rights in respect of the LBO-Related Causes of Action in the event the Court determines not to approve the settlement, and nothing in this brief is or should be taken as an admission by any of the DCL Proponents as to the merits of the claims or the significance of particular evidence or testimony in a litigation on the merits.

As demonstrated at trial and shown below, the DCL Plan settlement is a fair and reasonable resolution of the LBO-Related Causes of Action against two major creditor constituencies, the Senior Lenders and Bridge Lenders. It couples substantial guaranteed immediate distributions – more than 33% on the unsecured claims of Tribune's Non-LBO Creditors and payment in full of unsecured claims against the Subsidiary Debtors – with the prospect of potentially significant additional recoveries from claims against defendants other than the settling lenders, including selling shareholders, officers, directors, Mr. Zell and EGI-TRB LLC, and various professionals and advisors. All recoveries obtained by the Litigation Trust are allocated predominantly to Non-LBO Creditors.

Not surprisingly, a principal focus of the confirmation hearing was on whether the DCL Plan settlement is fair to holders of Senior Notes and subordinated PHONES Notes, the only two material dissenting classes. The answer to that question is a resounding "yes." The settlement fairly reflects the essential determinations of the Examiner, who found substantial barriers to avoidance of the Senior Lenders' "Step One Claims" and concluded that, while likely, avoidance of the Senior Lenders' "Step Two Claims" would produce only limited incremental recoveries for Senior Noteholders and none for Holders of PHONES Notes. In fact, the DCL Plan provides guaranteed recoveries well in excess of the recoveries the Senior Noteholders would receive if only the Step Two Claims were avoided, while preserving substantially all claims against entities other than the Senior and Bridge Lenders.

The fairness of the DCL settlement was also supported at trial by the testimony of Professor Bernard Black, who, unlike the Noteholders' experts, independently analyzed the claims against the Senior Lenders and demonstrated that the DCL Plan settlement consideration is at the high end of the range of reasonable results that a litigant could plausibly expect to

achieve, even under scenarios weighted heavily in favor of the Senior Noteholders.  Like the

Examiner, Black concluded that there was a significant likelihood that Step Two would be

avoided but that the resulting recoveries would be well below the amounts provided for under the

DCL Plan settlement.  Black also agreed with the Examiner's conclusion that a plaintiff would

have a much more difficult time avoiding the Step One claims.  He saw the likelihood of a court

collapsing the Step One and Step Two Transactions as remote and concluded that it would be

exceptionally difficult to prove insolvency of the Guarantor Debtors as of Step One.

At the hearing, the Noteholders took issue with these conclusions and argued that the

settlement was unfair.  The centerpiece of the Noteholders' presentation was the testimony of

their "decision tree" expert, Dr. Bruce Beron, who opined that the Examiner Report required a

settlement almost three times that embodied in the DCL Plan.  But the hearing put a spotlight on

his analytical errors and methodological deficiencies.  For example, Beron ignored significant

portions of the Examiner Report and his analysis failed to model accurately key issues

underlying the LBO-Related Causes of Action.  Indeed, Beron's own testimony made clear that

he knew nothing about any of those key underlying issues.  Beron also erroneously assumed that

all of the elements of the avoidance claims and defenses he purported to model were entirely

independent of one another, thereby grossly inflating potential recoveries.  Further, at the

direction of counsel for the Noteholders, Beron repeatedly departed from his professed strict

adherence to the Examiner's stated "conclusions," resulting in further inflation of the projected

recoveries.  And Beron inexplicably ignored the value of the claims in the Litigation Trust

altogether.

Perhaps recognizing the inadequacy of Beron's analysis, the Noteholders presented a

second expert, Ralph Tuliano, who directly challenged the Examiner's conclusions regarding the

Step One Transactions.  In contrast to both the Examiner's conclusions and the contemporaneous market evidence, Tuliano opined that both Tribune and the Guarantor Debtors were insolvent by a wide margin at Step One.  He did not, however, suggest that Tribune and the Guarantor Debtors were insolvent if Step One is viewed on a stand-alone basis.  Instead, with virtually no analysis, and with no support at all in the record, he simply assumed that Step One and Step Two should be collapsed.  Neither the Examiner nor Professors Black and Fischel, each of whom (in contrast to Tuliano) carefully analyzed this issue, reached a similar conclusion.  They instead concluded that collapse was unlikely.  Tuliano also took issue with the Examiner's analysis of Tribune's projections and, based on his own after-the-fact revisions and adjustments, concluded that Tribune's value was well below the value ascribed to it by contemporaneous analysts.  The Examiner's conclusions regarding Step One solvency – to say nothing of those of Black and Fischel – are a far more reasonable assessment of the Senior Lenders' potential exposure and fully support the settlement.

The Noteholders also argued that, even if the Examiner were right about the unlikely nature of the Step One avoidance claims, the Examiner's findings regarding Step Two render the DCL Plan settlement inadequate.  They assert that equitable considerations require the application of an unprecedented remedy preventing Senior Lenders from sharing in the value of the Debtors' estates to the full extent of their allowed Step One Claims if there is a finding of insolvency at Step Two.  They also contest the Debtors' valuation and assert that the settlement consideration is inadequate if their view of value is correct.  Neither argument undercuts the reasonableness of the DCL Plan settlement.  The law and the facts do not support the Noteholders' equitable arguments (their so-called "WEAR" theory).  And the Noteholders' valuation argument suffers from numerous defects,

including that their valuation expert, Rajnder Singh, was shown at trial to be wholly unqualified to opine meaningfully about Tribune's value.

In sum, the various alternative "pathways" to success posited by the Noteholders are risky and challenging. The Examiner Report was not, as the Noteholders contend, a "game changer" in their favor. To the contrary, the Examiner Report fully supports the settlement and the settlement fully satisfies the requirements of the Bankruptcy Code. Given this fact, as well as the fact that the DCL Plan has the support of the Committee and virtually all creditor constituents other than the sponsors of the Noteholder Plan themselves, the DCL Plan (which combines substantial certain recoveries now with the prospect of additional future recoveries) should be confirmed. By contrast, the Noteholder Plan is a swing for the fences that jeopardizes recoveries to virtually all creditors in an effort to win a litigation "home run" for the Noteholders. This gamble may be fine for the Noteholder Plan's sponsors, who are professional investors and who either bought their claims deep into the bankruptcy proceedings for the very purpose of making this litigation play, or are far out of the money and have nothing to lose. But it hazards the fortunes of the Debtors' other creditors, many of whom are retirees or trade creditors, not professional investors, and almost all of whom voted against the Noteholder Plan and in favor of the DCL Plan. For that reason alone (to say nothing of its other deficiencies), the Noteholder Plan should not be confirmed.

## II.     THE DCL PLAN SETTLEMENT IS REASONABLE AND IN THE BEST INTEREST OF CREDITORS.

The centerpiece of the DCL Plan is the proposed settlement of LBO-Related Causes of Action asserted against lenders (the Senior Lenders and the Bridge Lenders) who loaned more than $10 billion to Tribune in connection with the Leveraged ESOP Transactions.

The DCL Plan settlement provides Non-LBO Creditors with immediate, guaranteed initial distributions that are many multiples of their "natural recoveries" in the event the Senior Loan and Bridge Loan Claims are not avoided.[4]  At the Tribune parent level, Senior Noteholders receive an initial recovery of more than $431 million (either in cash or, at their option, in a "strip" of cash, New Common Stock, and New Senior Secured Term Loans), a distribution that is $369 million greater than their natural recoveries, plus interests in the Litigation and Creditors' Trusts.  Holders of Other Parent Claims (trade and other claims) have a choice of (a) a distribution (in the form of cash or a "strip") of 35.18 cents on the dollar plus a *pro rata* share of $2.3 million from the Bridge Settlement Proceeds, approximately $82.7 million in excess of natural recoveries, or (b) a slightly smaller initial distribution of 32.73 cents on the dollar (in cash or a "strip") plus a *pro rata* share of $2.3 million from the Bridge Settlement Proceeds and interests in the Trusts.[5]  At the Subsidiary Debtor level, general unsecured claims are paid in cash in full, providing distributions roughly $82.8 million in excess of natural recoveries.[6]

Initial settlement distributions are funded from three sources.  First, Senior Lenders forgo approximately $401.5 million in recoveries to which they otherwise would be entitled upon allowance of their claims.  Second, recipients of principal, interest, and fee payments on account of the Senior and Bridge Loans made in connection with the Tribune merger consummated in December 2007 (the so-called "Step Two Loans" or "Step Two Claims") contribute $120 million in cash, backstopped by the Step Two Arrangers.  Third, Bridge Lenders forgo approximately

---

[4] Unless specified otherwise, "natural recoveries," settlement values, and related calculations are premised upon total distributable enterprise value – or "DEV" – of $6.75 billion, established at trial to be an appropriate valuation. See Section III.D.3, below.  If the Court determines DEV to be greater than $6.75 billion, "natural recoveries" increase modestly due to the structural subordination of Tribune parent creditors, while the value of the settlement consideration (at least for creditors who elect to take their distribution in the form of a "strip") increases more rapidly.

[5] Tr. 3/9 at 35:3-4 (Kulnis); see also DCL Plan at § 3.2.6(c); DCL Ex. 1109 at 4; DCL Ex. 1110 at 20.

[6] Tr. 3/9 at 35:2-3 (Kulnis); Tr. 3/8 at 244:25-245:2 (Salganik); see also DCL Plan at § 3.3.5(b); DCL Ex. 1109 at 4; DCL Ex. 1110 at 20.

$13.3 million of their natural recoveries.  The following table summarizes the "sources and uses" of the initial settlement distributions:

| Settlement Funding | | Settlement Beneficiaries | |
|---|---|---|---|
| Senior Lenders | $401.5 million | Senior Notes | $369.4 million |
| Step Two Payment Recipients | $120 million | Other Parent Claims | $82.7 million |
| Bridge Lenders | $13.3 million | Subsidiary GUCs | $82.8 million |
| **Total** | **$534.9 million** | **Total** | **$534.9 million** |

The DCL Plan does not settle other LBO-Related Causes of Action.  Rather, it preserves – for pursuit by the Litigation and Creditors' Trusts (collectively, the "Trusts") – a multitude of potentially-valuable claims, including claims to recover more than $8 billion in payments made to Tribune shareholders in connection with the 2007 Leveraged ESOP Transactions; claims against the Debtors' officers, directors, and professionals for breach of fiduciary duties; claims against EGI-TRB LLC and Sam Zell; claims against Advisors, including Merrill Lynch, Citigroup Global Markets, Inc., and Valuation Research Corporation; and claims against Morgan Stanley.

An additional source of settlement consideration under the DCL Plan is the agreement by the Senior Lenders and Bridge Lenders to forgo *pro rata* participation in recoveries on the Preserved Causes of Action and the Transferred State Law Avoidance Claims.  As part of the settlement, the Senior Notes, PHONES Notes, and Other Parent Claims (the so-called "Non-LBO Claims") are entitled to receive the first $90 million in net recoveries by the Trusts plus 65% of all net recoveries over $90 million once the $20 million Trusts' Loan is repaid.  In comparison, if the Senior Loan and Bridge Loan Claims were allowed, Senior Lenders and Bridge Lenders would be entitled to more than *87%* of every dollar of such recoveries.  Thus, for

example, if net litigation recoveries under the DCL Plan were to equal $300 million,[7] the Non-LBO Claims would receive an additional $226.5 million on top of their guaranteed initial distributions, almost $190 million more than their natural *pro rata* distribution of such proceeds, increasing recoveries of Senior Noteholders and Holders of Other Parent Claims that elect to receive trust interests to more than 50 cents on the dollar.

As shown at trial and set forth below, the DCL Plan settlement provides creditors fair and reasonable recoveries in light of the probabilities of success on the LBO-Related Causes of Action against the settling lenders, the complexity of the litigation involved, and the attendant expense, inconvenience, and delay.[8]  Beyond merely "fall[ing] within the reasonable range of litigation possibilities" – all that is required under applicable law, see In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) – the evidence shows that the DCL Plan settlement provides recoveries that are near, if not above, the top of the likely range of litigation outcomes.  Moreover, the settlement fundamentally satisfies the paramount interest of creditors.

A.      **Creditors Overwhelmingly Support The DCL Plan And Settlement.**

We start by addressing the most important of all considerations – the views of creditors. Here, there can be no reasonable debate that creditors overwhelmingly endorse the DCL Plan and its settlement.  For one thing, the Committee, as fiduciary to all unsecured creditors, negotiated the DCL Plan settlement.  The Committee has standing to pursue and is the plaintiff in pending actions asserting the LBO-Related Causes of Action.  The Committee's embrace of the DCL Plan is thus an important indication that the settlement is in the best interest of all creditors.

---

[7] A figure deemed realistic by Professor Black, one of the DCL Proponents' experts.  See Section II.C.2, infra.

[8] These well-known factors are summarized in the Third Circuit's decision in Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d. Cir. 1996), and its progeny.  As shown in the DCL Reply and reinforced in this brief, the DCL Plan settlement satisfies each of the Martin factors.  See DCL Reply at 28-70.

For another, creditors across the Debtors' capital structure resoundingly voted in favor of the DCL Plan.[9]  In total, 2,300 out of the 2,520 conforming ballots received (91.27%) voted to accept the DCL Plan, with $10,309,165,026 out of $12,871,132,865 in claims represented by those ballots (80.10%) accepting.[10]  Strikingly, the very creditors that, according to the Noteholders, should have reason to reject the DCL Plan voted to accept by enormous margins. The class of Other Parent Claims – unsecured trade and other claims against Tribune offered virtually the same treatment as Senior Noteholders – emphatically supported the DCL Plan, with 226 out of 237 voting creditors (95.36%), holding 94.71% by dollar amount of the claims voted, choosing to accept the DCL Plan.[11]  Also telling is the vote of the Senior Noteholders, the class controlled by Aurelius (which holds $658 million, or 51%, of the Senior Notes).[12]  Because Aurelius alone has accumulated a "blocking position" in the Senior Notes, this class naturally failed to receive the two-thirds by claim amount of votes necessary for class acceptance. Nonetheless, almost *70%* of the Senior Noteholders that cast ballots voted to *accept* the DCL Plan, with ***38% of the Senior Noteholders who stated a preference indicating that they preferred the DCL Plan over the Noteholder Plan.***[13]  These voting results severely undercut the Noteholders' repeated assertion that the DCL Plan fails to serve the interests of Non-LBO Creditors.

---

[9] See Docket No. 7918, supplemented at Docket No. 8114 and Docket No. 8882 (as supplemented, the "Epiq Voting Declaration") and Docket No. 8724 (Order Authorizing Changes in Votes).  As the Court is aware, due to plan amendments made in response to objections of the Noteholders, the DCL Proponents are in the process of resoliciting the class of Senior Lenders.  The DCL Proponents do not anticipate that resolicitation will result in any material change to the voting results.

[10] See Epiq Voting Declaration, Docket No. 8882 at Ex. 1.

[11] Id.  Even excluding the Swap Claim, which the Noteholders incorrectly assert should be classified separately (see Section IV.D, infra), the class of Other Parent Claims overwhelmingly accepted the DCL Plan, with 220 out of 231 voting creditors (95.24%), holding 88.02% by dollar amount of the voting Other Parent Claims, accepting.

[12] See Docket No. 7205 (Noteholders' Responsive Statement), at 3 n.1.

[13] See Epiq Voting Declaration, Docket No. 8882 at Ex. 3.

Creditors were equally clear in their disapproval of the Noteholder Plan, which was rejected by virtually every class of impaired claims that voted on it.  Indeed, *a full 253 out of 256 (98.8%) impaired classes failed to accept the Noteholder Plan*.[14]  Of the three classes that voted to accept it, two are controlled by the Noteholders (the class of Senior Notes and the class of PHONES Notes) and the third represented a single voting claim in the amount of $47 (held by a creditor who also voted to accept the DCL Plan) – a claim so inconsequential that the Noteholders decided not to resolicit its vote in connection with plan modifications negatively impacting the treatment of that claim.[15]  The class of Other Parent Claims – the trade and other claims against Tribune whose interests the Noteholders purported to protect – likewise rejected the Noteholder Plan by overwhelming margins, with *233 out of 254 voting creditors (91.73%), holding 91.81% by dollar amount, voting no*.[16]  Creditors have thus confirmed that the Noteholder Plan serves the interests of no one other than Aurelius (a professional investor that bought significant amounts of Tribune debt in September 2010[17]), its ally Brigade Capital, and Holders of subordinated PHONES Notes, who have nothing to lose and are therefore willing to roll the dice at the expense of other creditors in the hope of hitting a litigation "home run."

**B.    The DCL Plan Settlement Is The Product Of Good Faith Negotiation And Extensive Mediation.**

The record conclusively demonstrates that the DCL Plan settlement was the product of arm's-length bargaining and disproves the Noteholders' oft-repeated allegations of bad faith and conflicts of interest.  The testimony and documents presented at trial demonstrate that the settlement was forged through extensive, contentious, arm's-length negotiations, two years of

---

[14] See Epiq Voting Declaration, Docket No. 7918 at Ex. B-1.
[15] See Docket No. 8757 (Noteholders' Motion regarding plan amendments) at ¶ 37.
[16] See Epiq Voting Declaration, Docket No. 882 at Ex. 1.
[17] Tr. 3/8 at 142:17-22 (Kurtz).

analysis by the Committee and other parties, an exhaustive investigation by the Examiner, and extensive mediation before the Court-appointed mediator.

Of course, "the important point of inquiry is the plan itself" rather than the process by which it was negotiated, drafted, and proposed.  See In re AbitibiBowater Inc., 2010 Bankr. LEXIS 3987, at *14 (Bankr. D. Del. Nov. 22, 2010) (quotation marks omitted).  Nevertheless, as the Noteholders' counsel asserted during opening statements, "when you have an appropriate bargaining process, it can help give the Court confidence in the product that comes out."[18]  The record here establishes precisely such an "appropriate process."

### 1. Initial Investigations, Negotiations, And The April Plan

The process started in the very first days of the bankruptcy cases, when both the Committee and the Debtors began investigations into the LBO-Related Causes of Action.  Upon formation, the Committee directed counsel and financial advisors first to conduct a legal analysis of possible claims arising out of the Leveraged ESOP Transactions and then to conduct a full factual investigation.[19]  In the first phase of the process, the Committee requested documents from more than 30 entities involved in the Leveraged ESOP Transactions, ultimately reviewing more than 4 million pages of documents, and deposed key participants.[20]  While the Committee's investigation was underway, the Debtors undertook their own substantial efforts to review, analyze, and understand the facts and potential claims.[21]

With the parties having developed a basic understanding of the applicable facts and law, initial negotiations began in late 2009.  At the outset, the Debtors and their advisors met individually with key stakeholders, including the Committee, the Senior Lenders, and

---

[18] Tr. 3/7 at 66:9-11 (Noteholders' Opening Statement).

[19] Tr. 3/8 at 203:11-18, 205:11, 208:4-11 (Salganik).

[20] Tr. 3/8 at 206:21-207:25 (Salganik).

[21] Tr. 3/8 at 37:22-42:6 (Kurtz).

Centerbridge Credit Partners, L.P. (then the largest holder of Senior Notes), each of which presented their views on the merits.[22] In early January 2010, the key stakeholders met jointly, with representatives of each advocating their positions.[23]

At that time, as would be expected at the start of any negotiation over claims of this magnitude, the parties were far apart and discussions were hostile.[24] Nevertheless, negotiations continued throughout January, February, and March of 2010, with the Debtors meeting on an individual basis with the various constituencies, presenting to each party the arguments and positions of the other stakeholders and transmitting various settlement bids and proposals.[25] Concurrently, the Committee actively negotiated with the Debtors, representatives of the Senior Lenders, and representatives of the Senior Noteholders,[26] including meeting with Centerbridge on multiple occasions.[27]

Those negotiations eventually led to a proposed "Global Settlement" of all LBO-Related Causes of Action embodied in a Settlement Support Agreement dated April 9, 2010, among Angelo Gordon (a holder of substantial Senior Loan Claims), Centerbridge (the largest holder of Senior Notes at that time, then represented by Akin Gump), Law Debenture Trust Company of New York (the trustee for certain Senior Notes), and JPMorgan (Senior Loan Agent and a Holder of substantial Senior Loan Claims).[28] That proposed settlement in turn served as the basis for the plan of reorganization (the "April Plan") that the Debtors filed on April 12, 2010 with the support

---

[22] Tr. 3/8 at 43:13-22, 44:20-45:6 (Kurtz).

[23] Tr. 3/8 at 45:7-46:24 (Kurtz); see also Tr. 3/9 at 18:20-19:16 (Kulnis).

[24] Tr. 3/8 at 46:19-24, 47:21-48:11 (Kurtz); Tr. 3/8 at 216:7-15 (Salganik).

[25] Tr. 3/8 at 46:25-49:15 (Kurtz); Tr. 3/9 at 19:19-20:1 (Kulnis).

[26] Tr. 3/8 at 210:5-211:3 (Salganik).

[27] Tr. 3/8 at 211:4-213:7, 218:4-13 (Salganik); DCL Exs. 5, 29, 182.

[28] DCL Ex. 396; Tr. 3/8 at 49:1-2; 49:18-22 (Kurtz).

of the Committee.[29]  Confirmation of the April Plan was far from a foregone conclusion, however, as Oaktree and certain other holders of Senior Loan Claims indicated that they would attempt to block the plan due to their belief that the settlement was too generous to Non-LBO Creditors and was unfairly funded entirely by Senior Lenders and not other potentially-liable parties.[30]

### 2.  The Examiner Report And Its Aftermath

After the April Plan was filed, the Court entered an order appointing Professor Kenneth N. Klee as Examiner with the charge of evaluating the merits of the LBO-Related Causes of Action.[31]  The major stakeholders supplied the Examiner with briefs and record evidence,[32] and the Examiner and his advisors were given access to the discovery materials compiled by the parties during their investigations and independently interviewed 38 witnesses.[33]

Ultimately, on July 26, 2010, the Examiner filed an extensive, four-volume report detailing the results of his investigation.  The parties to the settlement embodied in the April Plan assessed the implications of Professor Klee's conclusions and, despite identifying findings that supported each of their respective (and conflicting) views on the merits of the LBO-Related Causes of Action, ultimately determined that the April Plan was not likely to be confirmed.[34]

Negotiations in late July and early August attempted to restructure the settlement in order to build broader support that would ensure its success, but the parties were unable to reconcile their differing positions and terminated the April Plan settlement on August 9, 2010.[35] Stakeholders then redoubled their efforts to reach a consensual resolution, negotiating throughout

---

[29] See Docket No. 4008, Ex. A.
[30] See Docket Nos. 3999 and 4376.
[31] See Docket No. 4320.
[32] See, e.g., DCL Exs. 1540-47.
[33] Docket Nos. 5130-5133 ("Examiner Report"), Vol. 1 at 30, 32-38.
[34] Tr. 3/8 at 54:21-55:5, 55:24-56:18 (Kurtz).
[35] Tr. 3/8 at 56:19-58:21, 136:3-5 (Kurtz).

August in an attempt to achieve a new compromise that would reflect the parties' assessment of the Examiner Report.[36]  The Senior Noteholders were actively involved in those discussions.[37]

### 3. The Mediation And Proposed Settlement

On September 1, 2010, after efforts to forge a new agreement failed, the Court appointed Judge Gross as mediator.[38]  All material stakeholders were parties to the mediation, including the Debtors, the Committee, JPMorgan, Angelo Gordon, Oaktree, a group of "Step One Credit Agreement Lenders," Wells Fargo Bank, N.A. (the Bridge Loan Agent), EGI-TRB LLC, three separate Senior Note representatives (Aurelius, Law Debenture, and Deutsche Bank Trust Company Americas) and a representative of the PHONES (Wilmington Trust).[39]

On September 28, 2010, with the assistance of Judge Gross, the Debtors, Angelo Gordon, and Oaktree agreed to the terms of a proposed compromise (the "September Settlement").[40] Neither the Committee nor JPMorgan supported the September Settlement, however, and the Committee issued a press release indicating that, in its view, the September Settlement did not provide fair value to all creditors.[41]

---

[36] Tr. 3/8 at 60:13-61:17 (Kurtz).

[37] The Debtors spoke frequently with Centerbridge (still the largest holder of Senior Notes at the time) and, on at least one occasion, with Aurelius. Tr. 3/8 at 65:25-67:5 (Kurtz). The Committee, which had given consideration to the views of the Senior Noteholders throughout the process, met with Aurelius on multiple occasions, and the Committee's advisors met or spoke with Aurelius's advisors on numerous additional occasions. Tr. 3/8 at 218:4-13, 227:3-232:13, 235:11-14, 237:1-240:20, 278:6-10; Smith Dep. at 55:18-56:25, 70:16-20, 218:12-21, DCL Ex. 69 (Supplement to Aug. 19, 2010 Committee minutes), 87 (Supplement B to Oct. 7, 2010 Committee minutes). The Noteholders' assertion that they were "frozen out of the [settlement] process," Tr. 3/7 at 67:12-25 (Noteholders opening statement), is patently untrue. The evidence shows that the Senior Noteholders (including Aurelius) were represented continually in settlement negotiations and in mediation.

[38] Tr. 3/8 at 61:8-25 (Kurtz); DCL Ex. 382.

[39] DCL Ex. 382. Centerbridge, although named as a Mediation Party, did not participate in the mediation, having sold its entire position to Aurelius prior to the commencement of mediation. Tr. 3/8 at 142:17-22 (Kurtz).

[40] DCL Ex. 383; Tr. 3/8 at 75:14-77:17 (Kurtz).

[41] Tr. 3/8 at 235:15-236:25 (Salganik); DCL Ex. 273.

Subsequent to the September Settlement, the Debtors resumed discussions with stakeholders in an effort to forge a more broadly supported compromise.[42]  On October 12, 2010, under the continued auspices of Judge Gross, the Debtors, Committee, Oaktree, Angelo Gordon, and JPMorgan reached a new settlement (the "October Settlement") that provided approximately $174 million in additional cash settlement consideration to Senior Noteholders and other Non-LBO Creditors, along with a vastly improved split of litigation trust recoveries, and thereby won the support of the Committee as fiduciary to all unsecured creditors.[43]

The Committee did not lightly agree to the October Settlement.  It concluded that the settlement was fair for unsecured creditors as a whole after a detailed review of the merits and the negotiation process, including the review of "several hundred" memoranda and other written reports or analyses from its legal and financial advisors;[44] consideration of other potential dissenting views, including those of its members Deutsche Bank and Wilmington Trust;[45] and careful analysis and discussion of Aurelius's model of settlement values for the LBO-Related Causes of Action.[46]  In fact, starting in August 2010, the Committee held 21 meetings before voting to support the DCL Plan settlement, including two special weekend meetings that encompassed a detailed review of Aurelius's model.[47]

---

[42] Tr. 3/8 at 81:17-82:10 (Kurtz).

[43] DCL Ex. 384; Tr. 3/8 at 82:11-87:8 (Kurtz); Tr. 3/8 at 244:4-247:11 (Salganik).

[44] Tr. 3/8 197:7-17 (Salganik); DCL Exs. 185-209 (Moelis weekly industry updates from Dec. 2009 to Oct. 2010), 210-255 (AlixPartners weekly financial reports from Dec. 2009 to Oct. 2010).

[45] Tr. 3/8 at 252:24-253:6; DCL Ex. 76 (Supplement A to Sept. 16, 2010 Committee minutes).

[46] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Exs. 87 (Supplement B to Oct. 7, 2010 Committee minutes), 88 (Oct. 9, 2010 Committee minutes), 89 (Committee minutes from Oct. 10, 2010 meeting).

[47] Tr. 3/8 at 241:4-244:18 (Salganik); DCL Exs. 58-89 (Committee minutes from Aug. 2, 2010 to Oct. 10, 2010). These meetings represent only a fraction of the work performed by the Committee, which held 53 meeting in the 10-month period following the entry of the Depository Order.  See DCL Exs. 3-95 (Committee minutes from Dec. 17, 2009 to Oct. 21, 2010), 96-131 (Committee agendas dated from Dec. 17, 2009 to Oct. 21, 2010).

Further, the parties continued to mediate, and on January 28, 2011, with the continued

oversight of Judge Gross, also reached a settlement with the Bridge Lenders, generating a further

$13.3 million in settlement consideration.[48]

**C.**   **The DCL Plan Settlement Results In Recoveries Well Within The Range Of Reasonableness.**

As part of its consideration of the DCL Plan settlement, the Court must assess "the

probability of success in litigation" of the LBO-Related Causes of Action.  In re Martin, 91 F.3d

at 393.  In so doing, "the Court's task is not to decide the numerous questions of law and fact

raised by objections but rather to canvass the issues to see whether the settlement falls below the

lowest point in the range of reasonableness."  In re Exide Techs., 303 B.R. 48, 68 (Bankr. D.

Del. 2003) (internal quotation marks and alterations omitted).  The evidence presented during the

confirmation hearing, including the Examiner Report and Black's analysis, demonstrates that the

settlement easily meets this standard.  Indeed, Black's analysis showed that the settlement

consideration provided in respect of the Senior Notes and other Non-LBO Claims actually

exceeds the reasonably-expected range of recoveries.

**1.   The Examiner Report Supports The Reasonableness Of The DCL Plan Settlement.**

The Examiner Report – prepared by a neutral, independent, and highly-regarded

bankruptcy expert – provides the initial foundation for analyzing the DCL Plan settlement.  The

Examiner modeled recoveries to Non-LBO Creditors in six different litigation scenarios.[49]  Only

the Examiner's complete victory scenario (Case 6) – in which the Non-LBO Creditors would be

---

[48] DCL Ex. 385; Tr. 3/8 at 247:12-23 (Salganik).

[49] Examiner Report, Vol. 2, Annex B at B-7-B-9.  The Examiner also included two additional scenarios, Cases 7 and 8, which are variants of Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors).  Id.  Cases 7 and 8 add disgorgement proceeds from actions against Step Two Selling Stockholders.  These claims are included in the Preserved Causes of Action to be pursued after emergence under the DCL Plan, the proceeds of which go disproportionately to Non-LBO Creditors.  See Section II, above.

paid in full[50] – results in Non-LBO Creditors recovering more than even the initial guaranteed

distributions to be made to them under the DCL Plan (before the additional value provided to

Non-LBO Creditors from their disproportionate share of recoveries from the Trusts).[51]  In the

Examiner's other five scenarios, incremental recoveries to Non-LBO Creditors resulting from the

LBO-Related Causes of Action range from $0 (complete loss) to approximately $205 million to

$244 million (avoidance of all Senior Loan and Bridge Loan Claims against the Tribune parent

and avoidance of Step Two Claims against the Guarantor Debtors).[52]

      The Examiner analyzed each of the arguments that could lead to a full recovery

(avoidance of all claims at Step One and Step Two) and identified a number of problems.  For

instance, the Examiner found that there was "no credible evidence" that the Tribune entities

entered into the Step One Transactions in order to hinder, delay, or defraud creditors.[53]  The

Examiner also concluded that it was "highly likely" (the Examiner's highest probability) that the

Debtors would be found to have been solvent at Step One if the Step One and Step Two

Transactions were not collapsed, and that it was "somewhat unlikely" that those Transactions

would be collapsed.[54]  In addition, the Examiner found that, even if the Transactions were

collapsed, it was "somewhat likely (although a very close call)" that Tribune would be found to

be solvent.[55]  Finally, the Examiner concluded that the Guarantor Debtors – which hold the vast

---

[50] Assuming allowance of the PHONES Notes in the amount of $758.8 million (the "low PHONES" scenario).

[51] See Examiner Report, Vol. 2, Annex B at B-10-B-33.

[52] These recovery amounts are derived from the Examiner's Recovery Scenarios, taking Case 5 (Step One fraudulent transfer at Tribune and Step Two fraudulent transfer at Tribune and Guarantor Debtors) less the "natural recoveries" in Case 1 (base case) and using assumed high and low intercompany balances, respectively, from an intercompany claims settlement.  Examiner Report, Vol. 2, Annex B (the "Recovery Scenarios").  Pursuant to the Intercompany Claims Settlement embodied in the DCL Plan, the DCL Plan settlement assumes a settlement of Intercompany Claims at the midpoint in the settlement range, between the high and low intercompany balances.  See DCL Reply at 81-84.

[53] Examiner Report, Vol. 2 at 23.

[54] Examiner Report, Vol. 2 at 181, 187, 194.

[55] Examiner Report, Vol. 2 at 187-88.

majority of the Debtors' assets but collectively had substantially less debt than the parent entity –

were even more likely than Tribune to be found solvent in the event the Transactions were

collapsed.[56]  The Examiner reached this conclusion despite mistakenly assuming $603 million in

value attributed the Chicago Cubs, and 50% of the interest in Classified Ventures, were not owned

by a Guarantor Debtor.[57]  Taken together, the Examiner's conclusions demonstrate that the

Examiner believed that avoidance claims relating to Step One were more likely than not to end in a

complete loss (no avoidance).[58]

With respect to avoidance actions relating to Step Two, the Examiner reached a different

conclusion, finding that it was "somewhat likely" to "highly likely" that a plaintiff would prevail

on a claim of constructive fraud and "somewhat likely" that a plaintiff would prevail on a claim

for intentional fraudulent transfer.[59]  Critically, however, the Examiner determined that a

complete victory on Step Two avoidance would result *only in $45 million to $53 million* in

---

[56] Examiner Report, Vol. 2 at 211.

[57] Examiner Report, Vol. 2 at 209, 220.  DCL Ex. 1531 (Tribune's interest in Classified Venture equally split between Tribune Company and Tribune National Marketing Company); DCL Ex. 809 (Tribune National Marketing Company is a Guarantor Subsidiary).

[58] The testimony of Professor Fischel, the Senior Lenders' solvency expert, illustrates the difficulties the Noteholders would face in proving insolvency at Step One.  Fischel testified that "the contemporaneous economic evidence demonstrates that Tribune was solvent as of June 4, 2007 . . . whether the recapitalization and the merger are viewed as two separate transactions or as a single transaction."  Tr. 3/10 at 91:16-25 (Fischel).  Moreover, Fischel explained that the "proper view" based on market evidence is to regard Step One and Step Two as separate transactions.  Tr. 3/10 at 91:24-25 (Fischel).
In reaching his conclusions as to solvency, Fischel focused on "what contemporaneous [market] participants at the time, putting their wealth at stake, thought about the value" of Tribune.  Tr. 3/10 at 94:17-95:10 (Fischel).  Fischel cited Zell's investment in Tribune, the Lenders' decision to fund, rating agency data, bond yields, and CDS spreads as evidence of solvency as of Step One.  Tr. 3/10 at 95:14-97:12 (Fischel).  Fischel also performed a traditional balance sheet test and, based on DCF, comparable companies, and comparable transactions methodologies, found that Tribune was comfortably solvent at Step One irrespective of whether anticipated Step Two debt or S-Corp./ESOP tax benefits are taken into account.  Tr. 3/10 at 106:4-107:10; 119:3-21 (Fischel).  Using an average of third-party downside projections, Fischel similarly determined that Tribune had the ability to pay debts as they matured and adequate capital at Step One, even taking into account the Step Two debt.  Tr. 3/10 at 110:9-112:3; 121:11-125:18 (Fischel).

[59] Examiner Report, Vol. 2 at 32, 220, 229, 236, 240.

distributable value for holders of Non-LBO Claims[60] unless the Senior Lenders were equitably

estopped or otherwise barred from sharing in disgorgement recoveries in respect of payments

made on the Step Two Loans (a question the Examiner left in "equipoise").[61]  Moreover, even if

the Senior Lenders were prohibited from sharing in disgorgement, recoveries for Non-LBO

Creditors would increase by only approximately $275 million.[62]  In other words, even in the

Examiner's Step Two avoidance scenario most favorable to the Noteholders, a scenario that

includes unique and unprecedented subordination of valid Step One Claims,[63] Non-LBO

Creditors would benefit only by $320 to $328 million – *far less than the settlement*

*consideration provided under the DCL Plan.*

As the Examiner Report makes manifest, these issues are complex and dependent on

factual and legal issues as to which the outcome of litigation is uncertain.  The DCL Plan

settlement reflects the risks that all parties would face in litigation and strikes a reasonable

balance between scenarios the Examiner found more probable, which would result in recoveries

substantially lower than the DCL Plan settlement, and the "home run" (full avoidance at Step

One and Step Two) he found unlikely, which would result in a full recovery for Non-LBO

Claims.

---

[60] Litigation recovery amounts are derived from the Examiner's Recovery Scenarios, taking Examiner's Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors) less the "natural recoveries" in Case 1 (base case) and assumed high and low intercompany balances, respectively, from an intercompany claims settlement.  Examiner Report, Vol. 2, Annex B at B-10-B-13, B-18-B-21.

[61] Examiner Report, Vol. 2 at 302-03.

[62] The Examiner's Case 3 (Step Two fraudulent transfer at Tribune and Guarantor Debtors) includes $298 million of net disgorgement proceeds.  This amount is based on a gross number of $344 million, comprised of prepetition principal, interest, and fee payments to LBO Lenders ($318 million) and advisory fee payments ($25.6 million), from which the Examiner makes deductions for value conferred, collectability risk, and costs, resulting in a recovery of $298 million.  Examiner Report, Vol. 2, Annex B at B-18-B-21.  Removal of the advisory fee payments (which are not released under the DCL Plan settlement) and their share of the deductions results in a maximum of $275 million in recoveries on the Step Two Disgorgement Claims.

[63] See Section III.D.2, infra.

## 2.  Black's Analysis Demonstrates That The DCL Plan Settlement Is Reasonable.

The DCL Proponents' expert, Professor Bernard Black, assessed the reasonableness of the DCL Plan settlement and determined that it far exceeds the range of reasonable recoveries that Non-LBO Creditors could expect to receive.  Black analyzed both the potential recoveries Senior Noteholders could receive were they to litigate the LBO-Related Causes of Action as well as the probabilities of reaching each possible outcome.  After finding that Senior Noteholders could achieve payouts that exceed the proposed DCL Plan settlement's distributions in only one significantly unlikely scenario, Black concluded that the settlement is reasonable and advantageous for Senior Noteholders and other Non-LBO Creditors.

Like the Examiner, Black identified six main "Scenarios" representing the potential litigation outcomes, ranging from Scenario A (total Senior Lender victory and full allowance of all Senior Loan Claims) to Scenario F (total Senior Lender loss with full avoidance of all Senior Loan Claims).[64]  Notably, Black's six Scenarios do not model just the possibility of insolvency or intentional fraudulent transfer at each Step, but also capture issues that might affect recoveries.  For example, Scenario A includes not just the likelihood that Tribune was solvent at both Step One and Step Two (which would lead to no avoidance at either Step), but also the possibility that statutory defenses would prevent avoidance even if Tribune or the Guarantor Debtors were found to have been insolvent at either Step.[65]  Likewise, Scenario F includes the possibility that Senior Lenders

---

[64] Tr. 3/9 at 105:20-109:13 (Black).  The other four Scenarios were:  Scenario B, with Step Two Loans avoided at the Tribune parent but not at the Guarantor Debtors and no avoidance of Step One Loans; Scenario C, with Step Two Loans avoided at both the Tribune parent and the Guarantor Debtors and no avoidance of Step One Loans; Scenario D, with full avoidance at the Tribune parent and neither Step One or Step Two Loans avoided at the Guarantor Debtors; and Scenario E, with full avoidance at the Tribune parent and Step Two Loans (but not Step One Loans) avoided at the Guarantor Debtors.  Id.

[65] Tr. 3/9 at 109:14-110:8 (Black).

might be equitably subordinated to other creditors even if neither Step One nor Step Two were determined to be avoidable.[66]

Having established six possible Scenarios for litigation outcomes, Black then determined the likely recoveries for the relevant stakeholders under each Scenario and compared those recoveries to distributions provided under the proposed DCL Plan settlement.[67] The results, assuming net recoveries of $300 million by the Litigation Trust on causes of action preserved under the DCL Plan,[68] were discussed as part of Black's demonstratives and are summarized in the following table (Table 1):

**Table 1 – Payouts In Fully Litigated Scenarios (With Estimated Third-Party Recoveries)[69]**

Estimated payouts in different Scenarios, including $300 million in assumed net trust recoveries.  Senior Lender payouts are net of disgorgement; Bridge Lender payouts are before disgorgement ($143 million in Scenarios B-F). Amounts in $ millions.

| Creditor Class | Scenario | | | | | | DCL Plan |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | A | B | C | D | E | F | |
| Senior Loans (net of disgorgement) | 6,658 | 6,844 | 6,661 | 6,628 | 6,572 | 4,343 | 6,070 |
| Bridge Loans (before disgorgement) | 104 | 0 | 0 | 0 | 0 | 273 | 78 |
| Senior Notes | 83 | 132 | 271 | 310 | 352 | 1,433 | 659 |
| Swap | 113 | 121 | 153 | 142 | 153 | 154 | 151 |
| Other Parent Claims | 7 | 12 | 24 | 28 | 31 | 114 | 41 |
| Subsidiary Unsecured Claims | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 791 | 0 |
| **All Non-LBO Creditors** | **$288** | **$349** | **$532** | **$565** | **$621** | **$2,577** | **$936** |

Black (much like the Examiner) found that only in Scenario F, the full-avoidance "total victory" scenario, would the Senior Noteholders achieve more value than they will receive under

---

[66] Tr. 3/9 at 109:6-13 (Black).

[67] Tr. 3/9 at 111:11-112:8 (Black).

[68] Professor Black estimated at least $300 million in third-party recoveries based on his evaluation of settlement values for the preserved causes of action.  In particular, Professor Black focused on potential claims against Tribune's officers and directors, who are covered by a $200 million D&O insurance policy, actions to recover insider payments made in connection with the Leveraged ESOP Transactions, and claims against VRC and the financial advisors who assisted Tribune during the Leveraged ESOP Transactions.  Professor Black testified that $300 million was a conservative estimate given that he did not include any potential recoveries from third-party shareholders who sold stock during the Leveraged ESOP Transactions.  Tr. 3/9 at 147:19-152:2 (Black).

[69] DCL Ex. 1484 at 22-23; DCL Ex. 1492 at 3.

the DCL Plan settlement.[70]  In all other Scenarios, the Senior Noteholders would recover at least

*$300 million less* than the recoveries under the DCL Plan.  As such, Scenario F sets the upper

range on potential recoveries for the Senior Noteholders, while Scenarios A through E, which

offer substantially lower payouts, establish the lower and middle ranges for potential recoveries.

Viewed from this perspective, the DCL Plan settlement provides a middle ground

between Scenarios A through E on the one side and Scenario F on the other side and it is,

therefore, in the position of an archetypal settlement.[71]  Of course, the fact that the DCL Plan

settlement falls between the high and low litigation outcomes does not, by itself, conclusively

establish the reasonableness of the compromise.  Rather, as Black explained, the overall

reasonableness of the settlement depends on the likelihood of achieving each Scenario,

particularly Scenario F (total victory).[72]

Accordingly, to determine a hypothetical reasonable settlement range for the LBO-

Related Causes of Action, Black developed six "Cases," as sets of probabilities that he assigned

to each litigation outcome Scenario.[73]  The first four Cases, designed to reflect the full range of

views as to the strengths and weaknesses of the claims, range from a "Low Settlement Case" in

which probabilities are assigned in a manner strongly favorable to the Senior Lenders to a "High

Settlement Case" in which the assigned probabilities strongly favor the Non-LBO Creditors.  The

last two Cases reflect the views of the Examiner and Black himself, respectively.[74]

---

[70] Tr. 3/9 at 114:25-116:1 (Black).

[71] Tr. 3/9 at 113:19-21 (Black).

[72] Tr. 3/9 at 113:23-124:5 (Black).

[73] Assuming that most of the LBO-Related Causes of Action would end in settlement rather than being litigated to final judgment, the Cases were modeled as settlement outcomes, not full litigation outcomes. Tr. 3/9 at 116:6-9 (Black); DCL Ex. 1484 at 23.

[74] Tr. 3/9 at 116:6-118:11 (Black).  Professor Black also included a "Low-Mid Settlement Case," with probabilities moderately favorable to the Senior Lenders, and a "High-Mid Settlement Case," with probabilities moderately favorable to the Senior Noteholders. Id.

Black next determined the likelihood of success in each Case.  To do so, Black had to identify and assess the key drivers of the litigation outcomes, including:

- the likelihood the Court would "collapse" the Step One and Step Two Transactions for purposes of its solvency analysis (i.e., Step Integration);[75]

- whether the tax savings generated by Tribune's conversion to an ESOP-owned S corporation in connection with the Step Two Transactions (which Black called "S-ESOP tax value") should count in assessing balance sheet solvency;[76]

- how Tribune's projections and the state of the broadcasting and publishing markets in 2007 should be viewed as affecting Tribune's cash-flow cushion (its capital adequacy and projected ability to pay debts as they come due);[77]

- the likelihood the Debtors had actual intent to defraud creditors by means of the Step One or Step Two Transactions, or whether the Senior Lenders engaged in sufficiently egregious behavior to warrant equitable subordination of their claims;78 and

- whether the Senior Lenders' defenses would prevent avoidance in situations where it otherwise would occur.[79]

Of particular significance to Black's analysis was the first driver – the question of whether Step One and Step Two should be collapsed.  As the Examiner recognized and all parties concede, without collapse, the likelihood of demonstrating Step One insolvency is, at best, very small.[80]  As Black explained, there is substantial evidence that strongly supports the conclusion that Step One and Step Two should not be collapsed.[81]  On the basis of that evidence, the Examiner concluded that a finding that Step One and Step Two should be collapsed was

---

[75] Tr. 3/9 at 118:12-123:14 (Black).

[76] Tr. 3/9 at 124:2-125:10 (Black).

[77] Tr. 3/9 at 125:13-126:12 (Black).

[78] Tr. 3/9 at 127:2-128:24 (Black).

[79] Tr. 3/9 at 128:25-131:22 (Black).

[80] DCL Ex. 1484 at 38-39; Examiner Report, Vol. 2 at 207, 264.  See also Tr. 3/7 at 55:25-57 1 (Noteholder opening statement).

[81] Tr. 3/9 at 141:8-22; 153:17-154:8 (Black).

"somewhat unlikely"; for his part, Black opined that the likelihood of the Noteholders' prevailing on this point was even more remote.[82]

This reality has a profoundly negative effect on the ability of the Noteholders to succeed on what all parties view as the Noteholders' home run scenario – Scenario F (the only Scenario under which litigation recoveries would exceed those provided by the DCL Plan settlement). Additionally, as Black explained, the issue of collapse has a ripple effect on the value of other recovery scenarios. For example, while a finding in favor of formal Step Integration would increase the probability of Scenario F, Black testified that it also would increase the probability of Scenario A (the no avoidance scenario) because there would be no basis or occasion to take a "second look" at solvency at Step Two in the event that Step Two was collapsed into Step One.[83]

At the confirmation hearing, Black elaborated on each of these points and explained how he developed the probabilities associated with each of the litigation Scenarios in each of his Cases.[84] He also explained how, based on that analysis, he was able to derive expected recoveries for each Case.[85] These amounts, which are set out in Table 2 below and were presented to the Court as part of Black's demonstratives, establish the range of reasonable expected recoveries by the Non-LBO Creditors and demonstrate the reasonableness of the DCL Plan settlement.[86] More specifically, Black's analysis shows that when potential recoveries from third parties are considered, the distributions under the DCL Plan exceed *any* potential recoveries the Senior Noteholders or the Non-LBO Creditors as a whole would receive under any of the six Cases, even the High Settlement Case.

---

[82] Examiner Report, Vol. 2 at 181; DCL Ex. 1484 at 38, Tr. 3/9 at 153:17-24 (Black).
[83] Tr. 3/9 at 136:9-15 (Black).
[84] Tr. 3/9 at 118:16-144:21 (Black).
[85] Tr. 3/9 at 145:14-20 (Black).
[86] Tr. 3/9 at 146:21-147:16 (Black).

Table 2 – Recoveries In Different Cases (With Expected Third-Party Recoveries)[87]

Estimated payouts in different Cases, including $300 million in assumed net trust recoveries.  Senior Lender payouts are net of disgorgement; Bridge Lender payouts are before disgorgement.  Amounts in $ millions.

| Creditor Class | Case | | | | | | DCL Plan |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Low Settle | Low-Mid | Mid-High | High Settle | Black | Examiner | |
| Senior Lenders (net of disgorgement) | 6,624 | 6,539 | 6,415 | 6,185 | 6,544 | 6,305 | 6,070 |
| Bridge Lenders (before disgorgement) | 57 | 61 | 69 | 95 | 59 | 94 | 77 |
| Senior Notes | 217 | 295 | 409 | 600 | 294 | 475 | 659 |
| Swap | 129 | 134 | 139 | 146 | 134 | 138 | 151 |
| Other Parent Claims | 19 | 25 | 34 | 50 | 25 | 40 | 41 |
| Subsidiary Unsecured Claims | 85 | 85 | 85 | 85 | 85 | 85 | 85 |
| PHONES | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *All Non-LBO Lenders* | *$449* | *$539* | *$667* | *$881* | *$538* | *$738* | *$936* |

Finally, having determined that the distributions to be made under the DCL Plan exceed the range of reasonable litigation and settlement recoveries, Black reconfirmed his results by running a number of sensitivity tests that analyzed what the range of reasonable recoveries would be if he adjusted:  (i) the probabilities associated with each settlement Case; (ii) the amount of third-party recoveries; (iii) the Debtors' distributable enterprise value; (iv) the likelihood of the Senior Lenders receiving post-filing interest; (v) the likelihood of inclusion of S-ESOP tax value in the balance sheet analysis; (vi) the valuation/amount of PHONES debt; and (vii) the possibility that Senior Lenders would be prohibited (through equitable subordination or otherwise) from participating in disgorgement recoveries in respect of the Step Two Transactions.[88]

As Black testified, those tests confirmed that the DCL Plan settlement payouts remained reasonable even when contested issues affecting the LBO-Related Causes of Action were changed in favor of the Non-LBO Creditors.  Indeed, his analysis showed that the DCL Plan

---

[87] DCL Ex. 1484 at 28-29; DCL Ex. 1492 at 9.
[88] Tr. 3/9 at 155:11-168:18 (Black).

settlement consistently remained either above the resulting settlement range or at the top end of the range.[89]

## III. THE NOTEHOLDERS' OBJECTIONS TO THE DCL PLAN SETTLEMENT HAVE NO MERIT.

The evidence presented in connection with the confirmation hearing demonstrates that the Noteholders' criticisms of the DCL Plan settlement are unfounded and unsupportable. The DCL Proponents address each of the Noteholders' arguments in this Section of the brief.

### A.   The Noteholders Mischaracterize The DCL Plan Settlement And Understate The Settlement Consideration Provided To The Non-LBO Creditors.

The Noteholders first try to minimize the settlement consideration by mischaracterizing the DCL Plan settlement and its basic terms.

#### 1.   The Noteholders' "Settlement Percentages" Are False And Misleading.

To start, the Noteholders misleadingly characterize the DCL Plan settlement consideration as a percentage of the face amount of the various claims to be allowed and/or released under the DCL Plan. In a demonstrative exhibit referenced repeatedly during the confirmation hearing, for example, the Noteholders calculated a percentage "give up" for allowance of the Senior Loan Claims by dividing the settlement consideration they arbitrarily assign (see below) by the aggregate size of the Senior Lenders' allowed claim, predictably yielding very low percentages.[90]

This is misleading in the extreme. As the Court is aware, avoidance of an $8.6 billion claim (the amount of the Senior Loan Claims) does not result in $8.6 billion in new value flowing into the estate; and the avoidance claim therefore is not an "$8.6 billion claim" as the

---

[89] Tr. 3/9 at 168:23-170:1 (Black). Adjusting the sensitivities had a minimal impact on the upper end of the settlement range, although it did have an impact on the lower end of the range. See Tr. 3/9 at 168:23-169:7 (Black).
[90] See NPP Ex. 2473.

Noteholders disingenuously assert.  Rather, the "value" of avoidance of any given claim is the amount by which avoidance could improve the recoveries of remaining creditors, and the estates can recover no more than the amount necessary to pay the remaining creditors in full.  In the case of Senior Noteholders, possible litigation outcomes range from natural recoveries of 4.8% (approximately $62 million) if all Senior Loan Claims are allowed (total loss) to 100% (approximately $1.283 billion, excluding post-petition interest) if all such claims are completely avoided (total victory).[91]  Thus, the maximum recovery against which settlement consideration is measured vis-à-vis the Senior Noteholders would be $1.221 billion, not $8.6 billion.[92]

Under the DCL Plan, without any of the risks, cost, and delay of litigation, Senior Noteholders recover a guaranteed minimum of roughly **33.5%** (approximately $431 million).[93] If the Litigation Trust nets a combined $300 million on the numerous preserved claims (determined by Black to be a reasonable assumed recovery), Senior Noteholder and Other Parent Claim recoveries go up to **51%** (an additional $226.5 million).  This is the appropriate measure of the reasonableness of the DCL Plan settlement.

### 2. The Noteholders Ignore The Value Of Litigation And Creditors' Trust Recoveries.

In another attempt to understate the settlement consideration, the Noteholders completely ignore the value of the disproportionate share of recoveries from the Litigation and Creditors' Trusts that the DCL Plan provides to Non-LBO Creditors.

---

[91] See Examiner Report, Vol. 2, Annex B at B10-B13, B30-B33.
[92] Measurement including the PHONES Notes would add an additional $760 million to $1.26 billion to the calculus, depending on resolution of the dispute regarding the allowed amount of PHONES Notes claims.  However, because the PHONES Notes Claims are contractually subordinated, it is appropriate to exclude them from the analysis given that the evidence showed that the expected value of the LBO-Related Causes of Action is far less than the amount necessary to satisfy even the Senior Notes.  See e.g., DCL Ex. 1484 at 22.
[93] DCL Plan § 3.2.5; DCL Ex. 384.

As explained in Section II, above, the DCL Plan entitles Non-LBO Creditors to the first $90 million in net recoveries by the Trusts, plus 65% of all future net recoveries once the Trusts' $20 million Loan is repaid.  In contrast, a pure *pro rata* allocation of recoveries based upon the ratio of Non-LBO Claims to Senior and Bridge Loan Claims would entitle Senior and Bridge Lenders to roughly *87%* of every dollar distributed from the Trusts, after repayment of the Trusts' Loan.  Under the DCL Plan, if the Trusts receive just $300 million in net recoveries, Non-LBO Creditors will receive an additional $226.5 million, as compared to roughly $35 million were proceeds distributed on a *pro rata* basis.  By ignoring this beneficial split of Trust recoveries, the Noteholders render meaningless their comparison of the settlement to the alleged "expected value" of full litigation.

The Noteholders' disregard of this point also is fundamentally at odds with their own stated views of the merits of the LBO-Related Causes of Action.  For example, taking the Noteholders' expert (Beron) at his word that there is a 60% chance of a finding of intentional fraudulent transfer in connection with Step Two, the Litigation Trust would have a 60% chance of recovering up to $3.9 billion in payments made by Tribune to shareholders in December 2007.[94]  The Noteholders thus themselves implicitly assign an "expected value" of over $2.3 billion to such claims.  Under the DCL Plan, Non-LBO Creditors would receive more than $1.5 billion of such recoveries, on top of their $550+ million in initial, guaranteed, risk-free distributions, enough to pay the Senior Notes in full and provide a substantial distribution on account of the subordinated PHONES Notes.

As noted in Section III.E, below, the DCL Proponents disagree with Beron's methods and opinions.  The point here is simply that it is illogical for the Noteholders simultaneously to argue

---

[94] NPP Ex. 2476 at 28; DCL Ex. 376 at 61; DCL Ex. 1400 at 37.

that claims against the Senior Lenders have enormous value and that the favorable allocation of Trust interests somehow has *no* value whatsoever.

### 3. The Noteholders Improperly Apportion The Settlement Consideration.

Lastly, the Noteholders attempt to divide the comprehensive DCL Plan settlement into artificial pieces and arbitrarily assign a "value" to each piece. This piecemeal attack is inconsistent with governing law and basic logic. When many related claims are settled, parties rarely (if ever) assign specific settlement consideration to specific claims – and indeed often disagree regarding the value of each settled claim. The parties instead routinely negotiate a "global" settlement of all related claims without assigning specific settlement values. That is precisely the situation here.

The <u>Washington Mutual</u> case, cited by the Noteholders in support of their effort to slice and dice the settlement, in fact fully supports the assessment of a settlement of *related* claims – like the settlement embodied in the DCL Plan – as a whole. In <u>Washington Mutual</u>, when faced with a package of several settlements of wholly-*unrelated* claims bundled together as a "global" compromise, Judge Walrath divided the settlement into eleven smaller sub-settlements, each of which resolved a group of *related* claims against a particular defendant group. <u>In re Washington Mut., Inc.</u>, 442 B.R. 314, 329-44 (Bankr. D. Del. 2011)[95] Notably, Judge Walrath evaluated all fraudulent transfer claims against one group of creditors in the *same* sub-settlement group, without requiring that each alleged claim be assigned a specific settlement value. <u>Id.</u> at 342. The Noteholders' attempt to deconstruct the DCL Plan – which resolves highly-related avoidance claims – would assign weight and value to "settlements" that in fact were never agreed to and

---

[95] The eleven sub-settlements were: (a) deposit accounts, (b) tax refunds, (c) trust preferred securities, (d) intellectual property rights, (e) employee benefit plans, (f) VISA shares, (g) vendor claims, (h) goodwill litigation, (i) *fraudulent transfers and preference claims*, (j) business tort claims and (k) miscellaneous claims.

would not be agreed to in the absence of a comprehensive resolution. <u>Washington Mutual</u> simply does not support this effort.

The Noteholders first set up a false construct by comparing the settlement consideration offered under the September Settlement, which settled only avoidance claims relating to the Step One Loans, to the settlement embodied in the DCL Plan, which resolves avoidance actions in respect of all Senior Loan Claims. The Noteholders assert that the incremental consideration represents the settlement amount for the avoidance claims with respect to the Step Two Claims, which they contend were settled too cheaply.[96] Apart from the inappropriateness of comparing the September Settlement (which was not supported by the Committee or JPMorgan) to the DCL Plan (which is supported by the Committee and JPMorgan), the Noteholders' comparison of the two settlements does not withstand scrutiny. Although the September Settlement did leave Step Two Claims "disputed," the preserved avoidance claim was of little value to Non-LBO Creditors because, given the size of the Step One Claims to be allowed, all of the Debtors' DEV (other than a reserve of approximately $77.7 million for the Bridge Loan Claims) was to be distributed. With no reserve established for the avoidance of Step Two Claims, there would have been little to no net benefit to the estates accruing from avoidance of the Step Two Claims.[97] This was consistent with the Examiner's conclusion that the benefit to Non-LBO Creditors from avoidance of Step Two Claims was only an additional $45 to $53 million.[98] Given the low value to the estate of the additional claims settled under the DCL Plan, the DCL Plan provides a more than ample increased guaranteed recovery for Senior Noteholders and other Non-LBO Creditors, as well as

---

[96] Noteholder Obj. ¶¶ 86-87, 314.

[97] DCL Ex. 383.

[98] Examiner Report, Vol. 2, Annex B at B-10, B-13, B-18, B-21; <u>see also</u> n.60, <u>supra</u>.

substantially improving the potential upside for those creditors through enhanced participation rights in the Litigation Trust recoveries.

The Noteholders next complain that the DCL Plan provides for a "free" release of claims against former Senior Lenders for disgorgement payments made on account of Step One Loans (the "Step One Disgorgement Claims").[99]   In fact, however, resolution of the Step One Disgorgement Claims is an important part of the DCL Plan settlement as a whole, without which the Senior Lenders would not have agreed to provide more than $400 million in settlement consideration.[100]   As an initial matter, many current holders of Senior Loan Claims are the same parties that received prepetition payments of principal and interest on the Step One Loans and, understandably, were not willing to make significant payments to settle allowance of their Step One Claims only to face the risk of being forced to disgorge payments made on those very same allowed claims.   Settlement of disgorgement claims goes hand-in-hand with settlement of allowance claims, and the settlement consideration provided under the DCL Plan takes this into account.

In addition to the overlap between the two potential defendant groups, a failure to resolve the Step One Disgorgement Claims would have created unacceptable risks for all current Senior Lenders, even those with no exposure to disgorgement of prepetition payments.   Specifically, in the event that the Step One Disgorgement Claims were not resolved, Step One payment recipients sued for disgorgement would attempt to recoup their losses by asserting indemnity claims (based upon trading documents) against parties to whom they sold their debt, and would assert the right to share in distributions from the estates on account of claims for the amounts disgorged, both leading to dilution in recoveries by existing Senior Lenders.

---

[99] Noteholder Obj. ¶ 327.
[100] See Tr. 3/9 at 38:20-39:4 (Kulnis).

Thus, because avoidance and disgorgement claims cannot be neatly parceled out, it was critical that *all* claims respecting the Senior Loans be resolved through the DCL Plan settlement. Like any settling party, the Senior Lenders understandably were not willing to make significant settlement concessions to settle one set of claims while still remaining exposed to material risks due to the failure to resolve other integrally-related claims.[101] Ultimately, the Debtors and the Committee agreed to the overall settlement with the Senior Lenders because they concluded that the aggregate settlement consideration provided by current holders of Senior Loan Claims and the Step Two Arrangers was sufficient to resolve all claims against current and former Senior Lenders. Because the settlement was not negotiated on a claim-by-claim basis, it cannot fairly be evaluated on a claim-by-claim basis – it must stand or fall as a whole.

**B.    The Examiner Report Was Not A "Game Changer" In Favor Of Non-LBO Creditors.**

The Noteholders next attack the DCL Plan by claiming that it is inconsistent with the Examiner Report. Specifically, in an effort to escape the implications of Centerbridge's wholehearted endorsement of the April Plan settlement (not to mention Aurelius's own prior determination not to object to that settlement[102]), Dan Gropper of Aurelius testified that the

---

[101] The Noteholders may point to the $120 million settlement payment backstopped by the Step Two Arrangers as evidence that disgorgement claims can and should be settled separately, but this demonstrates nothing. The claims for disgorgement of payments in respect the Step Two Loans were different than the Step One Disgorgement Claims. Most critically, for all the reasons set forth by the Examiner, the risk profile of avoidance/disgorgement actions for Step One Loans is vastly different than for Step Two Loans, making the Step One Disgorgement Claims significantly less valuable. Moreover, the bulk of payments that are the subject of the $120 million backstopped payment in respect of Step Two Loans were received by a narrow, defined group – the Step Two Arrangers: JPMorgan, Bank of America, Merrill Lynch, and Citigroup. Those parties were substantially involved in the case, "at the table," and prepared to negotiate a contribution of settlement value to achieve a broad consensual resolution of all claims related to the Senior Loans, critically agreeing to "backstop" the settlement for the non-arranger defendants, and ensuring that the full $120 million in settlement consideration would be received by the estates.

[102] See Tr. 3/7 at 66:22-67:11.

Examiner Report was "a complete game changer in these Chapter 11 cases" – one that, in his view, should have driven up the settlement consideration available to Senior Noteholders.[103]

Of all interested parties, however, only Aurelius, seeking to boost the value of its mid-bankruptcy investment, professes the view that the Examiner Report radically altered the framework for analyzing the LBO-Related Causes of Action and assessing potential settlements. In fact, Aurelius's current view not only is inconsistent with the evidence in multiple ways, but is also at odds with Aurelius's own prior, less litigation-driven, perspective.

*First*, it is illuminating that, in the wake of the issuance of the Examiner Report, Centerbridge (then the largest Senior Noteholder) "wanted the [April Plan settlement] to go forward," modified only by a provision for a litigation trust containing claims arising out of Step Two against parties other than the Senior Lenders (the very same claims against shareholders, directors, officers, and advisors now preserved by the DCL Plan settlement).[104]  And, after the issuance of the Examiner Report, Aurelius did not "take any steps that caused [the April Plan settlement] to come apart."[105]

*Second*, contrary to the Noteholders' contention that the Examiner Report rendered the April Plan settlement woefully deficient and therefore led to its sudden abandonment, it was certain of the Senior Lenders – *not Centerbridge* – that withdrew from the settlement. JPMorgan's Miriam Kulnis testified that many Senior Lenders, including JPMorgan, "viewed [the Examiner's] findings with respect to Step One as sort of a vindication that Step One was good and, therefore, the [April] settlement was too high," and the Debtors and other supporters

---

[103] Tr. 3/15 at 232:18-233:22 (Gropper).
[104] Tr. 3/9 at 24:24-26:14 (Kulnis).
[105] Tr. 3/15 at 242:23-25 (Gropper).

of the April Plan were concerned that the Senior Lender class would not vote to accept the April Plan unless it was modified to reduce the settlement cost.[106]

**Third**, Aurelius itself appears to have believed that the Examiner's conclusions would reduce, rather than increase, the expected recovery for Senior Noteholders. As Aurelius's analyst, Dennis Prieto, conceded "not every finding that the Examiner made was helpful to the pre-LBO creditors" and, indeed, "numerous of the findings . . . are mixed or even unhelpful."[107] Certain of Aurelius's probability scenarios, which were modeled prior to release of the Examiner Report, were revised by Prieto as of August 2, 2010 (the "August 2 Model"), at least in part to reflect the conclusions in the Examiner Report.[108] After those revisions, the August 2 Model reflected a **decrease** in the Senior Noteholders' expected recovery in the "mid avoidance case" of the "mid valuation scenario" – which Prieto described as his "best estimate of [the] outcome" – from $640 million to $581 million.[109]

**Fourth**, while the Examiner Report placed a high probability on the likelihood that the Step Two Loans could be avoided, it also recognized that a complete Step Two victory would result in only small incremental gains for Non-LBO Creditors, particularly if the Senior Lenders

---

[106] Tr. 3/9 at 23:25-24:5, 24:18-20 (Kulnis); Tr. 3/8 at 55:6-13 (Kurtz). Oaktree never supported the April Plan because, even before the Examiner Report was issued, Oaktree viewed the amount of consideration provided to the Noteholders by the Senior Lenders as excessive. Liang Dep. at 221:11-23; Baiera Dep. at 41:9-16.

[107] Prieto Dep. at 126:12-14, 128:10-129:15; DCL Ex. 987 (July 30, 2010 e-mail from Prieto to Gropper).

[108] Prieto Dep. at 115:11-116:4, 117:7-9, 125:8-16, 127:14-24.

[109] Prieto Dep. at 106:5-12, 106:24-107:8, 123:8-19, 124:17-125:6; DCL Ex. 449 (e-mail from Prieto to Mark Brodsky concerning February 3 Model), DCL Ex. 1409 at AUR0001700 (February 3, 2010 Model), DCL Ex. 1422 at AUR009427 (August 2 Model). Among other revisions, the "mid avoidance case" in the August 2 Model reflects the lowering of the expected likelihood that both Step One and Step Two would be avoided from 36.5% to 25%, and the lowering of the expected likelihood that Step One and Step Two would be collapsed from 70% to 50%. See Prieto Dep. at 118:5-121:2; DCL Exs. 1409 at AUR0001702, DCL Ex. 1422 at AUR009424.

Indeed, Aurelius's contemporaneous assessment of the implications of the Examiner Report was corroborated by a concurrent analysis of an independent investment research firm, Credit Sights (the "Credit Sights Analysis"), which was circulated internally at Aurelius in August 2010. DCL Ex. 435 (e-mail from Matthew Zloto to Mark Brodsky attaching Credit Sights Analysis), DCL Ex. 1323 (Credit Sights Analysis, dated August 18, 2010). The Credit Sights Analysis estimated that, taking into account the Examiner Report, the Senior Noteholders' expected recovery would be only 32.7% (lower than under the April Plan), explaining, among other things, that "[f]or the senior note holders the problem is that the Examiner held out little hope that the first Step would be counted as a fraudulent transfer." DCL Ex. 1323 at AUR0073623-24.

were not equitably estopped or otherwise barred from sharing in Step Two disgorgement recoveries,[110] and that even this highly unusual estoppel remedy would yield recoveries far less than the settlement consideration provided under the April Plan (and the DCL Plan). The Senior Lenders knew this and their negotiations reflected that assessment.

In sum, the Noteholders' current black-and-white settlement narrative and reading of the Examiner Report is pure fiction. All other interested parties recognized that the Examiner Report is subject to varied interpretations and created risks and uncertainties for all parties, and therefore negotiated accordingly. The DCL Plan provides a reasonable compromise between the possible litigation extremes.

C.    **There Are Substantial Hurdles To Prevailing On A Claim For Full Avoidance.**

As noted above, the Noteholders' primary attacks on the DCL Plan are premised on the assertion that the claims of the Senior Loan are avoidable in full – the only litigation outcome that produces a result better than the DCL Plan. Accordingly, much of the evidence at the confirmation hearing focused on the key drivers that impact the prospects of success on the full avoidance claim. As shown below, and as confirmed both by the Examiner and by Black, the evidence regarding each of those sub-issues plainly supports the conclusion that the DCL Plan settlement more than fairly accounts for the probability of success on the full avoidance claim (total victory).

1.    **Challenges To Collapse**

First, full avoidance requires that the Court collapse the Step One recapitalization transactions that occurred in June 2007 with the Step Two ESOP merger transactions that occurred in December 2007, such that all of the Step Two debt (which had not yet been incurred)

---

[110] Examiner Report, Vol. 2 at 226; Examiner Report, Vol. 2, Annex B at B-10, B-13, B-18, B-21; see also n.60, supra.

is considered as an actual liability of the Debtors at the time of Step One.  Without collapse (*i.e.*, considering the Step One Claims alone), there is *no evidence* on which a court could reasonably conclude that the Tribune parent and the Guarantor Debtors were insolvent as of Step One. Indeed, the Examiner concluded that it was "highly unlikely" (the Examiner's lowest probability) that the Debtors would be found to have been balance sheet insolvent at the time of the Step One Transactions without collapse.[111]  Likewise, Professor Daniel Fischel testified that, considering Step One alone, Tribune had equity value (solvency) in excess of $3.7 billion.[112] Critically, even the Noteholders' expert, Tuliano, simply assumed collapse and conceded that he would have found Tribune to be solvent as of Step One considering the Step One obligations on a standalone basis.[113]

With respect to the issue of collapse, the Examiner concluded that "[a]lthough the question is close . . . a court is somewhat unlikely to include the Step Two Debt for purposes of determining solvency at Step One,"[114] and that "a court would be somewhat unlikely to conclude that the prerequisites established under the applicable law for collapse of Step One and Step Two are met here."[115]  In so opining, the Examiner pointed to evidence showing "that participants in the Leveraged ESOP Transactions not only contemplated the possibility that Step Two might not happen, they structured the documents so that Step One could stand alone if necessary."[116]  The Examiner also identified the "time lag" between the Step One and Step Two Transactions[117] as

---

[111] Examiner Report, Vol. 1 at 16-18.

[112] Tr. 3/10 at 106:4-107:10 (Fischel).

[113] Tr. 3/18 at 109:20-110:22, 143:11-14 (Tuliano).

[114] Examiner Report, Vol. 2 at 160.

[115] Examiner Report, Vol. 2 at 181.

[116] Examiner Report, Vol. 2 at 173-77.

[117] Time lag is significant because "the balance sheet test looks to the debtor's solvency (or insolvency) at a moment in time, as opposed to the debtor's solvency (or insolvency) at a point in the future."  Examiner Report, Vol. 2 at 130 n.391 (citing Boyer v. Crown Stock Distrib., Inc., 587 F.3d 787, 794 (7th Cir. 2009)).

well as the separate and independent conditions to the consummation of the Step Two Transactions, including FCC approval, Major League Baseball approval, and receipt of a solvency opinion and solvency certificate, as creating genuine uncertainty about whether Step Two would happen.[118]   The Examiner further cited "the relatively modest $25 million break-up fee" as an additional factor militating against collapsing the transactions.[119]   Finally, the Examiner highlighted market evidence supporting the conclusion that the transactions were separate, including "the fact that the Tribune Common Stock traded at a discount to the Merger price in the months following Step One," indicating uncertainty about whether the Step Two Transactions would close.[120]   Based on these facts, the Examiner concluded that, in order to collapse the Step One and Step Two Transactions for solvency purposes, "[*a*] *court would not just have to expand on the existing law*" but that doing so "*would entail disregarding . . . , in a very tangible way, substantive aspects of the Leveraged ESOP transactions.*"[121]

In their opening statement, the Noteholders promised that they would establish that they have "a very high chance of winning" the collapse question.[122]   The Noteholders, however, failed to introduce evidence to back up that promise, offering only the testimony of Tuliano.  But Tuliano did not dispute that the evidence establishes that Step Two was not a foregone conclusion, nor did he take issue with the fact that Step One could stand on its own.[123]   In fact, Tuliano conceded that there was considerable risk that Step Two in fact would not close,[124] that the drop in Tribune's share price during the summer of 2007 was consistent with the fact that the

---

[118] Examiner Report, Vol. 2 at 173-77.
[119] Examiner Report, Vol. 2 at 180.
[120] Examiner Report, Vol. 2 at 177, 179-80.
[121] Examiner Report, Vol. 2 at 181-82 (emphases added).
[122] Tr. 3/7 at 55:21-56:7 (Noteholders' opening statement).
[123] Tr. 3/18 at 113:17-123:17 (Tuliano)
[124] Tr. 3/18 at 144:6-146:2 (Tuliano).

market was uncertain as to whether those transactions would occur,[125] that the participants in the Step One Transactions never assumed that the Step Two Transactions would close,[126] and that Tribune's public filings disclosed that the Step Two Transactions might not close.[127]

Nevertheless, Tuliano insisted that it was necessary to collapse Step Two (consummated six months after Step One) into Step One based solely on the fact that the parties intended and desired to complete both transactions.[128]  That fact standing alone, however, is clearly not sufficient to collapse two separate transactions.  See Mervyn's Holdings, LLC v. Lubert Adler Group IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 497 (Bankr. D. Del. 2010) (no collapse where first transaction was not "dependent on or conditioned on other transactions").  Indeed, there is significant evidence beyond that cited by the Examiner supporting the conclusion that Step One and Step Two were separate transactions and as such should not be collapsed.  For example, Professor Black, who judged the likelihood of collapse as remote,[129] noted that Tribune had planned a major cash distribution to shareholders of $17.50 per share before Zell made his proposal, and that it insisted on a tender offer up front (Step One) so that, whether or not the merger (Step Two) happened, that value would have been distributed to shareholders.[130]  See Mervyn's, 426 B.R. at 497 (no collapse where first transaction "would have occurred on its own").  Fischel likewise opined that Step One and Step Two should not be collapsed, citing the

---

[125] Tr. 3/18 at 149:2-150:5 (Tuliano).

[126] Tr. 3/18 at 114:10-115:20 (Tuliano).

[127] Tr. 3/18 at 117:14-25 (Tuliano).  Tellingly, Tuliano did not know that Tribune was under no obligation to obtain the Step Two Loans, and did not know that EGI-TRB was provided a mechanism to sell its Tribune shares if the Step Two Transactions did not occur. Id. at 117:7-13, 116:22-117:3.

[128] Tr. 3/18 at 54:20-55:16; 121:24-125:19 (Tuliano).

[129] Tr. 3/9 at 153:18-24 (Black).

[130] Tr. 3/9 at 141:8-20 (Black).

"overwhelming" market evidence, and specifically the stock price data, reflecting the market's belief that there was substantial doubt as to whether Step Two would occur.[131]

### 2. Challenges To Proving Insolvency At Step One Even Assuming Collapse

The evidence further makes clear that prevailing on the issue of collapse alone would not establish insolvency at Step One. Even assuming collapse, taking all of the anticipated Step Two Loans into account, there is a substantial question as to whether the Tribune parent and the Guarantor Debtors were insolvent at Step One.

In examining solvency at Step One in the collapse scenario that includes the Step Two Debt, the Examiner concluded that, under the balance sheet test, it would be "somewhat unlikely (but, to emphasize, a very close call)" that a court would conclude that Tribune was rendered insolvent, but then observed that it was "more likely" that the Guarantor Debtors would be solvent even in a collapse scenario due to the fact that the Guarantor Debtors had more than $2 billion less debt than did Tribune itself.[132]

Importantly, the Examiner reached these conclusions despite the fact that, as explained above, the Examiner mistakenly assumed that $603 million in value attributed to the Chicago Cubs and 50% of Tribune's interest in Classified Ventures were not assets of the Guarantor Debtors.[133] Had the Examiner included that value in his assessment, he undoubtedly would have reached an even more forceful conclusion of Guarantor Debtor solvency. This is a critical weakness in the Noteholders' case for insolvency, because an inability to avoid the guarantees issued by the Guarantor Debtors would prevent the vast bulk of the Debtors' value from flowing to the Tribune parent and being made available to the Tribune parent's creditors.

---

[131] Tr. 3/10 at 219:20-23 (Fischel).
[132] Examiner Report, Vol. 2 at 206-07.
[133] Examiner Report, Vol. 2 at 209.

In addition, the Examiner did not give any credit in his assessment of balance sheet capital to two different forms of tax value that are special to ESOP-owned S Corporations (which Tribune became upon closing of Step Two) – the value of the ability to monetize assets without material tax liabilities and the value of virtually tax-free receipt of operating income.[134]  When these sources of value are taken into account, balance sheet solvency at Step One, even assuming collapse, is not a close question.[135]

Regarding cash flow and capital adequacy in the collapse scenario, the Examiner found it "reasonably likely" that a court would conclude that Tribune met those tests at the time of the Step One Transactions and even more likely that the Guarantor Debtors did so.[136]  In reaching these conclusions, the Examiner found that management's February 2007 projections were reasonable and that there was no reason to revise those projections based on declines in performance in April and May.[137]  While Tuliano took issue with these conclusions, as detailed in Section III.F, below, his analysis is riddled with errors.  In fact, Black and Fischel testified that in order to make a determination of insolvency at Step One, a court would either have to ignore the wealth of market evidence indicating to the contrary or conclude that the markets, the lenders, and Zell had all greatly misjudged Tribune's solvency.[138]

---

[134] See DCL Ex. 1484 at 56-73.  As Black pointed out, the Examiner appears to have misunderstood these two sources of value.  With respect to asset disposition tax value, the Examiner concluded that the S-ESOP structure "would not affect the price paid by a willing buyer for [Tribune's] assets."  Examiner Report, Vol. 2 at 27-28, n.87.  However, Tribune was able, effectively, to take a write up of the tax basis of its assets to market value without paying tax, which in turn allowed it to dispose of those assets at a higher tax basis.  A counterparty could then take higher depreciation deductions, which is something for which that counterparty would be willing to pay.  Tr. 3/10 at 19:11-22 (Black).  In Black's view, if the Examiner had properly understood this, he likely would have counted this value in his balance sheet test.  DCL Ex. 1484 at 66; Tr. 3/10 at 153:1-8 (Black).  Similarly, the Examiner gave no weight to the value of not paying federal income tax because he again did not seem to understand the argument.  Tr. 3/9 at 153:1-10 (Black).

[135] DCL Ex. 1106 at ¶ 66, Ex. O.

[136] Examiner Report, Vol. 2 at 211, 219-20.

[137] Examiner Report, Vol. 2 at 212-13.

[138] Tr. 3/9 at 142:18-144:5 (Black); Tr. 3/10 at 91:11-94:2, 95:14-96:23 (Fischel).

### 3. Challenges To Proving Intentional Fraudulent Transfer And Equitable Subordination

The Noteholders hold out intentional fraudulent transfer or equitable subordination of the Senior Loan and Bridge Loan Claims as alternative paths to full avoidance. In reality, however, these claims add little to the overall possibility of success.

The Examiner "did not find credible evidence that the Tribune Entities entered into the Step One Transactions to hinder, delay, or defraud creditors."[139] As such, the Examiner concluded that "a court is reasonably likely to conclude that the Step One Transactions did *not* constitute an intentional fraudulent transfer."[140] This is not surprising. As Black explained, it is simply not plausible that a court would determine that Tribune was solvent at Step One and then turn around and determine that Tribune had actual intent to hinder, delay, or defraud creditors by consummating the Step One Transactions.[141] The Noteholders do not seriously dispute this – all of the arguments in the Noteholders' pretrial briefing with respect to alleged intentional fraudulent transfers merely rehashed their insolvency claims.[142]

The Examiner also concluded that there was not "sufficient evidence to support a finding that the Lead Banks engaged in the kind of egregious behavior that would justify equitable subordination or equitable disallowance," and that it therefore was "somewhat unlikely" a court would impose such a remedy.[143] Much like a intentional fraudulent transfer, a finding that the Senior Lenders engaged in misconduct such that their claims could be equitably subordinated is implausible if a court does not first find that Tribune was rendered insolvent by the Transactions. The Noteholders, relying on the same documents that the Examiner found insufficient to support

---

[139] Examiner Report, Vol. 1 at 7; Examiner Report, Vol. 2 at 26, 28.
[140] Examiner Report, Vol. 1 at 7 (emphasis added).
[141] Tr. 3/9 at 127:10-14 (Black); Tr. 4/12 at 143:17-144:1 (Black).
[142] Noteholder Obj. ¶¶ 141-145.
[143] Examiner Report, Vol. 2 at 332, 336.

a claim for equitable subordination, attempt to recast them to show that the Lead Banks knew the transactions would render Tribune insolvent.[144]   However, the Noteholders offer no basis to believe that a court that had already determined that the transactions did *not* render Tribune insolvent would nevertheless reject the Examiner's interpretation of those emails and conclude that the allowed Senior Loan and Bridge Loan Claims somehow should be equitably subordinated or otherwise disallowed.

The weakness of the Noteholders' arguments of lender "misconduct" is further evidenced by the fact that they focus primarily on the Senior Lenders' efforts to obtain structural seniority through subsidiary guarantees.[145]   This transaction structure, which was permitted by the terms of all of Tribune's preexisting non-LBO debt, does not itself support equitable subordination. Indeed, the Noteholders have not made any allegations that the Senior Loan Agreement violated any terms of Tribune's existing debt instruments, and the Examiner and numerous courts have made it clear that it is not inappropriate for a prospective lender to attempt to structure a loan in a way that maximizes the prospect of repayment.[146]

### 4.   Potential Defenses Exist To The "Full Avoidance" Claims.

Finally, in assessing the probability of prevailing on a claim for full avoidance or any of the Noteholders' alleged "paths to success" (discussed in Section III.D, below), the Senior Lenders' potential defenses must be taken into account.  In this connection, the Examiner noted

---

[144] See Examiner Report, Vol. 1 at 263-65, 624-26; Vol. 2 at 333-38.

[145] Specifically, the Noteholders claim that it was inappropriate for the lenders to seek guarantees of entities that held the vast majority of Tribune's assets, to the detriment of the preexisting Non-LBO Creditors.

[146] See Examiner Report, Vol. 2 at 333 ("[T]here was nothing per se improper with exploiting an opportunity presented by the Tribune entities' capital structure and the absence of contractual prohibitions against the incurrence of debt at the Guarantor Subsidiary levels."); see also In re Owens Corning, 419 F.3d 195, 212-23 (3d Cir. 2005) ("To begin, the Banks did the 'deal world' equivalent of 'Lending 101.'  They loaned $2 billion to OCD [the parent] and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt.  What the Banks got in lending lingo was 'structural seniority' -- a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have.  This kind of lending occurs every business day. *To undo this bargain is a demanding task*.") (emphasis added).

that the Senior Lenders would argue that the extension of the loans themselves in good faith constituted consideration or value given to the Debtors in exchange for the incurrence of the loan obligations, rendering any constructive fraudulent transfer claim impossible.[147]  The Examiner further observed that the Senior Lenders would contend that the recently amended section 546(e) of the Bankruptcy Code presents a complete bar to recovery and that, even if the Senior Loan claims could be avoided at both the parent and the guarantor level, avoidance of the guarantees issued by the Guarantor Debtors would be limited to the extent necessary to satisfy the claims of the existing creditors of those entities, with all remaining value going to satisfy the guarantees.[148]

It is undisputed that if the Senior Lenders were to prevail on any one of these defenses, the avoidance claims would have little or no value.  Consequently, the fact that the Examiner recognized some possibility that the Senior Lenders would prevail on each of these defenses[149] is significant in that it adds a further obstacle to a litigant succeeding in achieving full avoidance.

### D.     Each of the Noteholders' Other Putative "Paths to Success" Faces Substantial Hurdles.

Tacitly conceding the substantial difficulties in prevailing on a claim for full avoidance, the Noteholders posit three other "paths" to full recovery for Tribune's Non-LBO Creditors.[150]  Each of these other supposed "paths to success," however, faces significant legal and factual hurdles.  Moreover, as shown below, even if the Noteholders were to prevail on their alternative theories, they likely still would not achieve full recovery.

---

[147] Examiner Report Vol. 2 at 86; see also, e.g., Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.), 388 B.R. 46, 49 (D. Del. 2008), aff'd on other grounds, 590 F.3d 252 (3d Cir. 2009) (affirming dismissal of fraudulent conveyance action, in part because "courts in [the Third] Circuit have typically required proof of bad faith or intent to defraud to justify collapsing otherwise independent transactions"); Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 55 (2d Cir. 2005) (collapsing has no applicability where loan is made in good faith).

[148] Examiner Report, Vol. 1 at 20-21; Vol. 2 at 241-55.

[149] Examiner Report, Vol. 1 at 89, 241, 253-54 (concluding that the latter two defenses were "reasonably unlikely" to succeed and that it was "highly likely" a court would view the loans and the distributions to the shareholders as one transaction).

[150] Tr. 3/7 at 55:16-64:1 (Noteholders' opening statement).

1.   **Challenges To Proving Tribune Insolvency At Step One While Eliminating All Step One "Protected Debt"**

The Noteholders first suggest that if the Step One Claims against Tribune (but not the subsidiaries) are avoided as constructively fraudulent, the Tribune estate would be able to recover almost $1.9 billion in prepetition principal, interest, and fee payments made in respect of the Step One Loans and an additional $318 million of such payments made in respect of the Step Two Loans.[151]   The Noteholders reason that, if a court found that *none* of the Step One Claims against the Tribune parent were preserved (*i.e.*, that all such Step One obligations were avoided in their entirety), the Tribune parent would have roughly $2.9 billion in value – enough to pay the Non-LBO Creditors in full.[152]

Prevailing on this theory, however, would require a determination in the Noteholders' favor on three issues:  (1) that the Tribune parent was insolvent at Step One; (2) that none of the Step One Loans would be preserved on account of reasonably equivalent value provided to the Debtors; and (3) that the Guarantor Debtors' claims against the Tribune parent pursuant to the Intercompany Claim Settlement would not be honored.  As noted above, substantial hurdles exist to establishing that the Tribune parent was insolvent at Step One.  But even if those hurdles were to be overcome, the Noteholders face challenging hurdles in prevailing on the remaining two issues.

With respect to the issue of protected debt at Step One, the Examiner concluded that it was "highly likely" that Step One Loans used to repay $2.5 billion in preexisting Tribune debt provided reasonably equivalent value to Tribune and "reasonably likely" that $300 million in Step One Loans used for working capital and purposes other than payments to shareholders

---

[151] Tr. 3/7 at 57:22-58:8 (Noteholders' opening statement).
[152] Id.; see also Tr. 3/9 at 171:11-18 (Black).

similarly provided reasonably equivalent value.[153]  The Examiner also found it "reasonably likely" that the Lenders acted in good faith in connection with the Step One Transactions as a general matter, and specifically that there was "no reasonable basis" for a finding of bad faith with respect to the $2.5 billion funds used to repay prior debt.[154]  Accordingly, it is very likely that, even if some of the Step One Loans were subject to avoidance, at least $2.8 billion in Step One Claims would be preserved and allowed.[155]  In that event, a very high percentage of the third-party distributable value of the Tribune parent would be payable to the Senior Lenders on account of that preserved Step One Claim, even if it were to be determined that Tribune was rendered insolvent by the Step One Loans.  The Noteholders made no serious attempt to dispute the Examiner's conclusions in this regard.

Overcoming the second hurdle, *i.e.,* the existence of $6.9 billion in Guarantor Debtor claims against the Tribune parent pursuant to the Intercompany Claim Settlement, would be even more daunting.  In order for the Noteholders to prevail on this theory, a court would have to ignore Tribune's intercompany liabilities.  The Noteholders, however, did not present any evidence or support for such a result.  Rather, the Noteholders embraced the Intercompany Claim Settlement, establishing those claims for purposes of confirmation of their own plan.[156]  The Noteholders cannot have it both ways.  If the Intercompany Claim Settlement is operative, as all parties have agreed, then its provisions must be enforced, meaning that a substantial portion of Tribune's value would be distributed to the Guarantor Debtors (and then to the Senior Lenders) even if (as the Noteholders posit) Tribune was found to be insolvent, all Step One Claims against

---

[153] Examiner Report, Vol. 2 at 92-93, 97.

[154] Examiner Report, Vol. 2 at 264-88.  Although the Examiner did not directly address in this context the $300 million in Step One Loans used for working capital and purposes other than payments to shareholders, no party has suggested or put forward evidence of bad faith with respect to those advances.

[155] Examiner Report Annex B at B-22; see also DCL Ex. 1484 at 74-75.

[156] Tr. 3/14 at 17:20-23 (Golden).

Tribune were avoided, and Tribune was able to recover $2+ billion in prepetition payments on the Senior Loans.

The Noteholders' failure to show how they could overcome these two obstacles completely undermines the credibility of their assertion that this pathway might lead to full payment of their claims. Indeed, in modeling Step One avoidance of the Senior Lenders' claims at Tribune, both the Examiner and Professor Black assumed that there would be protected debt and that the Guarantor Debtors' claims against Tribune would be enforced. For his part, the Examiner estimated in Case 5 that Senior Noteholder recoveries would range between $246.8 and $288.5 million depending on the amount of the Guarantor Debtors' claims against Tribune.[157] Black, who assumed for purposes of his analysis the amounts specified in the Intercompany Claim Settlement, concluded that Senior Noteholder recoveries in this scenario would be $286 million excluding third-party recoveries.[158] In both instances, the projected recoveries are well below the amount provided under the DCL Plan settlement.

### 2. The "WEAR" Theory Has No Basis in Law.

A second alleged alternative path to full recovery contemplates that, even if only Step Two were avoided, Senior Lenders would not be permitted to recover the full entitlement of their allowed Step One Claims; instead, any recoveries that would have been allocated to the Step Two Lenders would be turned over to Non-LBO Creditors.[159] Aurelius has coined this the "WEAR" theory, as an acronym for "waiver, estoppel, assumption of risk,"[160] and has seized on ambiguous passages in the Examiner Report in a attempt to build credibility for its unsupported and unprecedented theory. In reality, however, the Noteholders offered no real legal or factual

---

[157] See Examiner Report, Vol. 2, Annex B at B-26-B-29.
[158] Tr. 3/9 at 113:9; 172:14-23 (Black); DCL Ex. 1484 at 23.
[159] Tr. 3/7 at 58:19-59:18 (Noteholders' opening statement).
[160] Tr. 3/15 at 234:4-9 (Gropper).

support for the WEAR theory and it thus does not call into question the reasonableness of the DCL Plan settlement. WEAR as advocated by the Noteholders is simply an invention of their own making that goes well beyond any remedy that has ever been applied by a court and well beyond any argument considered credible by the Examiner.

The Examiner considered the ability of Senior Lenders to receive a *pro rata* share of ***disgorgement recoveries*** in respect of prepetition payments on avoided Step Two Loans[161] and concluded that "[a]bsent a basis to equitably subordinate the Step One Debt consistent with the standard governing equitable subordination . . . it is difficult to find a doctrinal basis that would support barring the debt from participating in avoidance recoveries."[162] The Examiner considered whether the doctrine of equitable estoppel might apply to preclude Senior Lenders from sharing in such disgorgement recoveries and concluded that the doctrine was "at best an imperfect fit" because it requires some form of representation from the party against whom estoppel is sought, and "the LBO Lenders did not make any representations to the Non-LBO creditors."[163] However, because the Examiner found that "the law is not clear" on this point, he left the question in "equipoise" (in the sense that the Examiner was not willing to predict how a court might rule on the question, and ***not***, as the Noteholders have misleadingly asserted, because the Examiner viewed the theory as having a 50% chance of success).[164]

In contrast, the Examiner was unequivocal in his rejection of a more aggressive form of the WEAR theory, which would go beyond disgorgement recoveries to attempt to bar Senior Lenders from receiving distributions from the estates upon avoidance of the Step Two Loans on account of their allowed Step One Claims in accordance with their nonbankruptcy priorities.

---

[161] Examiner Report, Vo. 2 at 298.

[162] Examiner Report, Vol. 2 at 301-02.

[163] Examiner Report, Vol. 2 at 302-03.

[164] Examiner Report, Vol. 2 at 302-03.

The Examiner initially noted that it was "reasonably likely that if the Step Two Debt, but not Step One Debt, is avoided, absent an otherwise applicable basis to subordinate or disallow the Step One Debt or assert rights of unjust enrichment, the Step One Debt would participate in distributions from the estates in accordance with applicable nonbankruptcy priorities."[165]  A few pages later, the Examiner reached an even more unequivocal conclusion:

> A straightforward application of the relevant Bankruptcy Code provisions makes it ***abundantly clear*** that barring equitable subordination, disallowance, or principles of unjust enrichment, if the Step Two Debt but not the Step One Debt is [avoided], ***the Step One Debt would be entitled to participate in distributions from the estates in accordance with their nonbankruptcy priorities***.[166]

The Noteholders have not come forward with any legal authority or facts not considered by the Examiner that would support the WEAR theory or lead to a different conclusion.[167] Moreover, even applying one or both of these two forms of WEAR would not increase recoveries at the Tribune parent level for the Non-LBO Creditors substantially.  As Black explained, subordinating allowed Senior Loan Claims at the Tribune parent level pursuant to the WEAR theory does not materially change recoveries to the Senior Noteholders due to the relatively low value of the Tribune parent company.  For example, a total win on the WEAR theory would result in recoveries to the Senior Noteholders just slightly above Black's Scenario D (Full Avoidance at Tribune; No Avoidance at Subsidiaries), or about $500 million – once

---

[165] Examiner Report, Vol. 2 at 298.

[166] Examiner Report, Vol. 2 at 301 (emphasis added).

[167] Indeed, applicable case law suggests that, absent grounds for equitable subordination, a court would not have the power to fashion this sort of remedy, which involves subordinating some creditors at the Tribune parent level in favor of other Tribune parent-level creditors.  See First Trust and Deposit Co. v. Receiver of Salt Springs Nat'l Bank (In re Onondaga Litholite Co.), 218 F.2d 671, 673-74 (2d Cir. 1955) (finding that the bankruptcy court was without power to subordinate a creditor's claim on the basis that such creditor was the recipient of an intentional fraudulent transfer where such creditor had surrendered the fraudulently-transferred assets).

again, less than the DCL Plan's estimated Senior Noteholder recoveries of $659 million

(including $300 million in assumed net third-party recoveries).[168]

Recognizing this, the Noteholders invented yet another doctrine to support their WEAR

argument, which directly contravenes well-established Third Circuit law respecting entity

separateness, as well as section 510(c) of the Bankruptcy Code.  The Noteholders contend that if

the Step Two Claims are avoided, "all of the Step Two Debt should be set aside," the "value

liberated by the avoidance of Step Two should be *upstreamed* to Tribune for distribution to

Tribune's Non-LBO Creditors," and the Senior Lenders should be precluded from sharing in

such value despite allowance of their Step One Claims.[169]  In substance, the Noteholders assert

that the Court should apply equitable principles to distribute the value of Guarantor Debtors to

the Tribune parent's creditors, even though the Guarantor Debtors' direct claims (the Step One

Claims) have not been paid in full.  Such a remedy would be unprecedented.  The Third Circuit

has made it clear that, absent grounds for substantive consolidation (which the Noteholders do

not even suggest), corporate boundaries are real and must be respected.  See Owens Corning, 419

F.3d at 211, 215.  Yet the Noteholders' theory that a Court would require distribution of the

Guarantor Debtors' value to Tribune's creditors before the Guarantor Debtors' creditors have

been satisfied requires complete disregard of Tribune's and the various Guarantor Debtors'

separateness.  As such, it amounts to *de facto* substantive consolidation, which Third Circuit's

Owens Corning ruling makes clear would be prohibited under these circumstances.  Id. at 215.

---

[168] Tr. 3/9 at 176:7-11 (Black).  In fact, Aurelius' own waterfall recoveries analysis shows that a total win on the
WEAR theory would only result in a $449 million recovery to the Senior Noteholders.  See NPP Ex. 31 at 121;
Prieto Dep. at 71:18-72:15

[169] Noteholder Obj. ¶¶ 234, 237 (emphasis added).  Aurelius' own waterfall recoveries model treats WEAR as
insufficient to provide Senior Noteholders with a recovery substantially in excess of their initial distribution under
the DCL Plan.  Only when combining a total win on the WEAR theory with the independent assumption of
"upstreaming" would the Noteholders' recoveries significantly improve.  Compare NPP Ex. 31 at 121 (WEAR
results in $449 million recovery) with NPP Ex. 31 at 89 (WEAR plus upstreaming results in par recovery).

Absent substantive consolidation, what the Noteholders seek directly violates section 510(c) of the Bankruptcy Code, which does not permit subordination of claims to equity interests. By asserting that the Court should take a portion of the Senior Lenders' recoveries from the Guarantor Debtors (i.e., that portion related to avoidance of the Step Two Guarantee Claims) and pay it over to Senior Noteholders and other Non-LBO Creditors at the Tribune parent, the Noteholders are creating an illegal subordination and turnover obligation out of thin air.[170] Such a remedy would effectively subordinate fully allowed claims against the Guarantor Debtors to the Tribune parent's equity interest in those guarantors. Calling this process as "upstreaming" does not alter its substance. It is an attempt to subordinate the Step One Lenders' allowed claims to Tribune's equity interests in the Guarantor Debtors in violation of section 510(c) of the Bankruptcy Code. It is not surprising, then, that the Examiner did not even consider this remarkable theory, which the Noteholders did not advocate at the time, and that the Noteholders concede has never been applied by a court.

But even assuming a court *could* apply this remedy, there is the additional question of whether it *would and should* do so as a matter of equity. Specifically, Black explained that if a court were to find that the Lenders had "misbehaved," the appropriate remedy would be to "knock them out directly" – *i.e.*, equitably subordinate or disallow their claims – rather than taking this "circuitous route"[171] of allowing distributions to be made on account of Step Two Claims but then inventing from whole cloth an obligation to turn those distributions over to Non-LBO Creditors. Accordingly, because Black had accounted for the possibility of equitable

---

[170] See DCL Ex. 1484 at 153; Tr. 3/9 at 176:12-177:5 (Black).
[171] Tr. 3/9 at 177:6-12 (Black).

subordination and disallowance in assessing his Scenario F (full avoidance), the WEAR theory did not change his opinion as to the reasonableness of the DCL Plan settlement.[172]

Finally, there is another debilitating problem with the WEAR theory. The Noteholders concede that the purpose of fraudulent transfer law is to put parties in the same position they would have been in had the fraudulent transfer never occurred.[173] Thus, if only Step Two is determined to be a fraudulent transfer, the corresponding remedy should place creditors in the position they would have been in if Step Two had never occurred. Avoidance of the Step Two Claims does exactly that. In contrast, application of the Noteholders' WEAR theories to alter the distributions to Senior Lenders would provide the Noteholders with a windfall by putting them in a better position than if Step Two had never occurred. If Step Two had never occurred, valid Step One Claims against Tribune and the Guarantor Debtors would remain. Refusing to honor those allowed Step One Claims to their full extent, as urged by the Noteholders, would be particularly inequitable because a court necessarily would have found that (a) Step One and Step Two were separate transactions, and (b) Tribune was solvent and had sufficient capital after Step One. The Noteholders' WEAR theory does not undermine the reasonableness of the DCL Plan settlement.

With the creative verbiage stripped away, the WEAR theory in its various guises and "upstreaming" are both strikingly similar to other well-established and yet difficult to obtain remedies, with a crucial difference: the Noteholders' concoctions do not require the high standard of proof that those remedies require, and that cannot be satisfied on these facts. WEAR is equitable estoppel without reliance and equitable subordination without a finding of egregious

---

[172] Id.

[173] Noteholder Obj. ¶ 223 ("The law is well established that the underlying purpose of the fraudulent conveyance statutes in the Bankruptcy Code is to restore the bankruptcy estate to the position it was in prior to the fraudulent conveyance.").

misconduct, "upstreaming" is substantive consolidation without the showing required under

Owens Corning.

### 3.   Challenges To The Claim Of Increased DEV Coupled With A Prohibition On Postpetition Interest In Respect Of Allowed Step One Senior Loan Guaranty Claims

Finally, the Noteholders suggest that they could obtain a full recovery even if the Step

One Claims are allowed, if one were to assume that (a) the Step Two Loans are avoided, ***and***

(b) Tribune's DEV exceeds $7.8 billion, ***and*** (c) the allowed Step One Claims are denied

postpetition interest.[174]  This argument, too, fails to establish that the DCL Plan settlement is

unreasonable in any way.

As an initial matter, avoidance of the Step Two Loans is not a foregone conclusion.

While the Examiner found that it was "highly likely" to "reasonably likely" that the Step Two

Loans constituted a constructive fraudulent transfer, he did not rule out the possibility that the

Senior Lenders could prevail on this issue.  Further, and perhaps more significantly, the

Examiner determined that certain of the Step Two debt conferred reasonably equivalent value,

including the obligations incurred to pay portions of the transaction fees and amounts equal to

various tax and annual 401(k) savings, and therefore would be protected from avoidance.[175]

Moreover, the other two components of this alternative "path" are untenable.  First, there

is not a shred of evidence that the DEV is anywhere close to $7.8 billion.  The Debtors' valuation

expert (Lazard), led by Suneel Mandava, applied standard valuation methodologies in a

straightforward manner to the Debtors' financial results and projections and concluded that the

Debtors' enterprise value would be in the range of $6.3 billion to $7.1 billion as of the

---

[174] Tr. 3/7 at 63:13-64:1 (Noteholders' opening statement); see also Noteholder Obj. at ¶¶ 122-23.
[175] Examiner Report, Vol. 1 at 19-20; Vol. 2 at 110-18.

emergence date, depending on market conditions.[176]  Drawing upon its in-depth understanding of

Tribune and the industries in which it operates, Lazard chose a sum-of-the-parts methodology to

value Tribune, enabling it to value each of the distinguishable parts of Tribune's business, taking

into account the unique aspects of each.[177]

In January 2011, shortly before the confirmation hearing, Lazard undertook an effort to

validate the reasonableness of its November 2010 valuation.[178]  As part of that effort, media

industry valuation expert John Chachas was retained.[179]  Chachas has over 20 years of

experience in valuing publishing and media companies in a variety of settings, including

restructurings, and specifically had performed valuation work for Tribune in 2009 and early

2010.[180]  This "refresh" of the earlier Lazard valuation used current financial market data and

current Tribune results and projections[181] and, as both Mandava and Chachas testified, it

confirmed the continuing reliability of Lazard's value range.[182]  While the Debtors' DEV had, as

a result of market changes, increased somewhat, the midpoint value was still well within

Lazard's original value range.[183]  The valuation performed by Lazard is the only valuation in the

record, and the only DEV that should be credited.

The Noteholders' putative valuation expert, Rajinder Singh, did not perform a bottoms-up

valuation, instead attempting only to critique Lazard's analysis.[184]  As set forth in detail in Section

III.G, below, Singh's critique is riddled with errors, betrays several fundamental

---

[176] Tr. 3/11 at 22:12-21 (Mandava); DCL Ex. 1104 at Ex. 2, p. 13.
[177] Tr. 3/11 at 22:12-21 (Mandava).
[178] Tr. 3/11 at 20:22-21:12 (Mandava).
[179] Tr. 3/11 at 147:22-148:3 (Chachas).
[180] Tr. 3/11 at 141:22-145:22 (Chachas).
[181] Tr. 3/11 at 21:6-21:12 (Mandava).
[182] Tr. 3/11 at 20:13-21:12 (Mandava); id. at 147:22-148:6 (Chachas).
[183] Tr. 3/11 at 77:9-17 (Mandava).
[184] Tr. 3/15 at 14:9-13 (Singh).