# **EXHIBIT A**

WHITTMAN DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>TRIBUNE COMPANY, *et al.*,<br>Reorganized Debtors. | Chapter 11<br>Bankruptcy Case No. 08-13141 (KJC)<br>Jointly Administered |
| WILMINGTON TRUST COMPANY, *et al.*,<br>Appellants,<br>v.<br>TRIBUNE COMPANY, *et al.*,<br>Appellees. | Case No. 12-cv-128 GMS<br>Case No. 12-mc-108 GMS<br>Case No. 12-cv-1072 GMS<br>Case No. 12-cv-1073 GMS<br>Case No. 12-cv-1100 GMS<br>Case No. 12-cv-1106 GMS<br>CONSOLIDATED APPEALS |

**DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF REORGANIZED
DEBTORS' MOTION TO DISMISS APPEALS AS EQUITABLY MOOT**

I, Brian Whittman, declare as follows:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation. A&M was retained by the Debtors to advise them in connection with their restructuring with the approval of the Bankruptcy Court on February 11, 2009. I am familiar with the Reorganized Debtors' businesses and financial affairs, the Debtors' chapter 11 cases, the DCL Plan and related confirmation proceedings, the financial and restructuring transactions contemplated by the DCL Plan, and other matters that concern the Reorganized Debtors' consummation of the DCL Plan and their emergence from chapter 11.

2. I have over fifteen years of financial restructuring and bankruptcy experience and have been working with the Debtors since November 2008. A&M is a leading independent global professional services firm with significant experience in advising debtors in complex bankruptcy cases.

3. I submit this declaration (the "Declaration") in support of the *Reorganized Debtors' Motion to Dismiss Appeals as Equitably Moot* (the "Motion").[1] I have reviewed the Motion and am generally familiar with the above-captioned appeals filed by the Appellants.

4. All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my experience with and knowledge of the Reorganized Debtors' businesses and financial affairs and their chapter 11 cases; (d) my knowledge of the DCL Plan; (e) my knowledge of the financial and restructuring transactions contemplated by the DCL Plan; (f) information supplied to me by the Reorganized Debtors; (g) diligence performed by other members of the Alvarez & Marsal team at my direction in support of this Declaration; or (h) as to matters involving United States bankruptcy law or rules or other applicable laws or practice, my reliance on the advice of the Reorganized Debtors' counsel. If called upon to testify, I could and would testify to the facts set forth herein.

## Substantial Consummation of the DCL Plan

5. The DCL Plan was confirmed on July 23, 2012 by the Bankruptcy Court.

6. The Debtors received FCC Approval on November 16, 2012, authorizing the assignment and/or transfer of control of the FCC Licenses from the Debtors to the Reorganized Debtors in accordance with the terms of the confirmed DCL Plan. The FCC's approval order became effective on November 16, 2012.

7. On December 31, 2012, following FCC Approval, each of the conditions precedent to the effectiveness of the DCL Plan pursuant to Section 10.1 thereof was satisfied, and the Effective Date of the confirmed DCL Plan therefore occurred.

---

[1] Capitalized terms used and not otherwise defined shall have the meaning ascribed to them in the Motion or the confirmed DCL Plan.

8. On December 31, 2012, the Reorganized Debtors issued a press release, and filed with the Bankruptcy Court and served the "Notice of (I) Effective Date of the Fourth Amended Joint Plan of Reorganization for the Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. and (II) Bar Date for Certain Claims" [D.I. 12939] (the "Effective Date Notice") upon all relevant holders of Claims and Interests in accordance with Section 15.17 of the confirmed DCL Plan.

9. Immediately upon the occurrence of the Effective Date, the Reorganized Debtors proceeded to implement and consummate the terms of the confirmed DCL Plan. Indeed, on or about the Effective Date, upon completion of the various distributions and transactions contemplated under the DCL Plan to be implemented upon such date, the Reorganized Debtors substantially consummated the DCL Plan.

10. In particular, on or shortly after the Effective Date, the Reorganized Debtors distributed over $3.6 billion in cash to more than 17,000 holders of Allowed Claims, issued approximately 100 million shares of New Common Stock and New Warrants, completed numerous complex restructuring and related transactions throughout their broadcasting, publishing and other businesses, appointed a new board of directors, closed approximately $1.4 billion in post-emergence financing transactions, cancelled all outstanding common stock and equity instruments, terminated the existing Tribune Employee Stock Ownership Plan, effectuated numerous interrelated settlement agreements embedded in the confirmed DCL Plan, discharged more than $12.6 billion in prepetition bank and other indebtedness, transferred numerous causes of action to the newly-created Litigation Trust, and implemented several other plan and operational transactions in reliance upon the effectiveness of the confirmed DCL Plan.

11. The following transactions, many involving third parties not before this Court, were consummated on or shortly after the Effective Date, all in accordance with and in reliance upon the confirmed DCL Plan.

### 1. DCL Plan Distributions of Cash and Securities

12. The Reorganized Debtors made approximately $3.6 billion in initial distributions of cash to over 17,000 holders of Allowed Claims on or shortly after the Effective Date. The initial distributions included approximately $3.5 billion in cash distributed to the Senior Lenders (including the Senior Guaranty Claim holders), the Bridge Lenders, and the Senior Noteholders pursuant to the confirmed DCL Plan. The initial distributions also included approximately $175 million in cash on account of other classes of Allowed Claims, including Administrative Expense Claims, Other Parent Claims and General Unsecured Claims. The Reorganized Debtors also reserved approximately $55 million for Other Parent Claims and General Unsecured Claims that are currently disputed, but may ultimately be Allowed, with any residual to be distributed to the Senior Lenders. The Reorganized Debtors also reserved approximately $132 million for professional fee claims and other Administrative Expense and Priority Tax and Non-Tax Claims anticipated to be Allowed post emergence. In addition, on or shortly after the Effective Date, the Reorganized Debtors issued approximately 100 million freely tradable equity securities in Reorganized Tribune to more than 400 holders of Allowed Claims or their designees.

13. A summary of the thousands of distributions that already have been completed pursuant to the confirmed DCL Plan by Claim Class follows:

    **a.** <u>Unclassified Claims; Priority Non-Tax Claims (Classes 1A, 2A-111A); Other Secured Claims (Classes 1B, 2B-111B)</u>: On or shortly after December 31, 2012, the Reorganized Debtors made the following distributions pursuant to the DCL Plan: (i) approximately $22.5 million in outstanding letters of credit issued under the DIP Facility were cancelled and replaced under the Exit Facility; (ii) Allowed Administrative Expense Claims were paid by check or wire to approximately 300 creditors in the aggregate amount of approximately $28.6 million; and (iii)

approximately $27,000 was paid to 49 holders of Priority Non-Tax Claims by check. Additional distributions may be made upon the allowance of Claims in these Classes during the Claims allowance process pursuant to the DCL Plan. Priority Tax Claims will be paid by Reorganized Tribune as they become Allowed Claims with approximately $20 million in cash scheduled to be paid on or about January 24, 2013 and an estimated $43 million in cash to be paid thereafter. Allowed Other Secured Claims were reinstated pursuant to the DCL Plan.

b. <u>Classes 1C, 50C-111C – Senior Loan and Senior Guaranty Claims (Excluding the Swap Claim Portion)</u>: On or shortly after the Effective Date, the Reorganized Debtors completed a cash distribution to Classes 1C and 50C-111C under the DCL Plan in the amount of approximately $2.9 billion[2] by book entry transfer to JPMorgan, as administrative agent under the Senior Loan Agreement. On or about January 7, 2013, JPMorgan, as Senior Loan Agent, notified the Reorganized Debtors that it, in turn, had completed the distributions, by wire, to each of the over 300 holders of Allowed Senior Loan and Senior Guaranty Claims on a ratable basis.[3] In addition, on or shortly after the Effective Date, approximately 98.2 million shares of New Common Stock and New Warrants with an imputed value pursuant to the DCL Plan of approximately $4.5 billion[4] as of the Effective Date were distributed under the DCL Plan through Computershare, as transfer agent, by book entry to the over 300 holders of Allowed Senior Loan and Senior Guaranty Claims or their designees.

c. <u>Classes 1D, 50D-111D – Bridge Loan and Bridge Loan Guaranty Claims</u>: On or about the Effective Date, the Reorganized Debtors completed a cash distribution to Classes 1D and 50D-111D of the DCL Plan in the aggregate amount of approximately $64.5 million[5] by wire transfer to Wells Fargo, as administrative agent under the Bridge Loan Agreement. On or about January 10, 2013, Wells Fargo, as Bridge Loan Agent (via its counsel), notified the Reorganized Debtors that it, in turn, had completed the distribution by wire or book transfer to each of the 26 Bridge Lenders (excluding the four Bridge Arrangers who elected to forego

---

[2] The actual amount of cash distributed to JPMorgan on account of certain Senior Lenders was reduced by an aggregate amount of $37 million as certain lenders elected to set off their respective obligations under the Step Two/Disgorgement Settlement against their distributions under the DCL Plan rather than funding their portion of the settlement. *See infra* para. 19.

[3] Pursuant to Section 3.3.3 of the DCL Plan, JPMorgan held back $32.5 million in cash for the Senior Lender Holdback.

[4] This amount, as well as the imputed equity amounts set forth in sub-parts (d), (e) and (f) of this paragraph and in paragraphs 14 and 20, are based on the valuation performed by Lazard Ltd. in February 2012, set forth in Exhibit C to the Supplemental Disclosure Document Relating to Fourth Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors, Oaktree Capital Management, L.P., Angelo, Gordon & Co., L.P., and JPMorgan Chase Bank, N.A. [D.I. 11169].

[5] The actual amount of cash distributed to Wells Fargo on account of certain Bridge Lenders was reduced by an aggregate amount of $2.3 million as certain lenders elected to set off their respective obligations under the Step Two/Disgorgement Settlement against their distributions under the DCL Plan rather than funding their portion of the settlement. *See infra* para. 19.

5

distributions under the DCL Plan), less an amount retained by Wells Fargo to cover reimbursable costs incurred under the Bridge Loan Agreement.

    **d.**    <u>Class 1E – Senior Noteholder Claims</u>: On or shortly after the Effective Date, the Reorganized Debtors completed cash distributions to Class 1E of the DCL Plan in the aggregate amount of approximately $416 million by wire transfer to the Senior Notes Indenture Trustees on behalf of the Senior Noteholders. On or about January 2, 2013, the Reorganized Debtors were advised that, after retaining approximately $29.7 million related to the Indenture Trustee fee claims and associated charging liens, all of such remaining cash distributions had, in turn, been distributed to DTC for further distribution to participating banks and brokers in order to credit the accounts of each of the beneficial holders of Senior Notes with Allowed Class 1E Claims, pursuant to direction letters from the Senior Notes Indenture Trustees.[6] In addition, on or shortly after the Effective Date, the Reorganized Debtors issued and distributed pursuant to the DCL Plan approximately 462,000 shares of New Common Stock and New Warrants with an imputed value pursuant to the DCL Plan of approximately $20.9 million as of the Effective Date through Computershare, as transfer agent, via DTC, to the 76 accounts of Electing Senior Noteholders or their designees. On or about January 3, 2013, DTC notified the Reorganized Debtors that it had completed such distributions.

    **e.**    <u>Class 1F – Other Parent Claims (Excluding the Swap Claim)</u>: On or shortly after December 31, 2012, the Reorganized Debtors made cash distributions in the aggregate amount of approximately $35.9 million by check or wire to approximately 700 holders of Allowed Other Parent Claims in Class 1F of the DCL Plan. In addition, on or shortly after the Effective Date, the Reorganized Debtors transferred approximately 5,000 shares of New Common Stock with an imputed value pursuant to the DCL Plan of approximately $240,000 as of the Effective Date through Computershare via book entry to 5 Electing Other Parent Claims holders. Additional distributions may be made to holders of Allowed Claims in Class 1F during the Claims allowance process pursuant to the DCL Plan.

    **f.**    <u>Swap Claim Portion of Class 1F and Classes 50C through 111C</u>: On or shortly after December 31, 2012, the Reorganized Debtors paid Oaktree approximately $93.3 million by wire transfer and distributed on behalf of Oaktree approximately 1.3 million shares of New Common Stock with an imputed value pursuant to the DCL Plan of approximately $60.9 million as of the Effective Date through Computershare, as transfer agent, on account of the Swap Claim.

---

[6] Approximately $12.6 million of the Senior Noteholder distribution was allocable to the Designated Debentures held by Morgan Stanley Capital Services, Inc. ("<u>MSCS</u>"). Pursuant to the Order Approving Stipulation in Aid of Implementation of Senior Noteholder Distributions Pursuant to Confirmed DCL Plan [D.I. 12734], MSCS transferred the Designated Debentures to an escrow account maintained by the Litigation Trustee on or shortly after December 31, 2012. On January 14, 2013, the Litigation Trustee informed the Reorganized Debtors that it had received the $12.6 million distribution on account of the Designated Debentures.

g. <u>Class 1G – Convenience Claims</u>: On or shortly after December 31, 2012, the Reorganized Debtors made cash distributions by check on account of approximately 1,500 Allowed Convenience Claims in Class 1G in the aggregate amount of approximately $325,000.

h. <u>Classes 2E-111E – General Unsecured Claims</u>: On or shortly after December 31, 2012, the Reorganized Debtors made cash distributions by check or wire in the aggregate amount of approximately $57.4 million to approximately 14,000 holders of Allowed General Unsecured Claims in Classes 2E-111E at the subsidiary level. Additional distributions may be made to holders of Allowed Claims in Classes 2E-111E during the Claims allowance process pursuant to the DCL Plan.

14. **Equity Distributions.** Under the DCL Plan, on the Effective Date, Reorganized Tribune issued approximately 100 million equity securities, comprised of 78,754,269 shares of New Class A Common Stock, 4,455,767 shares of New Class B Common Stock, and 16,789,972 New Warrants to over 400 holders of Allowed Claims or their designees. Consistent with the valuation performed by Lazard Ltd. in February 2012, as of the Effective Date, the New Class A Common Stock, New Class B Common Stock and New Warrants (collectively, the "<u>New Securities</u>") had an implied value of $45.36 per share of New Common Stock and $45.36 per New Warrant. Also on the Effective Date (unless expressly provided otherwise by the DCL Plan), Reorganized Tribune cancelled its prepetition debt and equity securities. The equity allocations under the DCL Plan were based on a carefully constructed allocation model designed to comply with applicable FCC rules and regulations, including those pertaining to foreign ownership restrictions. Accordingly, it is my understanding that the capital structure of Reorganized Tribune on the Effective Date was consistent with applicable regulatory law.

15. Based upon publicly-available data provided by OTC Markets Group Inc., it is my understanding that, since shortly after the Effective Date through January 17, 2013, over 4.6 million shares of New Class A Common Stock and over 260,000 New Warrants have traded in

7

the ordinary course in the Over-the-Counter ("OTC")/Pink Sheets markets under the symbols TRBAA and TRBNW, respectively.

16. **Litigation Trust Distributions**. As of the Effective Date, the Debtors transferred, assigned and delivered the Preserved Causes of Action to the Litigation Trust, which, in turn, was established as of the Effective Date in accordance with the confirmed DCL Plan to pursue those Preserved Causes of Action on behalf of the Litigation Trust Beneficiaries as a potential source of additional recovery. The Litigation Trustee and other senior officers of the Litigation Trust have been appointed as of the Effective Date. The Litigation Trustee has retained counsel and begun pursuing the Preserved Causes of Action. On or about December 31, 2012, Reorganized Tribune also paid $20 million by wire transfer into a segregated bank account established on behalf of the Litigation Trust to fund a term loan to the Litigation Trust pursuant to the confirmed DCL Plan. In addition, on or about December 31, 2012, pursuant to the DCL Plan, Litigation Trust Interests were ratably distributed to over 1,000 holders of Allowed Claims in Classes 1C, 1D, 1E, 1F, 1I, 1J and 1L under the DCL Plan. On or about December 31, 2012, the Reorganized Debtors informed the foregoing holders of the estimated value of their respective Litigation Trust Interests for tax purposes in accordance with Section 13.2.2 of the DCL Plan and withheld and paid to federal and state taxing authorities required tax withholding for such holders subject to such withholding.[7]

### 2. Settlement Transactions

17. As a part of the DCL Plan, the Debtors entered into several highly negotiated, multi-party, complex, and intricate settlements that are integral to the DCL Plan and were

---

[7] The Reorganized Debtors informed the holders of Litigation Trust Interests of the estimated value of their interests that was filed with the Bankruptcy Court on January 4, 2013 pursuant to Section 13.2.2 of the DCL Plan [D.I. 12976].

approved by the vast majority of creditors and the Bankruptcy Court, including the DCL Settlement, the Step Two/Disgorgement Settlement, the Retiree Claimant Settlement, and the Intercompany Claims Settlement. On the Effective Date, each of these settlements was fully consummated.

18. **DCL Settlement**. The DCL Settlement, a cornerstone of the DCL Plan, resolved complex litigation issues arising from the LBO-Related Causes of Action related to Tribune's 2007 leveraged employee stock ownership plan transactions (the "Leveraged ESOP Transactions"), particularly certain avoidance claims against the Senior and Bridge Lenders. The DCL Settlement was consummated on the Effective Date. In particular, substantially all of the terms of the DCL Settlement were effectuated on the Effective Date, including the following: (i) the Senior Lenders, certain Bridge Lenders and certain other settling parties provided to or for the benefit of the Debtors' Estates over $400 million in settlement consideration pursuant to the DCL Plan; (ii) the Reorganized Debtors, in turn, distributed 100% of the foregoing settlement consideration to the Holders of Allowed Senior Noteholder Claims, Other Parent Claims, Convenience Claims, and General Unsecured Claims against the Filed Subsidiary Debtors pursuant to the DCL Plan; (iii) in accordance with Section 5.15.2 of the DCL Plan, each of the foregoing distributions was "made on account of and in consideration of the [DCL] Settlement"; (iv) holders of Senior Loan Claims and Bridge Loan Claims that elected to participate in the DCL Settlement agreed to voluntarily relinquish the ratable Litigation Trust recoveries to which they would otherwise be entitled and to permit such recoveries to be disproportionately allocated to holders of Senior Notes, Other Parent Claims, PHONES Notes, and the EGI-TRB LLC Notes (including the first $90 million in proceeds recovered by the Litigation Trust); and (v) in return, as of the Effective Date, the Estates released all LBO-Related Causes of Action (other than

certain Preserved Causes of Action) against the relevant settling parties as set forth in greater detail in the DCL Plan.

19. **Step Two/Disgorgement Settlement.** On or shortly after December 31, 2012, the Reorganized Debtors consummated the Step Two/Disgorgement Settlement. In particular, prior to the Effective Date, 86 settling parties under the Step Two/Disgorgement Settlement had ratably funded approximately $80.7 million of the aggregate settlement amount of $120 million by depositing funds into an escrow account held for the benefit of holders of Allowed Claims entitled to receive Step Two/Disgorgement Settlement Proceeds in accordance with the DCL Plan. In addition, prior to the Effective Date, 16 other settling parties allowed the Debtors to collect the remaining $39.3 million through setoff against their distributions on account of any Senior Loan or Bridge Loan Claims under the DCL Plan. With respect to approximately 9 non-settling parties, approximately $255,000 was backstopped by the Step Two Arrangers (reflected in the amounts above), and certain litigation claims against such non-settling parties were preserved by the DCL Plan and transferred to the Litigation Trust as of the Effective Date. On or shortly after December 31, 2012, the Step Two/Disgorgement Settlement Proceeds were distributed by wire transfer, to the holders of Allowed Senior Noteholder Claims in accordance with the confirmed DCL Plan.

20. **Retiree Claimant Settlement.** On the Effective Date, the Reorganized Debtors consummated the Retiree Claimant Settlement. In particular, on or shortly after the Effective Date, the Reorganized Debtors distributed by check the aggregate amount of approximately $38.4 million in cash to approximately 200 individual retirees on account of the Retiree Claimant Settlement pursuant to the confirmed DCL Plan. In addition, on or shortly after the Effective Date, the Reorganized Debtors transferred approximately 5,000 shares of New Common Stock

with an imputed value pursuant to the DCL Plan of approximately $240,000 as of the Effective Date through Computershare via book entry to those retirees who were holders of Electing Other Parent Claims. The Retiree Claimant Settlement resolved approximately $113 million in Retiree Claims asserted by approximately 200 individuals holding claims arising from non-qualified pension and deferred compensation plans relating to their former employment with certain Debtors or their predecessors.

21. **Intercompany Claims Settlement.** On the Effective Date, the Reorganized Debtors consummated the Intercompany Claims Settlement. The Intercompany Claims Settlement compromised prepetition intercompany claims based on a comprehensive review and analysis of various intercompany arrangements and transactions and their possible impact on the value potentially available for distribution to each of the Debtors' creditors and stockholders under the DCL Plan. The Intercompany Claims Settlement was used, among other things, to determine the allocation of value among Tribune and certain of its subsidiaries and was taken into account in calculating certain creditor distributions under the DCL Plan, including those distributions to the Senior Lenders, Bridge Lenders, Senior Notes and Other Parent Claims.

### 3. Corporate Reorganization and Restructuring Transactions

22. On the Effective Date, pursuant to the confirmed DCL Plan, all of the Debtors' assets and property revested in the Reorganized Debtors.

23. On December 27, 2012, Reorganized Tribune filed an amended and restated certificate of incorporation with the Secretary of State of the State of Delaware, which became effective on the Effective Date. In addition, on the Effective Date, Reorganized Tribune adopted amended and restated by-laws, which became effective as of the Effective Date. Pursuant to the confirmed DCL Plan, certificates or articles of incorporation, by-laws, certificates of formation, limited liability company agreements, partnership agreements and similar governing documents

of the other Debtors and amendments thereto, were also adopted and filed, as applicable, with the governing authorities of the relevant jurisdictions and were effective as of the Effective Date.

24. On or before the Effective Date, the Debtors or Reorganized Debtors implemented the Restructuring Transactions in accordance with Section 5.2 of the DCL Plan. The Restructuring Transactions significantly streamlined and simplified the Reorganized Debtors' organizational structure by business segment (broadcasting, publishing, corporate investments and real estate). Collectively, the Restructuring Transactions involved over 80 mergers and over 25 conversions from corporations to limited liability companies, and the formation of over 20 new entities (excluding real estate), several of which were involved in the merger transactions. The Restructuring Transactions also implemented several intercompany conveyances of assets and liabilities and equity interests involving over 40 existing and newly-formed entities. Further, pursuant to the Restructuring Transactions, on or about December 21, 2012, certain Debtor entities transferred some or all of the real property owned by such entities to over 40 newly-formed limited liability companies specifically created to hold such property or group of properties.

### 4. New Board of Directors and Corporate Leadership

25. On the Effective Date, a new board of directors was designated by certain of Reorganized Tribune's shareholders pursuant to the terms of the DCL Plan. The board held its first meeting on January 17, 2013, at which, among other things, it elected a new Chairman and a new Chief Executive Officer.

### 5. Post-Emergence Financing Transactions

26. On the Effective Date, the Reorganized Debtors closed the following two debt facilities: (i) a term loan facility in the aggregate principal amount of $1.1 billion, and (ii) a senior secured asset based revolving credit facility in the aggregate principal amount of $300

million. These two facilities involved separate syndicated lender groups, including several third-party lenders, which were not actively involved in the bankruptcy cases or the appeals. Each of these facilities was expressly conditioned on the effectiveness of the DCL Plan.

27. **Replacement Term Loan Facility.** On the Effective Date, the Reorganized Debtors closed a senior secured term loan facility in the aggregate principal amount of $1.1 billion (the "Replacement Term Loan Facility") to replace the New Senior Secured Term Loan contemplated under the DCL Plan. The Replacement Term Loan Facility was funded on January 2, 2013, by JPMorgan, as agent. It is my understanding that the agent for the Replacement Term Loan Facility has already received commitments to syndicate the full $1.1 billion Replacement Term Loan Facility, and as of January 17, 2013, has already received over three-fourths (by amount) of the funds from the syndication group, and is actively completing the syndication process. I have also been advised that approximately 40% of the committed amounts are from approximately 40 lenders who were not Senior Lenders on the Distribution Record Date. The relevant engagement letter and fee letters were approved by the Bankruptcy Court prior to the Effective Date by order entered on November 6, 2012. The Replacement Term Loan Facility proceeds were used exclusively to fund cash distributions to holders of Allowed Senior Loan Claims/Senior Guaranty Claims, electing holders of Allowed Senior Notes Claims, and electing holders of Allowed Other Parent Claims who otherwise would have received participations in the New Senior Secured Term Loan as a component of their recoveries under the DCL Plan, and such amounts are reflected in the cash distributions described above.

28. On information and belief, based upon discussions with representatives of the agent for the Replacement Term Loan Facility, it is my understanding that, as of January 15, 2013, there have been over $200 million in trades involving the newly-issued debt securities

13

under the Replacement Term Loan Facility in the secondary debt markets, and it is anticipated that such trades should settle in the ordinary course upon the impending completion of the ongoing debt syndication process.

29.  **Exit Facility.** On the Effective Date, the Reorganized Debtors also entered into a $300 million senior secured asset based revolving credit facility with a $100 million letter of credit sub-facility (the "Exit Facility"). The relevant commitment letter and fee letters were approved by the Bankruptcy Court prior to the Effective Date by order entered on November 6, 2012. Pursuant to Section 3.2.3(c) of the DCL Plan, approximately $65.7 million of prepetition letters of credit were assumed under the Exit Facility on the Effective Date. In addition, pursuant to Section 2.1 of the DCL Plan, approximately $22.5 million of post-petition letters of credit were replaced by new letters of credit issued under the Exit Facility shortly after the Effective Date.

### 6. Post-Emergence Business Transactions

30.  On or after the Effective Date, the Reorganized Debtors have completed, entered into, or effectuated numerous additional business transactions and activities in the ordinary course and in reliance upon the effectiveness of the confirmed DCL Plan. For example, on or about the Effective Date, the Reorganized Debtors, pursuant to Section 6.1 of the DCL Plan, assumed all executory contracts and unexpired leases not previously rejected or previously expired or terminated pursuant to their respective terms prior to the Effective Date. Further, on December 30, 2012, the Debtors filed with the Bankruptcy Court amended contract cure exhibits [D.I. 12937] specifically identifying approximately 50 parties whose executory contracts would be assumed as of the Effective Date with aggregate associated cure costs of approximately $27.5 million. On the Effective Date, the Reorganized Debtors paid the approximately $27.5 million in cure costs in cash by check or wire transfer to each of the relevant counterparties.

31.     Since emergence, the Reorganized Debtors have also entered into numerous new contracts and other transactions in the ordinary course of business and in reliance on the effectiveness of the DCL Plan. For example, the Reorganized Debtors have both entered into new agreements and renewed expiring contracts with various advertisers, content providers, service providers and others in both the broadcasting and publishing segments of the business.

32.     In light of the numerous material, complex, and interrelated transactions that were completed pursuant to the DCL Plan on and shortly after the Effective Date, granting the relief requested by the Appellants would be unfair, impractical and inequitable. In addition, the relief requested would likely seriously undermine the ability of the Reorganized Debtors to fully and finally emerge from the reorganization process and would seriously threaten their ability to manage and operate their respective businesses.

[Signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 18, 2013

_____
Brian Whittman