# **EXHIBIT B**

KURTZ DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>TRIBUNE COMPANY, *et al.*,<br>Reorganized Debtors. | |
| WILMINGTON TRUST COMPANY, *et al.*,<br>Appellants,<br>v.<br>TRIBUNE COMPANY, *et al.*,<br>Appellees. | Chapter 11<br>Bankruptcy Case No. 08-13141 (KJC)<br>Jointly Administered<br><br>Case No. 12-cv-128 GMS<br>Case No. 12-mc-108 GMS<br>Case No. 12-cv-1072 GMS<br>Case No. 12-cv-1073 GMS<br>Case No. 12-cv-1100 GMS<br>Case No. 12-cv-1106 GMS<br>CONSOLIDATED APPEALS |

**DECLARATION OF DAVID S. KURTZ OF LAZARD LTD.
IN SUPPORT OF REORGANIZED DEBTORS' MOTION
TO DISMISS APPEALS AS EQUITABLY MOOT**

I, David S. Kurtz, declare as follows:

1. I am Vice Chairman of Investment Banking and Head of the Global Restructuring Group at Lazard Ltd. ("Lazard"), a financial advisory and investment banking firm that has been retained by the Debtors as their investment banker and financial advisor in connection with their Chapter 11 Cases. I am familiar with the Reorganized Debtors' businesses and financial affairs, the Debtors' chapter 11 cases, the DCL Plan and related confirmation proceedings, the financial and restructuring transactions contemplated by the DCL Plan, and other matters that concern the Reorganized Debtors' consummation of the DCL Plan and their emergence from chapter 11.

2. I have extensive experience in restructuring, M&A, and financing transactions, including recent engagements in other major chapter 11 cases. Prior to joining Lazard in 2002, I was a senior partner from 1999 to 2002 in the Corporate Restructuring Department at Skadden,

Arps, Slate, Meagher & Flom, a partner at Jones, Day, Reavis & Pogue from 1989 to 1999, and a partner at Mayer, Brown & Platt from 1986 to 1989. In total, I have over 30 years of restructuring experience. I earned a B.A. from Case Western Reserve University and a J.D. from Case Western Reserve University School of Law.

3. I submit this declaration (the "Declaration") in support of the *Reorganized Debtors' Motion to Dismiss Appeals as Equitably Moot* (the "Motion").[1] I have reviewed the Motion and am generally familiar with the above-captioned appeals filed by the Appellants.

4. All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my experience with and knowledge of the Reorganized Debtors' businesses and financial affairs and their chapter 11 cases; (d) my knowledge of the DCL Plan; (e) my knowledge of the financial and restructuring transactions contemplated by the DCL Plan; (f) information supplied to me by the Reorganized Debtors and their advisors; (g) diligence performed by Lazard in support of this Declaration; or (h) as to matters involving United States bankruptcy law or rules or other applicable laws or practice, my reliance on the advice of the Reorganized Debtors' counsel and other advisors. If called upon to testify, I could and would testify to the facts set forth herein.

**The Various Core Settlements That Are Integral To The DCL Plan Have Been Fully Consummated, And Any Effort To Unwind Those Settlements Would Potentially <u>Undermine The Foundation Of The Plan</u>**

5. The DCL Plan represents a holistic agreement, incorporating several underlying core settlements, among a large number of diverse and sophisticated parties, and was accepted by the vast majority of creditors across the Debtors' capital structure. The centerpiece of that Plan was the DCL Settlement. As the Bankruptcy Court determined (in its 2011 Confirmation

---

[1] Capitalized terms used and not otherwise defined shall have the meaning ascribed to them in the Motion or the confirmed DCL Plan.

Decision), the DCL Settlement, as well as the Step/Two Disgorgement Settlement, were the product of extensive, highly contentious, and arm's-length negotiations among the Debtors, the Plan Proponents and other parties acting in good faith. These negotiations were, in turn, informed by nearly two years of investigation and analysis by the parties, an extensive investigation conducted by the Bankruptcy Court-appointed Examiner, and mediation before the Bankruptcy Court-appointed mediator. The DCL Settlement and the Step Two/Disgorgement Settlement are each integral components of the consummated DCL Plan.

6. The DCL Plan also incorporates two other settlements that were negotiated and entered in good faith: the Retiree Claimant Settlement and Intercompany Settlement. Indeed, the Bankruptcy Court expressly determined (in its 2011 Confirmation Decision) that the Retiree Claimant Settlement was an "important piece" of the Debtors' reorganization. Both the Retiree Claimant Settlement and the Intercompany Claims Settlement are integral components of the consummated DCL Plan.

7. As set forth in greater detail in the Whittman Declaration, on or shortly after the Effective Date, the Reorganized Debtors implemented and substantially consummated the terms of the confirmed DCL Plan, including each of the DCL Settlement, the Step Two/Disgorgement Settlement, the Retiree Claimant Settlement and the Intercompany Settlement. As a result, the key terms of each of these settlements, including the transfer and receipt of a considerable amount of settlement consideration among numerous parties in interest, the distribution of billions of dollars of cash and stock payments to thousands of creditors, the issuance of corresponding discharges and releases, and a host of related transactions, have been effectuated in reliance upon the company's emergence from bankruptcy. In light of the foregoing, any

attempt to rescind, revoke or modify any significant portion of the foregoing settlements would, in my view, potentially undermine the foundation of the consummated DCL Plan.

### Reorganized Tribune Has Issued 100 Million Shares Of Freely Tradable New Common Stock And New Warrants To Its Creditors That Have Traded Since Shortly After The Effective Date

8. Pursuant to the DCL Plan, Reorganized Tribune has issued approximately 100 million shares of New Class A Common Stock, New Class B Common Stock and New Warrants to its creditors, some of whom, on information and belief, have subsequently sold their shares to third parties.

9. As set forth in greater detail in the Whittman Declaration, under the DCL Plan, on the Effective Date, Reorganized Tribune issued approximately 100 million equity securities, comprised of 78,754,269 shares of New Class A Common Stock, 4,455,767 shares of New Class B Common Stock, and 16,789,972 New Warrants to over 400 holders of Allowed Claims or their designees. Consistent with the valuation performed by Lazard Ltd. in February 2012, as of the Effective Date, the New Class A Common Stock, New Class B Common Stock and New Warrants had an implied value of $45.36 per share of New Common Stock and $45.36 per New Warrant.

10. Based upon publicly-available data provided by OTC Markets Group Inc., it is my understanding that, since shortly after the Effective Date through January 17, 2013, over 4.6 million shares of New Class A Common Stock and over 260,000 New Warrants have traded in the ordinary course in the Over-the-Counter ("OTC")/Pink Sheets markets under the symbols TRBAA and TRBNW, respectively. In addition, it is my understanding, based upon certain information from Computershare, that, as of January 16, 2013, over 9.0 million shares of New Class A Common Stock, New Class B Common Stock and New Warrants have been transferred from a registered position at Computershare to a broker position through DTC. It is also my

understanding that, in general, transfers of equity securities to a broker position through DTC may facilitate the ability to trade such equity securities in the applicable market and may make it more difficult, as a practical matter, to identity the beneficial holders of such securities. Claimants who have received the equity securities as part of their distributions under the DCL Plan, as well as their immediate and mediate transferees, have been free to sell, encumber, or otherwise dispose of those securities since the Effective Date. Moreover, on information and belief, with respect to many of the foregoing equity securities that have changed hands since the Effective Date, the actual identities of the beneficial owners of such securities are not known (and may be confidential).

### The Reorganized Debtors Have Closed $1.4 Billion In Post-Emergence Debt Facilities With New Syndicate Lenders Many Of Whom Have Been Free To Trade Their Interests Since Shortly After The Effective Date

11. As set forth in greater detail in the Whittman Declaration, the Reorganized Debtors closed two debt facilities on or about the Effective Date: (i) a senior secured term loan facility in the aggregate principal amount of $1.1 billion (the "Replacement Term Loan Facility"), and (ii) a $300 million senior secured asset based revolving credit facility with a $100 million letter of credit sub-facility (the "Exit Facility"). These two facilities involved separate syndicated lender groups, both of which included third-party lenders not involved with the appeals and not presently before the Court. On information and belief, as set forth in the Whittman Declaration, it is my understanding that approximately 40 third-party lenders who were not Senior Lenders on the Distribution Record Date, representing approximately 40% of the committed amounts as of January 15, 2013, have participated in the initial syndication of the Replacement Term Loan Facility.

12. On information and belief, it is my understanding that, since shortly after the Effective Date, certain interests distributed to the lenders under the Replacement Term Loan

Facility have freely traded. In particular, as set forth in greater detail in the Whittman Declaration, it is my understanding that, as of January 15, 2013, there have been over $200 million in trades involving the newly-issued debt securities issued under the Replacement Term Loan Facility, and it is anticipated that such trades should close in the ordinary course upon the impending completion of the ongoing debt syndication process. Moreover, on information and belief, with respect to many of the foregoing Replacement Term Loan Facility interests that have changed hands since the Effective Date (or may change hands imminently), it is fair to assume that the good-faith purchasers of such interests are not parties to the Appeals or the underlying Tribune bankruptcy.

**The Relief Sought By The Appellants Would Undermine The DCL Plan And Threaten The Reorganization And Viability Of The Reorganized Debtors**

13. The Bankruptcy Court found that a *delay* in the Tribune's emergence from bankruptcy could cause $1.5 billion or more in harm to the Debtors and their stakeholders. Likewise, *vacating* the Bankruptcy Court's orders approving the DCL Plan at this point could cause profound economic harm to the Reorganized Debtors and to thousands of stakeholders.

14. In light of the numerous material, complex, and interrelated transactions that were completed pursuant to the DCL Plan on and shortly after the Effective Date, granting the relief requested by the Appellants would, at a minimum, severely undermine the now consummated DCL Plan. For example, the relief sought by the Appellants would potentially implicate the recovery of billions of dollars in distributions made to thousands of creditors under the DCL Plan in cash and equity securities that have been freely tradable since shortly after the Effective Date. Given the considerable number of transactions consummated in reliance on the DCL Plan, it is difficult to conceive of a way to unwind the transactions and return the Reorganized Debtors and their creditors to their pre-emergence positions. Granting the Appellants' relief, in light of the

consummated DCL Plan, would be impractical and extremely costly, and would likely prejudice and create considerable uncertainty for the Reorganized Debtors' thousands of creditors, equity interest holders, employees, vendors and customers, many of whom have waited over four years for distributions.

15. I also believe that granting the Appellants' requested relief would potentially jeopardize the Reorganized Debtors' successful emergence from chapter 11 and seriously threaten the viability of their ongoing businesses. In addition, any efforts to unravel the consummated DCL Plan would harm the prospects of the Reorganized Debtors, and likely result in further costly litigation.

16. Therefore, after carefully considering the relevant facts, it is my view that granting the relief requested by the Appellants would be unfair, impractical and inequitable to the Reorganized Debtors, their numerous stakeholders and other parties in interest.

[Signature page to follow]

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 18, 2013

_David A. Kurtz_
David S. Kurtz