IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) |
| | ) |
| TRIBUNE COMPANY, *et al.*, | ) |
| | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |
| | ) |
| WILMINGTON TRUST COMPANY, | ) Chapter 11 |
| *et al.*, | ) Bankruptcy Case No. 08-13141 (KJC) |
| | ) Jointly Administered |
| Appellants, | ) |
| | ) Case No. 12-cv-128 GMS |
| v. | ) Case No. 12-mc-108 GMS |
| | ) Case No. 12-cv-1072 GMS |
| TRIBUNE COMPANY, *et al.*, | ) Case No. 12-cv-1073 GMS |
| | ) Case No. 12-cv-1100 GMS |
| Appellees. | ) Case No. 12-cv-1106 GMS |
| | ) CONSOLIDATED APPEALS |
| | ) |

## MEMORANDUM

## I.    INTRODUCTION

On December 7, 2012, the court consolidated the above-captioned bankruptcy appeals filed by Wilmington Trust Company ("Wilmington Trust"), Aurelius Capital Management, LP ("Aurelius"), Law Debenture Trust Company of New York and Deutsche Bank Trust Company Americas (collectively, the "Trustees"), and EGI-TRB, LLC ("EGI"). (D.I. 57.) Although Wilmington Trust, Aurelius, the Trustees and EGI raise different arguments in their respective appeals, the court will collectively refer to them as the "Appellants." Presently before the court is the Reorganized Debtors' Motion to Dismiss [the Appellants'] Appeals as Equitably Moot.

(D.I. 58.) For the reasons that follow, the court grants-in-part and denies-in-part the motion.

## II.    BACKGROUND

On December 8, 2008, the Tribune Company ("Tribune") and its affiliates, the owners and operators of the *Chicago Tribune,* the *Los Angeles Times,* and other newspapers, television stations and media properties nationwide, filed voluntary petitions for Chapter 11 protection. (D.I. 59 at 3.) The bankruptcy filings occurred approximately one year after Tribune and certain of its subsidiaries (collectively, the "Debtors") completed a leveraged buyout ("LBO") in December 2007. (D.I. 40 at 12-15.) Prior to the LBO, Tribune had approximately $5 billion in debt. Roughly $2 billion of that debt consisted of certain notes that are held by Aurelius, the Trustees, and Wilmington Trust. (*Id.* at 12.) In the course of the LBO, the Debtors incurred an additional $8 billion in debt through Senior Loan Agreements. Unlike the pre-LBO debt, the Senior Loan Agreements were guaranteed by a number of Tribune's subsidiaries. (*Id.* at 13.)

On July 23, 2012, the Bankruptcy Court confirmed the Fourth Amended Joint Plan of Reorganization for Tribune and Its Subsidiaries (the "DCL Plan") proposed by the DCL Plan Proponents.[1] According to the Reorganized Debtors, "the cornerstone of the DCL Plan is the DCL Settlement," which resolved certain LBO-related causes of action against Senior and Bridge Lenders in exchange for immediate distributions of settlement funds paid to other

---

[1] The Debtor/Committee/Lender Plan ("DCL Plan") Proponents include the Debtors, the Official Committee of Unsecured Creditors, and certain senior lenders -- Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan"). (*See* D.I. 60-2 at 2 n.4, 2011 Bankruptcy Court Opinion on Confirmation ("2011 Confirmation Decision").) Also before the bankruptcy court in 2011 was a competing reorganization plan -- the "Noteholder Plan" -- which was proposed by a majority of the present appellants -- Aurelius, the Trustees, and Wilmington Trust. (*Id.* at 3 n.5.) The Noteholder Plan was premised on continued litigation of the LBO-related claims. "The Bankruptcy Court rejected the Noteholder Plan, among other reasons, due to its promise of 'extensive and costly litigation' that 'is highly speculative' and because it received such limited support from creditors." (D.I. 86 at 8 n.16 (citing 2011 Confirmation Decision at 125).)

creditors, particularly Senior Noteholders and Other Parent Claims.[2]  (D.I. 59 at 4.)  The DCL

Plan assigned the remaining non-settled LBO-related causes of action to a Litigation Trust for

the benefit of creditors.  (D.I. 75 at 4.)

The Bankruptcy Court's 2012 confirmation order came after it had held more than ten

days of evidentiary hearings and multiple days of subsequent legal argument; issued a 2011

confirmation opinion on competing plans for reorganization; issued a reconsideration decision

after extensive briefing; and held a separate two-day evidentiary hearing and issued an

Allocation Ruling that directly addressed the exact intercreditor disputes raised in many of the

Appellants' appeals.  Accordingly, the Bankruptcy Court's confirmation order is supported by

extensive fact-finding and detailed conclusions of law.

## III.   STANDARD OF REVIEW

### A.   Equitable Mootness

"Under the doctrine of equitable mootness, an appeal should be dismissed, even if the

court has jurisdiction and could fashion relief, if the implementation of that relief would be

inequitable." *In re PWS Holding Corp.*, 228 F.3d 224, 235-236 (3d Cir. 2000).  However,

"[d]ismissing an appeal as equitably moot should be rare, occurring only where there is sufficient

---

[2] Aurelius provides additional details and a different perspective for the DCL Settlement:
The DCL Settlement releases the lenders and holders of the LBO Debt (collectively, the "'LBO Lenders") from all of the valuable LBO-related claims . . . asserted against them in their capacities as LBO Lenders, including claims to (a) avoid the Debtors' obligation to repay the LBO Lenders any of the $8.6 billion of LBO Debt, and (b) recover the more than $2 billion of principal, interest and fees paid to the LBO Lenders by Tribune pre-petition.  In consideration for these broad releases, Aurelius and Tribune's other senior and subordinated noteholders (collectively, the "Noteholders"), who are the would-be beneficiaries of approximately $2.3 billion in proceeds that could have been derived from the [LBO-related claims], received only $369 million-a mere 16% of the Noteholders' aggregate allowed claims against Tribune . . . .
(D.I. 80 at 3.)

justification to override the statutory appellate rights of the party seeking review." *In re SemCrude*, 728 F.3d 314, 326-27 (3d Cir. 2013). Sufficient justification may be found when "granting relief on appeal [is] almost certain to produce a 'perverse' outcome -- 'chaos in the bankruptcy court' from a plan in tatters and/or significant 'injury to third parties.'" *Id.* at 320 (quoting *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012)). Because dismissal "should be the rare exception and not the rule," the party seeking dismissal bears the burden to prove that it is warranted, "based on an evidentiary record, and not speculation." *Id.* at 321.

Courts assess five prudential factors to determine whether an appeal should be dismissed as equitably moot:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (*en banc*) ("*Continental I*"). The factors are "interconnected and overlapping," which, in practice, leads the equitable mootness determination to proceed in two analytical steps: "(1) whether a confirmed plan has been substantially consummated; and (2) if so, whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *SemCrude*, 728 F.3d at 321.

Satisfaction of the Bankruptcy Code "substantially consummated" statutory standard[3] is

---

[3] Substantial consummation is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101.

sufficient for the first step, and "indicates that implementation of the plan has progressed to the point that turning back may be imprudent." *Id.* After the threshold step is satisfied, courts should then analyze "whether granting relief will require undoing the plan as opposed to modifying it in a manner that does not cause its collapse." *Id.*[4] Courts should also "consider the extent that a successful appeal, by altering the plan or otherwise, will harm third parties who have acted reasonably in reliance on the finality of plan confirmation." *Id.* (citing *In re Continental Airlines*, 203 F.3d 203, 210 (3d Cir. 2000) ("*Continental II*").

### B. Appellate Review of a Bankruptcy Court Decision

"In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous." *See Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 641 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992). Conversely, a Bankruptcy Court's conclusions of law are subject to plenary review. *See id.*, at 641. Mixed questions of law and fact are subject to a "mixed standard of review." *Id.* at 641-42. Under this "mixed standard of review," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to historical facts." *Id.* at 642 (citation and internal quotation marks omitted).

## IV. DISCUSSION

### A. Equitable Mootness Analysis

The Appellants uniformly argue that the Reorganized Debtors have not satisfied their

---

[4] *See In re Zenith Elecs. Corp.*, 329 F.3d 338, 343-44 (3d Cir. 2003) (appeal not equitably moot where disgorgement of professional fees would not unravel plan); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 228 (3d Cir. 2003) (appeal not equitably moot where striking indemnification provision would allow the plan to stay otherwise intact).

burden to moot the respective appeals because the Appellants individually seek only limited relief that will not unravel the DCL Plan or have a significant impact on third parties. (D.I. 71 at 1-2; D.I. 72 at 3-4; D.I. 75 at 1; D.I. 80 at 15-16.) The court notes, however, that each of the Appellants original requests for relief sought to either reverse or vacate the Bankruptcy Court's Confirmation Order.

### 1.    Substantial Consummation and Obtaining a Stay

The parties do not dispute, and the court has no reason to disagree, that the DCL Plan has been substantially consummated. Indeed, the Reorganized Debtors argue that pursuant to the DCL Plan, "more than $8 billion in cash and securities has been distributed to thousands of creditors; 100 million new shares of stock and warrants have been issued and are actively trading on the open market; the Reorganized Debtors have incurred $1.1 billion in new debt, completed multiple corporate restructuring transactions, appointed a new Board, and hired a new Chief Executive and other officers; and dozens of pending lawsuits and causes of action have been dismissed with prejudice or transferred to new plaintiffs." (D.I. 86 at 1.)

Further, the DCL Plan has been substantially consummated due in part to the Appellants' failure to obtain a stay. Neither Wilmington Trust nor EGI requested a stay. Aurelius and the Trustees did seek a stay and, after a full-day hearing, the Bankruptcy Court granted that request, but conditioned the stay on the posting of a supersedeas bond in the amount of $1.5 billion. (D.I. 59 at 2.) Aurelius and Trustees did not post the bond. They argue that the bond amount was prohibitive and more than the total value of their claims at issue. (D.I. 75 at 4; D.I 80 at 5.) Accordingly, the court finds that first two factors favor the Reorganized Debtors, but those factors are not dispositive of the equitable mootness issue before the court.

"[T]hus [the court] turn[s] to whether granting [the Appellants] relief will have the feared

outcomes--collapsing the plan and significantly injuring third parties who reasonably relied on its implementation--with which equitable mootness is ultimately concerned." *SemCrude*, 728 F.3d at 323.

### 2. Success of the Plan and Injury to Third Parties

#### a. Aurelius

"Aurelius is the largest holder of senior and subordinated notes issued by the Tribune Company prior to the highly leveraged buyout in 2007 that drove the company into bankruptcy." (D.I. 80 at 2.) It seeks modification of the DCL Settlement, which Aurelius argues is unreasonable because it provides "meager consideration" to senior and subordinated noteholders in light of the fact that the LBO-related claims, if successful, would have resulted in payment in full to those noteholders. (*Id.* at 4.) Aurelius estimates that the LBO-related claims released by the DCL Settlement would return a judgment "up to approximately $1.60-1.68 billion" in addition to the distributions already made under the DCL Plan. (*Id.* at 17.) It contends that there are at least three remedies related to the DCL Settlement that the court could implement that would grant senior and subordinated noteholders complete or partial relief and not unravel the DCL Plan. (*Id.* at 16-20.) Specifically, Aurelius suggests that the court could 1) order the Reorganized Debtors to fund any liability resulting from the ultimate outcome of the LBO-related claims; 2) allow the Litigation Trust to pursue the LBO-related claims directly against the LBO Lenders[5]; or 3) strike the releases granted to the LBO Lenders and allow the Litigation

---

[5] According to Aurelius, there are twenty LBO Lenders. Of those twenty, three -- Oaktree, Angelo Gordon, and JPMorgan -- received more than $3 billion, which is half of the distributions under the DCL Plan. Aurelius contends that amount exceeds the balance of the LBO-related claims. Therefore, it suggests that the court allow the LBO-related claims to proceed against just those three parties. (*See* D.I. 80 at 19 n.46.) However, Aurelius was unsuccessful advancing an identical argument in the past, and the court cannot endorse such a measure in the present case. *See In re Adelphia Commc'ns Corp.*, 367

Trust to pursue the LBO-related claims, but limit the senior and subordinated noteholders' recovery to the 35% payable to the LBO Lenders under the terms of the Litigation Trust distribution waterfall.[6] (*Id.* at 17-20.)

Regarding Aurelius' first option, it argues that a $1.68 billion judgment would not threaten the Reorganized Debtors' ongoing business because they emerged from bankruptcy with an enterprise value of $7.37 billion. (*Id.* at 17-18.) The court disagrees. As an initial matter, making the Reorganized Debtors liable for the LBO-related claims would nullify the purpose of the DCL Plan -- discharge of Tribune's prepetition debt -- and amount to a reinstatement of $1.68 billion of that debt. Courts generally allow potential claims to proceed when they are a relatively small fraction of the reorganization plan. *See SemCrude*, 728 F.3d at 324 (finding a potential $207,000 claim would not destabilize a $160 million settlement provision and "pale[d] even more in the context of the entire reorganization plan, which involved over $2 billion."); *In re Aurora Foods*, No. 04-166-GMS, 2006 U.S. Dist. LEXIS 91659, at *15-16 (D. Del. Dec. 19, 2006) (concluding that a $930 million reorganization "[p]lan need not be undone to satisfy a

---

B.R. 84, 97 (S.D.N.Y. 2007) (finding "selective disgorgement from cherry-picked creditors as opposed to ordering disgorgement from all creditors . . . is it equitable because those [select few] creditors would not be able to recoup their losses by pursuing other creditors as they agreed to relinquish those claims as part of the Global Settlement.").

[6] The DCL Plan classified various creditor claims and interests against Tribune. The classifications relevant to the present appeal include: 1C - Senior Loan Claims; 1D - Bridge Loan Claims; 1E - Senior Noteholder Claims; 1F - Other Parent Claims; 1G - Convenience Claims; 1I - EGI Notes Claims; and 1J - PHONES Claims. (D.I. 60-1 ("DCL Plan") at A8-A9.)

The Litigation Trust distribution "waterfall" (the protocol for distribution and priority) requires that: (a) the first $90 million in net proceeds recovered by the Litigation Trust to be distributed to Senior Noteholders (Class 1E) and other "non-LBO creditors" who elected to receive Litigation Trust Interests (Class 1F), *pro rata*, after enforcing subordination of claims in the EGI Notes (Class I) and the PHONES (Class 1J); (b) the next $20 million in net proceeds to be used to repay Reorganized Tribune's loan to the Litigation Trust; and (c) 65% of any additional net proceeds to be distributed to be split *pro rata* among holders of Class 1E and 1F Litigation Trust Interests until paid in full, then to holders of Class 1J and 1I Litigation Trust Interests, with the remaining 35% of such proceeds to be distributed to the Senior Lenders (Class 1C and 1D Litigation Trust Interests). (D.I. 72 at 5; D.I. 86 at 29 n.71.)

$6.85 million contested payment" because the reorganized debtor had sufficient projected strength to pay the potential claim if validated.). In contrast, the potential $1.68 billion judgment in this case amounts to approximately 22% of the over $7 billion reorganization plan. Thus, the court concludes it would be inequitable to make the reorganized debtors liable for the LBO-related claims.

In response to Aurelius' remaining proposals, the Reorganized Debtors argue that the relief requested would eviscerate the DCL Plan. (D.I. 86 at 7.) They argue a fundamental flaw in Aurelius' proposals is that the Senior Noteholders and thousands of other creditors would keep the $400 million in settlement compensation provided by the LBO Lenders and distributed under the DCL Plan, but the LBO Lenders would not receive the benefit for which they paid -- the release and discharge of the LBO-related claims. (*Id.* at 7-8.) As such, Aurelius' proposals are directly at odds with the bargain negotiated among the parties and ultimately reflected in the DCL Settlement. The Reorganized Debtors assert that the court does not have power to rescind the releases without restoring the settlement consideration the LBO Lenders provided to other creditors for those releases. Rather, the Reorganized Debtors contend that the court would be required to rescind the entire bargain and reverse the DCL Settlement. (*Id.* at 8-9.) The court agrees.

The Bankruptcy Court found that the LBO Lenders provided sufficient consideration for the release of the LBO-related claims, and that the release of those claims is "connected to the [DCL Settlement], which is integral to the DCL Plan." In addition, it correctly concluded that "release of the [LBO Lenders] is necessary to the Debtor's reorganization." (2011 Confirmation Opinion at 90.) As such, the court finds that the release of LBO-related claims under the DCL

Settlement was an integral component of the DCL Plan for which the LBO Lenders paid approximately $400 million. Accordingly, the court cannot rescind the DCL Settlement releases without reversing the entire plan.[7] *See In re SLI Inc.*, No. 04-4231, 2006 U.S. App. LEXIS 5188, at *9 (3d Cir. Mar. 1, 2006) (quoting *Continental II*, 203 F.3d at 209) ("Because they are consideration for investment that was crucial to the [reorganization plan], the releases form an 'integral nexus with the feasibility of the . . . plan of reorganization.'").

Finally, the Reorganized Debtors correctly characterize the Litigation Trust distribution waterfall as "a heavily negotiated, integral component of the DCL Settlement" that "includes elaborate, detailed provisions identifying the creditor classes with Litigation Trust Interests and specifying the manner in which the Litigation Trust recoveries are to be allocated." (D.I. 86 at 29; *see also* Note 6, *supra*.) As part of that negotiation, the senior lenders agreed to forgo some of their natural recoveries and bargained to retain a 35% share of the Litigation Trust recoveries. (*See* D.I. 86, Ex B, Supplemental Declaration of David Kurtz ("Supp. Kurtz Decl."), ¶ 11.). The Bankruptcy Court specifically found that "it was appropriate for the parties to include this element as part of the DCL Plan Settlement." (D.I. 60-4, 2011 Bankruptcy Court Memorandum on Reconsideration ("Reconsideration Opinion Decision") at 19). Accordingly, the Court rejects Aurelius' third proposal -- that senior and subordinated noteholders receive the Senior Lenders' 35% share of Litigation Trust proceeds -- because it would fundamentally alter the terms of the

---

[7] Aurelius argues that "releases (or some of the releases) could be stricken from the plan without undoing other portions of it." (D.I. 58 at 19 (quoting *PWS*, 228 F.3d at 236).) The court is not convinced. The releases at issue in *PWS* were not integral to the reorganization plan. Rather, they released individuals who had provided services after the petition date from certain liability for their work in the reorganization. *PWS*, 228 F.3d at 235. The *PWS* Court concluded that the equities did not require dismissal because striking the releases would not necessitate reversal or unraveling of the entire reorganization plan. *Id.* 237-38. In contrast, the releases at issue here are the heart of the DCL Settlement, which is an integral part of the DCL Plan.

DCL Settlement.

The court concludes that Aurelius' requested relief directly attacks the DCL Settlement, which is an integral component of the DCL Plan. Therefore, the court finds that if Aurelius' requested relief was granted, it would have the feared outcome of collapsing the DCL Plan.

### b.    The Trustees

The Trustees represent Senior Noteholders, which are the holders of pre-leverage buyout debt. (*See* No. 12-1073, D.I. 36 ("Trustee Appeal") at 3.) They raise an intercreditor dispute and contend that the DCL Plan violates the Subordination Agreements[8] by improperly dispersing $29 million to a different class of creditors. (D.I. 75 at 5.) Specifically, the Trustees argue that only Senior Noteholders (Class 1E creditors) are entitled to the benefit of the Subordination Agreements and that holders of Other Parent Claims (Class 1F creditors) -- consisting of retirees, trade creditors, and the Swap Claim -- should not share in the "turn over" of settlement consideration under the Subordination Agreements.[9] (Trustee Appeal at 3-8.) They contend that the court can provide effective relief to Class 1E creditors (including the Trustees) by (A) ordering either 1) the Reorganized Debtors to disburse the $29 million to Class 1E creditors, 2) the Class 1F creditors to disgorge the $29 million wrongfully diverted to it and transfer such cash

---

[8] The Subordination Agreements provide, in pertinent part, that all payments that otherwise would repay the PHONES and EGI Notes must be turned over to more senior creditors until their claims are paid in full. (*See* Note 6, *supra*.)

[9] Class 1F Other Parent Claims is composed of 7 holders of the Swap Claim (approximately 57% -- $151 million), 191 retirees (approximately 40% -- $105 million), and 517 unsecured trade and other creditors (approximately 3% -- $8.8 million). (2011 Confirmation Opinion at 109; D.I. 72 at 17 n.13; D.I. 86, Ex. A, Supplemental Declaration of Brian Whittman ("Supp. Whittman Decl."), ¶ 34.) The class members were presented the opportunity to choose between (a) larger distributions on their claims (35.18%) while forgoing future litigation interests; and (b) smaller initial distributions (32.73%) accompanied by Litigation Trust Interests. (Supp. Whittman Decl. at 14 n.8.) The holders of the Swap Claim chose option one -- to receive a higher distribution on their claim. As such, of the 715 class members, 113 (16% by number, but 77% of all distributions to Class 1F creditors) chose the first option and received a slightly higher distribution on their claim, while 602 (84% by number, but only 23% by claim amount) chose to receive Class 1F Litigation Trust Interests. (*Id.*, ¶¶ 35, 39, 47.)

to Class 1E creditors, or 3) the modification or additional distribution under the Litigation Trust distribution waterfall to redirect Class 1F creditors' recoveries to Class 1E creditors; and (B) the modification of the "spin-up" provisions of Class 1I (EGI Notes Claims) and Class 1J (PHONES Claims) Litigation Trust Interests to require future distributions to be turned over to only Class 1E creditors (and not Class 1F) until their claims are paid in full. (D.I. 75 at 5-6.)

The Reorganized Debtors argue, and the court agrees, that the Trustees requested relief would adversely affect key provisions of the DCL Plan and inequitably impact third parties not before the court. (D.I. 86 at 22.) The Trustees first option -- that the Reorganized Debtors pay $29 million to remedy the alleged inappropriate distribution to Class 1F creditors -- would be inequitable because it would require the Reorganized Debtors to pay that sum twice and would harm new creditors and shareholders. The Reorganized Debtors indicate that between December 2012 and February 2013, over 16 million shares of common stock and over 1 million new warrants have been freely traded in open markets. (D.I. 86 at 24 n.54; Supp. Whittman Decl., ¶ 7.) Accordingly, the Trustees requested relief would adversely impact innocent parties not before the court. *See In re SemCrude L.P.*, 456 F. App'x 167 (3d Cir. 2012) (affirming appeal as equitably moot where payment of judgment would impact the rights of persons holding "stocks and warrants issued as part of the consummation of the plan [that] have been freely tradable since their issuance").

In addition, the Reorganized Debtors convincingly argue that the court cannot practically or equitably order disgorgement from Class 1F creditors because it consists of more than 700 members, the majority of which are individuals and small-business trade creditors.[10] (D.I. 86 at

---

[10] The Reorganized Debtors state that, excluding the Swap Claim, the average initial distribution paid to Class 1F creditors was approximately $51,150. (*See* Supp. Whittman Decl., ¶ 36.)

27; *see also* Note 9, *supra*.) The proposed disgorgement would also be difficult to implement uniformly given that 16% of the class creditors received only cash distributions, while the remaining 84% received part of their distributions in Litigation Trust Interests. (*See* Supp. Whittman Decl., ¶ 35.) Accordingly, the court rejects this proposal because it would be inequitable to numerous individuals and extremely difficult to implement.

Finally, the Trustees requested modifications to the Litigation Trust distribution waterfall would have an inequitable impact on third parties not before the court. The Class 1F creditors were given the opportunity to choose between (a) larger distributions on their claims while forgoing future litigation interests; and (b) smaller initial distributions accompanied by Litigation Trust Interests. (*See* Note 9, *supra*.) Hundreds of individuals and small-business trade creditors, who not parties in the present appeal, elected to participate in the Litigation Trust. (*Id.*) In making that election, they were entitled to rely upon the finality of the Confirmation Order. *See Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,* 258 F.3d 180, 189 (3d Cir. 2001) (finding parties that "are not currently before [the appellate reviewing court] and relied on the plan confirmation . . . merit protection under the equitable mootness doctrine."). Thus, the court concludes that equity requires protecting the hundreds of Class 1F creditors that would be adversely impacted by the Trustees requested relief.

### c.    Wilmington Trust and EGI

Wilmington Trust is "the Successor Indenture Trustee" for the PHONES notes Indenture. (D.I. 72 at 1.) EGI is a general unsecured creditor of Tribune that lent it $235 million prior to the bankruptcy filings. (D.I. 71 at 2.) Both parties challenge the Bankruptcy Court's ruling on subordination issues.

Specifically, the core issue in Wilmington Trust's three appeals is whether the PHONES

are entitled to participate, on an unsubordinated basis, in the DCL Settlement, including initial distributions for settlement of the LBO-related claims, as well as future distributions by the Litigation Trust. (D.I. 72 at 2.) Its requested relief would require modification of the Litigation Trust distribution waterfall to "first repay the PHONES to provide for the same 32.73% recovery received under the DCL Settlement by holders Class 1E and 1F claims" that elected to receive Litigation Trust Interests, and after that recovery is reached, to make distributions "to holders of Class 1E, 1F, and 1J Litigation Trust Interests on a *pari passu* basis." (D.I. 72 at 12.)

Unlike Wilmington Trust, EGI does not seek to recoup an initial distribution made to creditors under the DCL Plan, but it does propose to modify the Litigation Trust distribution waterfall. EGI appeals the bankruptcy court's determination that it is subordinated to all of Tribune's other unsecured creditors, and alternatively argues that it should be superior to or *pari passu* with the PHONES.[11] (D.I. 71 at 3.)

Wilmington Trust argues that its requested relief would not unravel the DCL Plan because it will not affect the initial distributions or create any unforeseen financial difficulties for the Reorganized Debtors. (D.I. 72 at 12.) In addition, it argues that reordering the Litigation Trust distribution waterfall would not upset the DCL Plan core elements because the Litigation Trust Interests are not freely tradable and the Litigation Trust has not yet made any distributions. (*Id.* at 16.) Finally, it contends that any parties that would be adversely affected are either before the court or were aware of Wilmington Trust's appeals as a result of disclosures made available

---

[11] The second issue that EGI appeals is the Bankruptcy Court's ruling that EGI may not recover from a Creditor Trust that was deleted from the confirmed DCL Plan. EGI contends that the "advisory opinion may have confusing and mischievous affects on matters beyond the scope of the Confirmation Order, EGI asks only that this Court excise this advisory ruling from the Confirmation Order." (D.I. 71 at 1-2.) This issue is discussed in detail in Part B below.

to creditors prior to electing Litigation Trust Interests.[12]  (*Id*. at 17-18.)

In response, the Reorganized Debtors argue that Wilmington Trust's proposed modification would materially impact Litigation Trust distributions to Class 1E and 1F creditors, which are entitled to *pro rata* shares of the first $90 million of Litigation Trust proceeds, and 65% of any proceeds over $110 million. (D.I. 86 at 32.) They calculate that Class 1E and 1F creditors with Litigation Trust Interests would likely receive a 13% to 25% lower recovery. (*See* Supp. Whittman Decl., ¶ 46, Ex. C.) Similarly, the Reorganized Debtors contend that EGI's proposal would likely result in a 1.9% to 5.2% lower recovery for Class 1E and 1F Litigation Trust Interests. (*Id*., ¶ 49.) They further argue that, like the Trustees proposal, *supra*, these proposals would disproportionately impact the Class 1F creditors that elected to receive Litigation Trust Interests and make them bear the burden of the proposal for all Class 1F claimants.[13]  (*Id*., ¶ 47.)

The court finds the Reorganized Debtors' argument more persuasive.  Although Wilmington Trust's and EGI's proposed remedies would not require the Reorganized Debtors to reenter bankruptcy or completely unravel the DCL Plan, they would adversely affect numerous

---

[12] Wilmington Trust argues that the Trustees and Aurelius make up Class 1E, those parties vigorously opposed the DCL Plan, and the bankruptcy court imposed the plan on them. Therefore, it contends the alternative relief sought would not deprive the Class 1E creditors of benefit of their bargain. (D.I. 72 at 17.) The court disagrees. Wilmington Trust is correct that Class 1E rejected the DCL Plan. A closer examination of the record, however, reveals that 85% of Class 1E creditors (by number, but only 10% by total claim amount) actually voted to accept the plan. (D.I. 60 at A-256.)

Wilmington Trust additionally argues that Class 1F creditors that elected to receive a reduced initial distribution and Litigation Trust Interests, did so with knowledge of the PHONES subordination appeals and accepted the risk that the PHONES appeals would be successful. (D.I. 72 at 17-18.)

[13] The Reorganized Debtors state that approximately 16% by number and 77% by allowed Claim Amount Class 1F creditors elected cash-only distributions that would be unaltered and entirely unaffected by the Wilmington Trust proposal. They estimate that a Class 1F claim that opted out of the Litigation Trust would receive approximately 36% of their allowed claim while a Class 1F claim that participated in the Litigation Trust would receive approximately 33.6% of their allowed claim. (Supp. Whittman Decl., ¶ 47.)

Class 1F individuals and small-business entities that are not presently before the court.

Accordingly, like the Trustees proposal, *supra*, the court rejects Wilmington Trust's and EGI's

proposals that would inequitably impact hundreds of parties that relied on the plan confirmation

and are not presently before the court. *See Nordhoff*, 258 F.3d at 189.

EGI's alternative remedy that it is subordinated to all creditors except for the PHONES

is distinguishable. EGI correctly argues that PHONES appealed the Bankruptcy Court's

confirmation order, and therefore, cannot claim that they relied on the correctness of that order.

(*See* D.I. 88-1 at 2.) Accordingly, the court could order the requested limited relief if EGI's

appeal succeeds.

### 3. Policy Considerations

The Third Circuit's rationale underpinning the general public policy affording finality to

bankruptcy judgments is highly relevant in the present case.

> Our inquiry should not be about the "reasonableness" of the Investors'
> reliance or the probability of either party succeeding on appeal. Rather, we
> should ask whether we want to encourage or discourage reliance of
> investors and others on the finality of bankruptcy confirmation orders. The
> strong public policy in favor of maximizing debtor's estates and
> facilitating successful reorganization, reflected in the code itself, clearly
> weighs in favor of encouraging such reliance. Indeed, the importance of
> allowing approved reorganizations to go forward in reliance on
> bankruptcy court confirmation orders may be the central animating force
> behind the equitable mootness doctrine. Where, as here, investors and
> other third parties *consummate a massive reorganization in reliance on an
> unstayed confirmation order that, explicitly and as a condition of
> feasibility, denied the claim for which appellate review is sought*, the
> allowance of such appellate review would likely undermine public
> confidence in the finality of bankruptcy confirmation orders and make
> successful completion of large reorganization like this more difficult.

*Continental I*, 91 F.3d at 565 (citations omitted) (emphasis added).

Similarly, the reorganized debtors in this case, "consummate[d] a massive

reorganization" in excess of $8 billion; the Appellants advance on appeal the same arguments considered and rejected by the Bankruptcy Court in four detailed opinions; the Bankruptcy Court confirmed the fourth revision of a reorganization plan; and the Bankruptcy Court's confirmation order "explicitly and as a condition of feasibility, denied the claim[s] for which appellate review [are] sought." *See id.*

### 4. Equitable Mootness Summary

The DCL Plan has been substantially consummated in a definitional sense and in reality. The Appellants either did not seek a stay or were unsuccessful in obtaining a stay of the confirmation order. Importantly, as discussed above, the court finds that, with the exception of EGI's narrow requested relief with respect to the PHONES, the Appellants' proposed remedies would either unravel the DCL Plan or adversely and inequitably effect parties that reasonably relied on the finality of the confirmation order and are not before the court. Finally, the strong public policy affording finality to bankruptcy judgments weighs in favor of equitable mootness in this case based on the sheer size and complexity of the reorganization and the extensive fact-finding and detailed legal conclusions provided by the Bankruptcy Court's numerous opinions.

After weighing the five pertinent factors, the court finds that Reorganized Debtors have presented sufficient factual evidence to prove that Aurelius', the Trustees', and Wilmington Trust's appeals are equitably moot. With respect to EGI's appeal, if successful, the court finds that it could fashion limited relief that would not unravel the DCL Plan or affect parties not before the court. Therefore, the court grants-in-part and denies-in-part the Reorganized Debtors' motion to dismiss the Appellant's appeals as equitably moot.

### B. EGI's Appeal

On appeal, EGI challenges the Bankruptcy Court's determination that the EGI Notes are

subordinated from all sources of recovery, including the Litigation Trust. (No. 12-1100-GMS, D.I. 32 at 1.) Specifically, EGI argues that the terms of the EGI Subordination Agreement only subordinate its right to recover from "assets of the Company" and its right to receive payments made "by or on behalf of the Company," where the "Company" is expressly defined as "Tribune Company." EGI contends that it did not agree to subordinate its right to recover from a Tribune successor, like the post-bankruptcy Litigation Trust. (*Id.* at 3.) In addition, it argues the fraudulent transfer claims, which are a subset of the LBO-related claims, are not "assets of the Company." (*Id.*at 4.) Therefore, EGI asserts that when the Litigation Trust makes distributions to creditors, it will not be making payments "by or on behalf of [Tribune Company]" of "assets of [Tribune Company]."

After reviewing the Bankruptcy Court's April 9, 2012 Memorandum Regarding Allocation Disputes ("Allocation Ruling") under a mixed standard of review, the court finds that the Bankruptcy Court properly subordinated the EGI Notes with regard to Litigation Trust recoveries. (*See* D.I. 60 A-196 – A-247.) The Bankruptcy Court found "[t]he flaw in EGI's argument is the focus on whether the fraudulent transfer claims *belong* to the Debtors." (*Id.* at A-239.) The Bankruptcy Court explained "[f]raudulent conveyance law aims to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away." (*Id.* (quoting *PWS*, 303 F.3d at 313).) Further, "section 544(b) places the debtor in possession in the shoes of its creditors, giving it the right to prosecute individual creditors' fraudulent transfer claims for the benefit of the bankruptcy estate. This provision of the Bankruptcy Code is consistent with its objective of equitable distribution." *PWS,* 303 F.3d at 314. With that legal support, the Bankruptcy Court reasoned that the DCL Plan's

distributions of recoveries by the Litigation Trust for federal fraudulent transfer claims would be payments by or on behalf of Tribune.

> In this case, the Debtors have proposed a plan that will exercise their power to resolve, or pursue through the Litigation Trust, potential fraudulent transfer claims on behalf of creditors under Bankruptcy Code § 544(b) and § 548. Any recoveries will be property of the estate pursuant to §541(a)(3) (Property of the estate includes "any interest in property that the trustee recovers under section ... 550"). Since the DCL Plan Settlement Proceeds and the Litigation Trust recoveries are property of the estate, the distribution of those funds would be a distribution or payment "by or on behalf of the Company" and the subordination provisions of the EGI Subordination Agreement will apply to those distributions.

(D.I. 60 at A-240.)

In addition, the Bankruptcy Court analyzed the subordination provisions relating to both the PHONES Notes and EGI Notes and found them to be ambiguous regarding the relative seniority. (*Id.* at A-225-A-227.) The Bankruptcy Court then reviewed parol evidence presented by both parties and found that "the collective, contemporaneous understanding of the parties negotiating the LBO was that the EGI Notes would be the most junior in Tribune's capital structure." (*Id.* at A-234.) Therefore, the Bankruptcy Court concluded that the PHONES Notes are senior to the EGI Notes. (*Id.*)

The court finds no reason to deviate from the Bankruptcy Court's conclusions.

EGI's second issue on appeal is that the Bankruptcy Court's ruling that EGI is subordinated as to state law fraudulent transfer claim recoveries from a Creditor Trust -- that was never formed -- amounts to an advisory opinion and should be vacated. Essentially, the Bankruptcy Court performed the above analysis again, but it interpreted the EGI Subordination Agreement under Delaware law rather than bankruptcy law. (*See id.* at A-240 – A-243.) Because the Creditor Trust was removed from the fourth revision of the DCL Plan, EGI contends

that the Bankruptcy Court erred when it entered a final judgment order incorporating the entire Allocation Ruling, which had become, in part, an advisory opinion about the Creditor Trust. (No. 12-1100, D.I. 14 at 27.) The court agrees. Therefore, the court vacates the Bankruptcy Court's Allocation Ruling to the extent it opines on the Creditor Trust issue.[14]

## V.    CONCLUSION

For the reasons stated above, the court grants-in-part and denies-in-part the Reorganized Debtors motion to dismiss the appeals as equitably moot (D.I. 85). In addition the court grants EGI the limited requested relief regarding the Allocation Ruling's discussion of the Creditor Trust.

Dated: June ___, 2014

_____
CHIEF, UNITED STATES DISTRICT JUDGE

---

[14] The pertinent portion begins at the last paragraph on page 45 of the Allocation Ruling and ends in the middle of page 48. (*See* D.I. 60 at A-240 – A-243.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | |
| TRIBUNE COMPANY, *et al.*, | ) | |
| | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |
| WILMINGTON TRUST COMPANY, | ) | Chapter 11 |
| *et al.*, | ) | Bankruptcy Case No. 08-13141 (KJC) |
| | ) | Jointly Administered |
| Appellants, | ) | |
| | ) | Case No. 12-cv-128 GMS |
| v. | ) | Case No. 12-mc-108 GMS |
| | ) | Case No. 12-cv-1072 GMS |
| TRIBUNE COMPANY, *et al.*, | ) | Case No. 12-cv-1073 GMS |
| | ) | Case No. 12-cv-1100 GMS |
| Appellees. | ) | Case No. 12-cv-1106 GMS |
| | ) | CONSOLIDATED APPEALS |
| | ) | |

## <u>ORDER</u>

At Wilmington, this ___ day of June, 2014,

IT IS HEREBY ORDERED THAT:

1.    EGI's Motion to File Sur-Reply (D.I. 88) is GRANTED;

2.    The Reorganized Debtors Motion to Dismiss Appeals as Equitably Moot (D.I. 58)

is GRANTED-IN-PART and DENIED-IN-PART;

3.    Wilmington Trusts' bankruptcy appeals (No. 12-cv-128-GMS, No. 12-mc-108-

GMS, and 12-cv-1106-GMS) are DISMISSED as Equitably Moot;

4.      Aurelius' bankruptcy appeal (No. 12-cv-1072-GMS) is DISMISSED as Equitably Moot;

5.      The Trustees' bankruptcy appeal (12-cv-1073-GMS) is DISMISSED as Equitably Moot;

6.      The court vacates the Bankruptcy Court's limited findings, as identified in the Memorandum accompanying this order, regarding the Creditor Trust in the Bankruptcy Court's April 9, 2012 Memorandum Regarding Allocation Disputes;

7.      The court affirms the Bankruptcy Court's April 9, 2012 Order Regarding Allocation Disputes (the "Allocation Order") to the extent it found the EGI Notes are junior in priority to the PHONES Notes; and that the subordination provisions in the EGI Subordination Agreement are applicable to distribution of Settlement Proceeds and distribution of Litigation Trust proceeds; and

8.      The court affirms the July 23, 2012 Order of the Bankruptcy Court, Confirming the Fourth Amended Joint Plan of Reorganization for Tribune Company and its Subsidiaries to the extent it adopted the limited findings of the Allocation Order as modified above.

_____
CHIEF, UNITED STATES DISTRICT JUDGE

22