IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *IN RE*<br><br>TRIBUNE MEDIA COMPANY, *et al.*,<br><br><br>Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| LAW DEBENTURE TRUST COMPANY<br>OF NEW YORK & DEUTSCHE BANK<br>TRUST COMPANY AMERICAS,<br><br><br>Appellants,<br><br>v.<br><br>TRIBUNE MEDIA COMPANY, *et al.*,<br><br>Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Chapter 11
Bankruptcy Case No. 08-13141 (KJC)
Jointly Administered

Case No. 12-cv-128 GMS
Case No. 12-mc-108 GMS
Case No. 12-cv-1072 GMS
Case No. 12-cv-1073 GMS
Case No. 12-cv-1100 GMS
Case No. 12-cv-1106 GMS
CONSOLIDATED APPEALS

## MEMORANDUM

### I.   INTRODUCTION[1]

On June 18, 2014 the court issued an opinion finding the appeals equitably moot for the

above-captioned bankruptcy appeals filed by Wilmington Trust Company ("Wilmington Trust"),

---

[1] D. Del. LR 7.1.3(6) instructs parties to "include a citation to the docket item number as maintained by the Clerk in the following format: 'D.I.' followed by the docket item number of the paper." Both parties have failed to comply with this rule in their briefs. As such, the court will properly cite to the record as follows. The parties cite to the Appendix attached to D.I. 109, which includes references to earlier-filed papers in this civil action. For example, parties have cited to "[A99]" instead of the appropriate D.I. 109-2 at A99. Thus, when citing to the Bankruptcy Court's Opinion on Confirmation the court will cite to D.I. 1-2. The court will refer to the Memorandum Regarding Allocation of Disputes as D.I. 109-2, which the parties have cited as simply "A99-A148." The court will cite to the Court of Appeals for the Third Circuit Opinion, which Parties cited as A171-A208, as D.I. 102. The court will cite to its previous Memorandum and Order, which parties cited as A149-A170, as D.I. 93. Where Appellees cite to "SA," the court believes this refers to D.I. 110-1, D.I. 110-2, and D.I. 110-3 and will cite to these dockets accordingly.

Aurelius Capital Management, LP ("Aurelius"), Law Debenture Trust Company of New York and

Deutche Bank Trust Company Americas (the "Appellants"), and EGO-TRB, LLC ("EGI"). (D.I.

93.) Although Tribune Media Company and Tribune Media Retirees (Class 1F Creditors) raise

different arguments in their respective appeals, the court will collectively refer to them as the

"Appellees."[2]   Subsequently, on July 16, 2014, Aurelius appealed the court's decision. (D.I. 95.)

On September 21, 2015 the United States Court of Appeals for the Third Circuit affirmed the court

finding that Aurelius's appeal is equitably moot, but reversed the court finding that the Trustees'

appeal is not equitably moot. (D.I. 102 at 23.)  Presently before the court is the Appellants' appeal

asking the court to find that the Bankruptcy Court erred in confirming the DCL Plan. (D.I. 109 at

1.)  For the reasons that follow, the court will affirm the Bankruptcy Court.

**II.      BACKGROUND[3]**

On December 8, 2008, the Tribune Company ("Tribune") and its affiliates, the owners and

operators of the *Chicago Tribune,* the *Los Angeles Times,* and other newspapers, television stations

and media properties nationwide, filed voluntary petitions for Chapter 11 protection.  (D.I. 59 at

3.)  The bankruptcy filings occurred approximately one year after Tribune and certain of its

subsidiaries (collectively, the "Debtors") completed a leveraged buyout ("LBO") in December

---

[2] The court notes that the Tribune Media ("TM") Retirees, Class 1F Creditors, submitted a brief to supplement Appellees' and address issues unique to the TM Retirees. (D.I. 111.) Because the court affirms the Bankruptcy Court's decision, the result urged by TM Retirees, it does not need to consider the TM Retirees' arguments. *In re Tribune Media Company, et al.,* 2014 WL 2797042 at *17 (D. Del. June 18, 2014), *rev'd* 799 F.3d 272 (3d Cir. 2015).

[3] While Appellants submit a "Statement Regarding Oral Argument," the court does not believe oral argument is necessary. (D.I. 113.)  As Appellants point out, oral argument is unnecessary where the district court judge determines that the facts and legal arguments in the briefs and record are adequate, and the decisional process would not be significantly aided by oral argument. (D.I. 113 at 3.)

Given the lengthy and numerous opinions issued in this case, the court will recite only those facts necessary to the resolve the present dispute.

2007. (D.I. 40 at 12-15.)[4] Prior to the LBO, Tribune had a market capitalization of approximately

$8 billion and around $5 billion in debt. (D.I. 60-1 at 4.) Tribune's debt included (1) $10.2 billion

in LBO debt; (2) $1.2 billion in "Senior Notes," for which the Trustees served as indenture trustee;

(3) around $1 billion in subordinated debt—the PHONES Notes and the EGI Notes; and (4) $265

million in "Other Parent Claims" consisting of $105 million of claims by Tribune Media Retirees

("TM Retirees"), $9 million of trade and miscellaneous debt, and the $151 million "Swap Claim"

arising from termination of an interest rate swap agreement tied to the LBO debt. *In re Tribune

Co.*, 464 B.R. 126, 137-41, 194-95 (Bankr. D. Del. 2011) ("*Tribune I*"); (D.I. 110 at 4.)

The Trustees represent the interests of certain pre-LBO debt treated as "Class 1E

Creditors"—Tribune's Senior Noteholders—in the Plan. (D.I. 109 at 3.) Two other series of

Tribune Notes—the PHONES notes and the EGI Notes—are contractually subordinate to the

Senior Notes. (D.I. 109 at 3.) The Senior Notes are referred to as "Senior Indebtedness" in the

contract governing the PHONES Notes and as "Senior Obligations" in the contract governing the

EGI Notes. (D.I. 109 at 3.) According to the subordination agreements, if Tribune went bankrupt,

any recovery by the PHONES and EGI Notes would be payable to the Class 1E Creditors. The

Plan, however, provides that any recovery from those Notes are distributed pro rata between Class

1E and Class 1F. The latter has about 700 creditors in it, the majority of whom "are individuals

and small-business trade creditors." *In re Tribune Co.*, Nos. 12-cv-1072 et al., 2014 WL 2797042,

at *6 (D. Del. June 18, 2014); (D.I. 93.)

Before trial, the parties stipulated to the monetary impact of the PHONES and EGI

subordination on distributions to the Trustees and holders of Other Parent Claims. (D.I. 109-1 at

---

[4] The LBO is a transaction by which a purchaser acquires an entity using debt secured by assets of the acquired entity. (D.I. 60-1 at 4.)

A95-98.) Among other things, the parties agreed that the Trustees' initial recoveries under the plan would increase from 33.6% (31 million) to 35.9% ($461 million) if they were the only creditors entitled to benefit from the relevant subordination agreements. (D.I. 109-2 at A95-98.) The difference between the Trustees' recovery under the Plan (33.6%) and the Trustees' desired recovery had they been able to enforce all of their alleged subordination rights (35.9%) was 2.9% by recovery percentage. (D.I. 110 at 1.)

During the bankruptcy case, Tribune and its primary creditor constituents negotiated a compromise of various avoidance claims related to the LBO. The holders of the LBO debt agreed to contribute nearly $535 million in guaranteed settlement payments plus litigation trust interest. This produced another $225 million in settlement value. *Tribune I*, 464 B.R. at 153-54. Tribune then proposed its Plan, which provided for the Trustees and holders of Other Parent Claims to share the settlement consideration. (D.I. 109-2 at A118.) The Trustees objected, arguing they alone were entitled to recoveries otherwise allocable to the subordinated PHONES and EGI Notes and that, as a consequence, the Plan unfairly discriminated against them by sharing those recoveries with the class of Other Parent Claims. To address this issue, the Bankruptcy Court established a procedure for resolving this and other "Allocation Disputes." (D.I. 109-2 at A100-03.)

The Bankruptcy Court's 2012 confirmation order came after it had held more than ten days of evidentiary hearings and multiple days of subsequent legal argument; issued a 2011 confirmation opinion on competing plans for reorganization; issued a reconsideration decision after extensive briefing; and held a separate two-day evidentiary hearing and issued an Allocation Ruling that directly addressed the exact inter-creditor disputes raised in the Appellants' appeals. On April 9, 2012, the Bankruptcy Court concluded that even if the Trustees were correct in

asserting that no other creditor could benefit from the PHONES and EGI Subordination Agreements, any discrimination resulting from a sharing of the subordination recoveries was immaterial and permitted by § 1129(b)(1). (D.I. 109-2 at A124-28.) In making this finding, the Bankruptcy Court rejected the Trustees' argument that § 510 of the Bankruptcy Code (the "Code") overrides § 1129(b)(1) and requires "full implementation[,]" or enforcement, of subordination agreements. (D.I. 109-2 at A122-23.)  At the same time, the Bankruptcy Court determined that it was not necessary to decide whether any of the Other Parent claims were entitled to seniority over the PHONES and EGI Notes because the alleged discrimination was not material.  The Bankruptcy Court nevertheless held that the Swap Claim comprising 57% by amount of all the Other Parent Claims was a senior debt just like the LBO itself. (D.I. 109-2 at A119-20 n.19.)  This reduced the alleged discrimination against the Trustees to 0.9% of their initial recovery percentage from 34.5% to 33.6% and made the Plan "even less vulnerable to a charge of 'unfair discrimination.'" (D.I. 109-2 at A119-20 n.19, n.21.)   On December 31, 2012, the Fourth Amended Plan was "substantially consummated" and distributions were made, including the payment of approximately $91 million to over 700 Class 1F Creditors. (D.I. 111 at 4.)

Subsequently, on June 18, 2014, the court determined that the parties' appeals were equitably moot. (D.I. 93.)  Aurelius appealed arguing that the case was not equitably moot and sought a Settlement that was not unreasonably low.  The Trustees appealed, representing certain pre-LBO debt treated as "Class 1E Creditors" in the Plan, arguing that they had subordination agreements with the holders of two series of pre-LBO notes Tribune issued called the PHONES Notes and the EGI Notes which were worth a total of around $30 million. (D.I. 60-1 at 8-9.)  On September 21, 2015, the Court of Appeals for the Third Circuit affirmed the District Court in part

concluding that, while Aurelius' appeal is equitably moot, "the Trustees' appeal is not[.]" (D.I. 102 at 23.) The Third Circuit remanded the matter for a determination on the merits concluding that, in the event the court reverses the Bankruptcy Court, some relief might be fashioned without unraveling the Plan or harming third parties who relied on its confirmation. (D.I. 102 at 4, 23.)

## III.   STANDARD OF REVIEW

### A.   Appellate Review of a Bankruptcy Court Decision[5]

Appeals from the bankruptcy court to this court are governed by 28 U.S.C. § 158. District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1); *In re DNIB Unwind*, No. 16-11084 (BLS), 2017 WL 3396468, at *3 (D. Del. Aug. 8, 2017)(Sleet, J.)

The court reviews for clear error the Bankruptcy Court's finding that the discrimination alleged by the Trustees was immaterial, while reviewing *de novo* the Bankruptcy Court's construction of Section 1129 and relevant provisions of the Bankruptcy Code. *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010)("For mixed questions of law and fact, we will engage in a mixed standard of review, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts."); *Anes v. Dehart*, 195 F.3d 177, 180 (3d Cir. 1999). "In reviewing a case on appeal, the Bankruptcy Court's factual determinations will not be set aside unless they are clearly erroneous." *See Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 641 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992). Under this "mixed standard of review," the appellate court accepts findings of "historical or narrative facts unless clearly erroneous, but exercise[s] plenary review of the trial court's choice

---

[5] The Bankruptcy Court observed, the question of "unfairness" or materiality of alleged discrimination under a plan is "fact-intensive" and "not a pure legal issue." *In re Tribune Co.*, 477 B.R. 465, 472 (Bankr. D. Del. 2012).

and interpretation of legal precepts and its application of those precepts to historical facts." *Id.* at

642 (citation and internal quotation marks omitted).

## IV.   DISCUSSION

On appeal, Appellants challenge the Bankruptcy Court's determination that the

subordination agreements do not have to be enforced.   Specifically, Appellants make three

arguments: (1) that the bankruptcy court erroneously refused to enforce the subordination

agreements, in violation of 11 U.S.C. § 1129(b)(1); (2) even if the subordination agreements were

not enforceable, the bankruptcy court erred in holding the plan does not "discriminate unfairly"

against the Senior Notes; and (3) that the bankruptcy court erred in holding that a contract claim

resulting from Tribune's termination of interest-rate hedges (the "Swap Claim") was senior debt

under the two subordination agreements. (D.I. 109 at 3.)  The court will address each issue in turn.

### B.   Enforcement of the Subordination Agreements is Not Required

#### a.   Textual Analysis of § 1129(b) and § 510(a)

First, Appellants argue that the Bankruptcy Court erred in its reading of § 1129(b)(1)'s

"notwithstanding" provision because the statutory text and legislative intent of the Bankruptcy

Code requires enforcement of the subordination agreement when a plan is being "crammed down"

on dissenting creditors. (D.I. 109 at 1, 8.)   Specifically, Appellants assert that the text of §

1129(b)(1) singles out the only portion of § 1129(a) that does not apply, paragraph eight, and says

that "all" other requirements apply. (D.I. 109 at 11.)  In contrast, Appellees point out that the

Bankruptcy Court previously determined that the Appellants' position regarding the

"notwithstanding" provision "is not supported by relevant decisional law." (D.I. 110 at 13); (D.I.

109-2 at A122.)  The court agrees with the Bankruptcy Court.

Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). Section 1129(b)(1) of the Code, however, provides that the court "shall confirm" a plan over the objection of an impaired dissenting class "*[n]otwithstanding* section 510(a)." 11 U.S.C. § 1129(b)(1). Applying the plain meaning of the word "notwithstanding," the Bankruptcy Court held that the "notwithstanding" provision meant that Section 1129(b) "is applied without prevention or obstruction of any applicable subordination agreement." (D.I. 109-2 at A123); (D.I. 110 at 12.) In making its conclusion, the Bankruptcy Court utilized the Third Circuit decision *In re Goody's Family Clothing, Inc.*, which held that "notwithstanding" as used in a different section of the bankruptcy code "means 'in spite of' or 'without prevention or obstruction from or by.'" 610 F.3d 812, 817 (3d Cir. 2010), *aff'd by In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 369 (3d Cir. 2012); (D.I. 109-2 at A123.) The Bankruptcy Court observed that "presumptively, identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484-85 (1990); *see United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); (D.I. 109-2 at A123.) Other courts to consider the issue have reached the same conclusion. *In re TCI2 Holdings*, 428 B.R. 117, 141 (Bankr. D.N.J. 2010); *In re Croatan Surf Club, LLC*, No. 11-00194-8-SWH, 2011 WL 5909199 at *2 (Bankr. E.D.N.C. Oct. 25, 2011). In *TCI2*, the court stated:

> The only logical reading of the term "notwithstanding" in section 1129(b)(1) seems to be: "Even though section 510(a) requires the enforceability of subordination agreements in a bankruptcy case to the same extent that the agreement is enforceable under nonbankruptcy law, if a nonconsensual plan meets all of the § 1129(a) and (b) requirements, the court 'shall confirm the plan.'" The phrase "[n]othwithstanding section 510(a) of this title" removes

> section 510(a) from the scope of section 1129(a)(1), which requires
> compliance with "the applicable provisions of this title."

*TCI2*, 428 B.R. at 141. Similarly, the *Croatan Surf* court held that:

> § 510(a) was not intended to give parties *carte blanche* to override
> other provisions of the Bankruptcy Code. This is evident in the
> language of § 1129(b) which allows a court to confirm a plan if it
> "does not discriminate unfairly, and is fair and equitable,"
> "notwithstanding section 510(a) of this title.". . . Therefore, a court
> can confirm a plan which disrupts bargained for priority, and thus is
> inconsistent with the terms of a subordination agreement, as long as
> it is fair and equitable and does not discriminate unfairly.

*Croatan Surf*, 2011 WL 5909199 at *2. Therefore, the statutory text of the § 1129(b)(1)

"notwithstanding" provision permits the Bankruptcy Court to confirm a plan over the objection of

a dissenting class where "the plan does not discriminate unfairly, and is fair and equitable," even

if the plan does not fully and completely enforce a subordination agreement. (D.I. 110 at 14.)  The

court, thus, believes the statutory text *alone* supports the Bankruptcy Court's interpretation.

### b.  Legislative History of § 1129(b) and § 510(a)

Next, Appellants assert that the legislative history of the "notwithstanding" *proviso* in §

1129(b) should be considered because the Bankruptcy Court's "preferred reading of the statutory

text is plainly at variance with the policy of the legislation as a whole" and leads to "absurd

results." (D.I. 112 at 7-8); (D.I. 109 at 11-13.) The court cannot agree.

The United States Supreme Court has held that legislative history has no role in the

interpretation of an ambiguous statute. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546,

568 (2005).[6]  It may be appropriate, however, to consider legislative history when an ambiguous

---

[6] "[L]egislative history is itself often murky, ambiguous, and contradictory." Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983); *see Exxon Mobil*, 545 U.S. at 568.

statute has "two equally plausible readings of statutory text" or when "the statutory language does

not express Congress's intent unequivocally[.]" *Bruesewitz v. Wyeth*, 561 F.3d 233, 240, 244 (3d

Cir. 2009)(citing *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir.2000)). Here, however, there

is only one plausible reading of the statute.[7]  As Appellees point out, the Bankruptcy Code does

not prohibit all disparity in plan treatment, only *unfair* discrimination. *Armstrong*, 348 B.R. at 121;

(D.I. 110 at 17.)  Recognizing that there is no law of the District of Delaware, courts in this District

have rejected the assertion that the legislative history sheds any light on the meaning of unfair

discrimination. *Armstrong*, 348 B.R. at 121. "Unfair discrimination [as used in § 1129(b)(1)]  is

not defined in the Bankruptcy Code, nor does the statute's legislative history provide guidance as

to its interpretation." *Armstrong*, 348 B.R. at 121; *In the Matter of Johns–Manville Corp.*, 68 B.R.

618, 636 (Bankr. S.D.N.Y. 1986); Bruce A. Markell, *A New Perspective on Unfair Discrimination

in Chapter 11*, 72 AM. BANK. L. J. 227, 237-38 (1998)(the examples of unfair discrimination in

the legislative history have been described as "roundabout, almost otiose.").[8]

Even if the court were to consider the legislative history, it still finds no error in the

Bankruptcy Court's approach.  The Bankruptcy Court rejected the Appellants' assertion that a plan

must strictly enforce a subordination agreement without exception and, instead, determined that a

subordination agreement does not transform the rule against unfair discrimination into a strict

---

[7] Appellants claim that the Third Circuit "has held the legislative history of Section 1129(b) to be an 'authoritative' and persuasive guide to Congress's intent." (D.I. 109 at 13.) (quoting *In re Armstrong World Indus.*, 432 F.3d 507, 513 (3d Cir. 2005)). *Armstrong*, however, merely observes that House Report 95-595, in contrast to other legislative materials relating to the 1978 Bankruptcy Code, "has been considered an authoritative source of legislative history for section 1129(b)." *Armstrong*, 432 F.3d at 513. The Third Circuit ultimately "appl[ied] the plain meaning of the statute" without relying upon legislative history. *Id.*; (D.I. 110 at 17.)

[8] Appellants argue for the first time that the Bankruptcy Court's holding violates the Fifth Amendment by "allow[ing] judicial confirmation of reorganization plans that trample private parties' contractual rights to subordination." (D.I. 109 at 15.) Appellees argue that because the Appellants did not make this argument below, it is waived. (D.I. 110 at 17); *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006). The court agrees and will not consider, for the first time absent exceptional circumstances, an argument not raised below.

prohibition against all disparity in treatment. (D.I. 110 at 17.)  Appellees assert that beneficiaries of a subordination agreement are entitled to the same protections under § 1129(b)(1) as all other creditors, but they are not entitled to enhanced protections by virtue of inter-creditor arrangement negotiations prior to the bankruptcy case. (D.I. 110 at 17.)  Adopting the Appellants' interpretation would require the court to enforce alleged subordination rights without considering the extent to which they suffered economic harm. This reading is inconsistent with the flexibility of the unfair discrimination inquiry and Chapter 11, generally. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525-27 (1984) ("policies of flexibility and equity [are] built into Chapter 11 of the Bankruptcy Code"); 7 COLLIER ON BANKRUPTCY ¶ 1129.03 (16th ed. 2015).[9]

Finally, Appellants assert that the Bankruptcy Court's holding has "allow[s] abandonment of subordination agreements when a plan is being forced upon dissenting creditors but require[es] enforcement of subordination agreements when a reorganization plan enjoys unanimous creditor support." (D.I. 109 at 1.)  To support their assertion, Appellants cite to an Article written by Professor Klee.  Professor Klee, who served as an Examiner in this case, explained that in a cramdown under Section 1129(b), "the subordination agreement will be enforced through the *fair and equitable test*[.]" Klee, 53 AM. BANKR. L.J. at 142 n.70.  The fair and equitable test, however, is not at issue in this case. *Id.*  Even if the fair and equitable test were at issue, Professor Klee's Article supports the Bankruptcy Court's conclusion. Professor Klee explained that the unfair discrimination test "permit[s] the court to evaluate the complex relationship inherent in the relative

---

[9] As the Bankruptcy Court noted, the example in the House Report confirms that "the Plan's proposed effect to the [Trustees] passes muster." (D.I. 109-2 at A127-28 n.23.)  Specifically, the House Report concludes, in an example, that senior debt's receipt of $25 was unfair discrimination where it was entitled to receive $30 on the basis of contractual subordination rights. H.R. REP. NO. 95-595, at 416 (1977). On a percentage basis, that discrimination was several multiples greater than the discrimination alleged by the Trustees and more than six times greater if, as the Bankruptcy Court found, the Swap Claim also was entitled to seniority.

classes caused by partial subordination" and "protects the senior class . . . from being treated unfairly." *Id.* at 141-42, n.70.  Professor Klee, therefore, did not advance a statutory interpretation requiring absolute enforcement of a subordination agreement no matter how immaterial the resulting discrimination. (D.I. 110 at 15.)  Similarly, Professor Klee's 1995 Article explains that § 1129(b)(1), in his opinion, "appears to have the anomalous result of overriding § 510(a) and eliminating enforcement of subordination agreements" in cramdown cases. Kenneth N. Klee, *Adjusting Chapter 11: Fine Tuning The Plan Process*, 69 AM. BANK. L.J. 551, 561 (1995).  In this Article, Professor Klee suggests that Congress amend the statute to remove the introductory clause to § 1129(b)(1), which Congress did not. *Id.*; *TCI2*, 429 B.R. at 141.  An interpretation of Section 1129(b)(1) that would render such subordination unenforceable, therefore, cannot be reconciled with the clear legislative intent that such agreements would be enforced against cramdown plans under that provision.

Simply put, the Bankruptcy Court properly determined that it was not required to enforce the subordination agreements pursuant to § 510(a).

### C.   The Plan Did Not Unfairly Discriminate Against Senior Noteholders

Next, Appellants take issue with the Bankruptcy Court's holding that the Plan did not discriminate unfairly against Senior Noteholders.  (D.I. 109 at 17.)[10]  Specifically, Appellants assert that when the Bankruptcy Court considered whether the DCL Plan's violation of the Senior Noteholders' subordination rights amounted to unfair discrimination against them, it made two

---

[10] The parties stipulated that the Senior Noteholders received a 21.9% recovery from Tribune's estate, with the rest of their payment coming from the partial enforcement of the subordination agreements. (D.I. 112 at 10.) The Class 1F (Other Parent Claims) received a 33.6% recovery from Tribune's estate if one assumes they were not entitled to recover under the subordination agreements. (D.I. 112 at 10.) According to Appellants, because Class 1F received a 53% higher percentage recovery from the estate than Senior Noteholders, this is a "materially lower percentage recovery for the dissenting class" establishing a rebuttable presumption of unfair discrimination prohibited by § 1129(b)(1). (D.I. 112 at 10-11); (D.I. 109 at 7); (D.I. 109-2 at A127-28.)

main legal errors: (1) it refused to evaluate the difference in the DCL Plan's treatment of the two classes—Class 1E and Class 1F; and (2) the Bankruptcy Court justified that conclusion by "erroneously suggesting, in a footnote, that the subordination agreements contractually entitled the Swap Claim—which made up 57% of Class 1F—to benefit from the subordination recoveries." (D.I. 109 at 16-17.)  In contrast, Appellees assert that the Bankruptcy Court properly concluded that the Other Parent Claims benefit from subordination of the PHONES and EGI Notes. (D.I. 110 at 8.)  Nevertheless, the Bankruptcy Court concluded that even if Appellants were correct, the Plan did not discriminate unfairly. (D.I. 110 at 8.)

Section 1129(b)(1) of the Bankruptcy Code provides:

> [n]otwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not *discriminate unfairly*, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  To cram a plan down the throats of dissenting creditors, the plan proponent must specifically request it, or it must be evident by the provisions of the plan that cramdown is the only method by which the plan may be confirmed.  Section 1129(b)(1) articulates two independent tests that a plan proponent must satisfy to confirm a plan over dissenting creditors. First, the plan must not "discriminate unfairly;" and second, the plan must be "fair and equitable." 11 U.S.C. § 1129(b)(1).

As explained earlier, the Bankruptcy Code does not define unfair discrimination, nor does the statute's legislative history provide guidance as to its interpretation. *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006); *In the Matter of Johns–Manville Corp.*, 68 B.R.

618, 636 (Bankr. S.D.N.Y. 1986). Consequently, courts have developed several methods to determine whether a proposed plan unfairly discriminates against a dissenting class. "The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination." *In the Matter of Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003). Traditionally, courts applied a four-factor test to determine unfair discrimination. The factors considered are:

> (1) whether the discrimination is supported by a reasonable basis;
> (2) whether the debtor could consummate the plan without the discrimination;
> (3) whether the discrimination is proposed in good faith; and
> (4) the relationship between the discrimination and its basis or rationale.

*In re Ambanc La Mesa Limited Partnership*, 115 F.3d 650, 656 (9th Cir. 1997); *In re Dow Corning Corp.*, 244 B.R. 696, 700 n. 3 (Bankr. E.D. Mich. 1999) (listing cases applying four-factor test). In *Dow Corning*, the bankruptcy court in the Eastern District of Michigan noted that some courts had pared the four-factor test down to two factors: (1) whether the discrimination is supported by a legally acceptable rationale; and (2) whether the discrimination is necessary "in light of the rationale." 244 B.R. at 701 n. 5; *Armstrong*, 348 B.R. at 121.

More recently, several courts have replaced the four-factor test with a rebuttable presumption test, first proposed in an Article by Professor Bruce A. Markell in the AMERICAN BANKRUPTCY LAW JOURNAL. *See Dow Corning*, 244 B.R. at 701 (citing Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L. J. 227 (1998)). In this analysis, a rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3)
> a *difference in the plan's treatment of the two classes* that results in
> either (a) a *materially lower percentage recovery* for the dissenting
> class (measured in terms of the net present value of all payments),
> or (b) regardless of percentage recovery, an allocation under the plan
> of materially greater risk to the dissenting class in connection with
> its proposed distribution.

*Dow Corning*, 244 B.R. at 702. If there is an allegation of a materially lower percentage recovery,

the presumption can be rebutted "by showing that, outside of bankruptcy, the dissenting class

would similarly receive less than the class receiving a greater recovery, or that the alleged preferred

class had infused new value into the reorganization which offset its gain." *Id.* A demonstration

that the risk allocation was similar to the risk assumed by the parties prior to bankruptcy can rebut

the presumption that a discriminatory risk allocation was unfair. *Id.* The bankruptcy court in *Dow*

*Corning* found Professor Markell's test to more effectively target unfair discrimination than did

the four-factor test, and therefore adopted and applied the rebuttable presumption standard. *Id.*;

*see In the Matter of Greate Bay Hotel & Casino. Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J .2000).

Although the Third Circuit has not yet discussed what standard should apply when

assessing unfair discrimination, based on the parties' arguments, it appears to the court that the

parties agree the Markell rebuttable presumption test (the "Markell Test") is applicable in the

instant case. Notably, the Bankruptcy Court expressly adopted this test for analyzing the unfair

discrimination issue of § 1129(b). (D.I. 109-2 at A124.) The court will therefore apply the Markell

Test. *Armstrong*, 348 B.R. at 121–22. Section 1129(b)(1)'s unfair discrimination standard

"ensures that a dissenting class will receive relative value equal to the value given to all other

similarly situated classes. The pertinent inquiry is not whether the plan discriminates, but whether

the proposed discrimination is unfair." *Armstrong*, 348 B.R. at 121. The Bankruptcy Court

explained that "[m]inor or immaterial differences in the plan treatment do not rise to the level of *unfair* discrimination." (D.I. 109-2 at A124)(citing *Unbreakable Nation*, 437 B.R. at 203)(explaining that the difference between 1.5% and 1.25% in a proposed distribution to two classes was not unfair discrimination).

Appellants assert that "[u]nfair discrimination under Section 1129(b)(1) turns on the 'difference in the plan's treatment' of the dissenting class versus its treatment of another class of the same priority—excluding funds turned over among creditors under subordination agreements." (D.I. 109 at 19) (quoting *Armstrong*, 348 B.R. at 121); (D.I. 112 at 10.) In contrast, Appellee asserts that when a plan provides different treatment to similarly situated classes, the court presumes that the discrimination is unfair, but only if the difference in treatment results in "a materially lower percentage recovery for the dissenting class." (D.I. 110 at 9); *Dow Corning*, 244 B.R. at 702; *Armstrong*, 348 B.R. at 121. The court must, therefore, decide under the circumstances of this case whether the amount designated for the Appellants is materially lower recovery than designated for the holders of Other Parent Claims. Minor or immaterial differences in the plan do not rise to the level of unfair discrimination. *Unbreakable Nation*, 473 B.R. at 203. Here, the Appellants—the dissenting class—received a percentage recovery that was, at most, 2.3 percentage points lower than the recovery to which they claim they are entitled. (D.I. 110 at 9.) The Bankruptcy Court concluded that "[t]he discriminatory effect on the dissenting class is immaterial and, therefore, no rebuttable presumption of unfair discrimination arises." (D.I. 109-2 at A128); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000)("[c]ourts which have rejected confirmation on the basis of unfair discrimination have confronted plans proposing grossly disproportionate treatment (50% or more) to similarly situated creditors."). (D.I.

16

109-2 at A126); (D.I. 110 at 9.)  While the actual amount of money at issue is large, the percentage

difference is not significant or material. (D.I. 109-2 at A125-26.)

> **D.**    **The Swap Claim is Entitled to Seniority Under the Subordination Agreements**

Appellants assert that the "bankruptcy court erroneously concluded, in a footnote, that the

DCL Plan is 'even less vulnerable' to a charge of 'unfair discrimination' because the subordination

agreements entitled Class 1F's largest member—the Swap Claim—to receive a share of the

subordinate noteholders' recovery." (D.I. 109 at 23); (D.I. 109-2 at A119, n.19.)    Specifically,

Appellants assert the Bankruptcy Court "committed legal error, reviewed *de novo*, in holding that

the Swap Claim was 'Senior Indebtedness' (as defined in the PHONES agreement) and a 'Senior

Obligation' (as defined in the EGI agreement)." (D.I. 109 at 23, 26.)  In contrast, Appellee argues

that entitlements to seniority under the subordination agreements were heavily litigated in the

Bankruptcy Court and holders of the Swap Claim ($151 million) and the retiree claims ($105

million), which comprised 97% of all Other Parent Claims, filed "voluminous" briefs arguing that

their claims were senior obligations like the Appellants' Senior Notes. (D.I. 110 at 21); *In re*

*Spansion, Inc.*, 426 B.R. 114, 148-51 (Bankr. D. Del. 2010) (The Bankruptcy Court has particular

expertise in interpreting subordination agreements); (D.I. 110 at 22.)  Because the Plan's alleged

discrimination would have been immaterial if none of the Other Parent Claims were entitled to

seniority, the Bankruptcy Court ultimately held that it "need not decide" those entitlements. (D.I.

109-2 at A119.)    Nevertheless, the Bankruptcy Court believed the entitlements were "easily

determined" and concluded that the largest of the Other Parent Claims, the $151 million Swap

Claim, was a senior obligation entitled to share equally with Appellants' claim. (D.I. 109-2 at

A119-20 n.19.) This reduced the alleged discrimination against Appellants to 0.9% of their initial

recovery percentage from 34.5% to 33.6% and made the plan "even less vulnerable to a charge of 'unfair discrimination.'" (D.I. 109-2 at A119-25 n.19, n.21.) The court, thus, finds no reason to deviate from the Bankruptcy Court's conclusions. Nevertheless, the court will address each of Appellants' arguments on appeal in turn.

### a. Senior Indebtedness under the PHONES Indenture to EGI

First, Appellants argue that the PHONES Notes are subordinate in the right of any bankruptcy recovery to "Senior Indebtedness." (D.I. 109 at 23.) Appellants assert that "the bankruptcy court erroneously held that a claim asserted in connection with the Swap Agreement represented an 'other amount[] due . . . in connection with' the LBO Lenders' Credit Agreement, and thus was entitled to recoveries turned over by the PHONES noteholders under the PHONES indenture." (D.I. 109-2 at A119 n.19); (D.I. 109 at 23.)   Appellants assert that the ordinary meaning of "other amounts due on or in connection with any Indebtedness[,]" refers to ancillary fees and payments arising out of the LBO indebtedness itself—like closing costs, bank charges, or attorneys' fees. (D.I. 109 at 24); (D.I. 109-2 at A119-20 n.19.) The text, however, does not support this interpretation. The plain meaning of the phrase "in connection with any Indebtedness" includes obligations that the Credit Agreement compelled Tribune to incur. (D.I. 110 at 24.)

"Senior Indebtedness" that benefits from subordination under § 14.01(2) of the PHONES Notes is defined, in relevant part, as follows:

> "Senior Indebtedness" means the principal of (and premium, if any) and interest on . . . and *other amounts due on or in connection with* any Indebtedness of [Tribune] incurred, assumed or guaranteed and all renewals, extensions and refundings of any such Indebtedness of [Tribune] the Company . . . .

(D.I. 110 at 23); (D.I. 109 at 23); (D.I. 109-1 at A70.)  Aiding the court's interpretation, the

PHONES Indenture defined "Indebtedness" to include "(i) all obligations represented by notes,

bonds, debentures or similar evidences of indebtedness; [and] (ii) all indebtedness for borrowed

money." (D.I. 109-1 at A70.)  The Swap Claim qualified under both parts of this definition.  First,

the Swap Claim bore interest, gave rise to contractual rights of set off, was guaranteed by Tribune's

subsidiaries, and, therefore, was "similar evidence of indebtedness."  Second, Tribune regularly

reported the Swap Claim as "Debt" in its financial statements,[11] and the Credit Agreement treated

swap liability as indebtedness for borrowed money. (D.I. 110-2 at SA28). The Swap Claim, thus,

qualified as "indebtedness for borrowed money."

Similarly, it is undisputed that Tribune's obligations under the Credit Agreement were

"Senior Indebtedness" under the PHONES Indenture. *Id.*  The swap claim is connected to the

Credit Agreement because Tribune subsidiaries guaranteed Tribune's obligations in respect of both

the Credit Agreement and the Swap Agreement, in the same document, and on the same terms.

The Guarantee Agreement combined all obligations under the Swap Agreement and the Credit

Agreement in the same defined term "Guaranteed Obligations," treating them the same. (D.I. 110-

1 at SA53).  Thus, if the amounts due under the Swap Agreement were not "in connection with"

the Credit Agreement, it is hard to determine what kind of obligation is covered by the phrase. *See*

*Thompson v. Gordon*, 948 N.E. 2d 39, 47 (Ill. 2011) (under Illinois law, "contract must be

construed as a whole, viewing each provision in light of the other provisions"); *Lukasik v. Riddell,*

---

[11] Though the Bankruptcy Court initially believed the subordination provisions relating to both the PHONES Notes and EGI Notes were ambiguous regarding the relative seniority, after reviewing the parol evidence presented by both parties the Bankruptcy Court determined that "the collective, contemporaneous understanding of the parties negotiating the LBO was that the EGI Notes would be the most junior in Tribune's capital structure." (D.I. 109-2 at A128-30, A137.) Thus, the Bankruptcy Court properly concluded that the PHONES Notes are senior to the EGI Notes. (D.I. 109-2 at 137.)

*Inc.*, 452 N.E. 2d 55, 60 (Ill. App. Ct. 1983) (under Illinois law, "agreement is to be construed to give meaning to all parts and the court must avoid a construction which renders some provisions superfluous"). Thus, Tribune's obligations under the Swap Agreement were amounts due "in connection with" the Credit Agreement because the Credit Agreement required Tribune to hedge its variable-rate Credit Agreement debt with fixed rate obligations. (D.I. 110 at 22.)[12]

### b. The Swap Claim is a Senior Obligation under the EGI Subordination Agreement

Next, Appellants assert that the EGI Notes are subordinate to "Senior Obligations." (D.I. 109 at 26.)  Paragraph 1 of the EGI Subordination Agreement defines a "Senior Obligation" to exclude "trade payables and accrued expenses incurred in the ordinary course of business." *Id.*; (D.I. 109-1 at A78); (D.I. 109-2 at A128.)  Appellants take issue with a four line footnote where the Bankruptcy Court rejected the Appellants' argument, holding that the definition of "Senior Obligations" under the EGI subordination agreement is "even broader" than the definition of Senior Indebtedness under the PHONES Indenture. (D.I. 109-2 at A119- 20 n.19).  According to Appellants, without further explanation or mention of the applicable exclusion from that definition, the Bankruptcy Court assumed that the Swap Claim must be a "Senior Obligation." (D.I. 109-2 at A119 n.19.)[13]  Under the EGI Subordination Agreement, "Senior Obligations" are defined in relevant part as:

---

[12] Appellants also assert that the Swap Claim was not debt because it is "an early termination charge calculated based on whether the parties' respective payment obligations to one another . . . were in the money or out of it." (D.I. 109 at 25.)  Notwithstanding Appellants position on the matter, a contingent obligation is still a debt. The PHONES Notes provided for payment of a "Contingent Principal Amount" that was to "be reduced on a quarterly basis to the extent necessary such that the yield to the date of computation" did not exceed a specified maximum level. (D.I. 110-2 at SA62-63).  Importantly, Appellants conceded below that the Swap Claim was entitled to seniority under both the PHONES and EGI subordination agreements. (D.I. 110 at 26.)

[13] In footnote note 21, referenced by footnote 19, the Bankruptcy Court explains that "[i]f both the Senior Noteholders *and* the Swap Claim benefit from the subordination provisions, the decrease in the Senior Noteholders' percentage recovery is even smaller. (*See* n.19, *supra.*)" (D.I. 109-2 at A125 n.21.)  Despite Appellants' contention,

> [A]ll obligations, indebtedness and other liabilities of the Company
> other than . . . trade payables and *accrued expenses incurred in the
> ordinary course of business*, in each case, whether incurred on or
> prior to the date hereof or hereafter incurred.

(D.I. 109-2 at A78); (D.I. 110 at 26.)

While Appellants argue that the Swap Claim was an "accrued expense incurred in the
ordinary course of business[,]" the court cannot agree. (D.I. 109 at 26.) First, as noted above,
Tribune's financial statements accounted for the Swap Claim as either short-term or long-term
debt and not as an "accrued expense."(D.I. 110 at 26-27.) Second, the Swap Claim was not
incurred in the "ordinary course of business." The Swap Claim was incurred in connection with
the Credit Agreement and the financing of the $12 billion LBO, which was anything but "ordinary"
and the very transaction the Trustees asserted to be the basis for billions of dollars of fraudulent
conveyance causes of action. (D.I. 109-2 at A176-77.) Finally, Appellants cite nothing to support
the proposition that interest rate hedging agreements, particularly hedging agreements the size of
the Swap Agreement, were an ordinary business practice of Tribune. (D.I. 110 at 27.)

The court therefore concludes that the Swap Claim is a senior obligation as defined by the
EGI subordination agreement and believes the Bankruptcy Court properly concluded that the Plan
did not unfairly discriminate against Senior Noteholders.

## V. CONCLUSION

For the reasons stated above, the court will affirm the Bankruptcy Court's Confirmation
Order and Memorandum Regarding Allocation of Disputes.

---

the Bankruptcy Court clearly explained why the Swap Claim is a Senior Obligation. In doing so, the Bankruptcy Court
provided for a higher recovery than it would have received otherwise.

Dated: July 30, 2018

UNITED STATES DISTRICT JUDGE